John E. Mitchell, SBT # 00797095
Rosa A. Shirley, SBT # 24056313
**BAKER & McKENZIE LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 2300
Dallas, Texas 75201
Tel: (214) 978-3000
Fax: (214) 978-3099
Email: john.mitchell@bakermckenzie.com
Email: rosa.shirley@bakermckenzie.com

**PROPOSED ATTORNEYS FOR THE DEBTORS**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **BUFFET PARTNERS, L.P., et al.** | § | **CASE NO. 14-30699-11** |
| | § | |
| **DEBTORS.** [1] | § | **CHAPTER 11** |
| | § | |
| | § | |
| | § | |

**DECLARATION OF BARRY M. BARRON, SR.
IN SUPPORT OF DEBTORS' VOLUNTARY PETITIONS UNDER CHAPTER 11 OF
TITLE 11 OF THE UNITED STATES CODE AND FIRST DAY MOTIONS**

I, Barry M. Barron, Sr., state as follows:

## INTRODUCTION

1.     I am the Chief Executive Officer of Buffet Partners G.P., Inc. ("Buffet G.P.") the

general partner of Buffet Partners, L.P. ("Buffet Partners"). I was hired as the Debtors' CEO in

May, 2013. Since my hiring, I have been actively involved in the management of the Debtors'

business operations. These efforts included not only regular operations, but I have also been

actively engaged in addressing the Debtors' cash and liquidity issues, as well as implementing

other pre-bankruptcy restructuring initiatives.

---

[1] The Debtors in these chapter 11 cases are Buffet Partners, L.P. and Buffet G.P., Inc.

2.    Recently, I have been actively engaged in the preparations for the Debtors to enter Chapter 11.  I have reviewed and was integrally involved in the Debtors' preparations of its business plans, budgeting, decision to file Chapter 11, and all relief sought in the Emergency First Day Motions.

3.    I am an accomplished franchising executive in the restaurant and retail/financial services industries with more than 30 years of continued experience.  I am highly qualified in growing businesses through new development and acquisition, and have extensive experience growing and operating international and domestic business for public companies and smaller private organizations.  My career includes experience with well-respected companies including Host International, PepsiCo, Papa Johns International and Ace Cash Express.  I was most recently Chief Operating Officer and Executive Vice President of Ace Cash Express.

4.    Except as otherwise indicated, all facts wet forth in this affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion, based upon my experience and knowledge of the Debtors' operations and financial condition or information reported to me in the course of my duties by the Debtors' officers, agents or employees.  If I were called to testify, I could and would testify competantly to the facts set forth herein.  I am authorized to submit this affidavit.

## BACKGROUND

### Company Overview

5.    Headquartered in Plano, Texas, Buffet Partners, L.P., d/b/a Furr's Fresh Buffet ("Furr's," the "Company" or the "Debtor(s)"), is a well-recognized, value oriented restaurant chain with  29 restaurants in Arizona, Arkansas, New Mexico, Oklahoma and Texas, generating in excess of $100 million in revenue.  With a rich, 65+ year operating history and strong brand

awareness, Furr's operates straight-line and scatter-bar buffet units that feature a wide variety of "all-you-can-eat," "home-cooked," high quality foods served with personalized service at an affordable price ($9.00 average guest check).

6.    Furr's provides a compelling price-to-value relationship which results in high average sales per restaurant, relatively low labor costs and attractive unit economic returns.  The Company enjoys a unique competitive advantage through its Dynamic Foods division ("Dynamic Foods" or "Dynamic"), a fully integrated food processing, manufacturing, warehousing and distribution operation centrally located in Lubbock, Texas, that services Furr's restaurants and a host of external customers.

7.    Furr's is one of the longest-tenured and most recognized restaurant brands in the Southwest.  The restaurant was founded in 1946 by Roy Furr, and expanded to approximately 60 locations as a family-owned business for over 35 years.  In 1980, it was acquired by Kmart Corporation.  Kmart ultimately sold Furr's in a leveraged buy-out which subsequently went public in 1986.  Following a take private transaction, the Company entered a period of decline due to its debt burden, culminating in a restructuring and reorganization under chapter 11 in 2003 in Dallas, Texas (*In re Cafeteria Operators, L.P.*, Case No. 03-30179-HDH-11, Bankr. N.D. Tex).

8.    Recognizing the strength of the brand, attractive restaurant locations and vertically integrated food processing capabilities, Buffet Partners, L.P. was formed to purchase Furr's in September of 2003.  Under Buffet Partners' ownership, management systematically shifted the business to the Furr's Fresh Buffet (scatter-bar) concept while closing underperforming straight-line units.  Furr's hired me in May, 2013.  I am a seasoned restaurant industry veteran, and I will oversee the next phase of the Company's growth.  Additionally,

Furr's has a highly experienced and committed management team with over 160 years of combined restaurant experience and an average of 14 years with Furr's.

**Operations and Financial Performance**

9.      Today, the Company operates 29 restaurants, of which 12 are scatter-bar concepts and 17 are straight-line concepts, in five states throughout the Southwest. All restaurants are Company owned, and all are assets of Buffet Partners, L.P., including Dynamic Foods. Restaurants are supported by Dynamic Foods, a captive, vertically integrated food processing and distribution operation. Approximately 2080 persons are employed at the restaurants, 200 are employed by Dynamic Foods, and approximately 20 persons are employed at the corporate headquarters in Plano, Texas.

10.      Furr's continues to strategically convert its restaurant portfolio to the Furr's Fresh Buffet (scatter-bar) concept that generates over $4 million in average annual unit volume, and higher profit per store. Additionally, Dynamic's sales have nearly doubled since 2009, and with capacity utilization only near 50%, Dynamic and the Company have substantial upside growth opportunities, to service both an increased number of Furr's units as well as external customers.

11.      For the year ending December 2013, Furr's total net sales for restaurant operations exceeded $100 million. Dynamic's total net sales for the same period exceeded $59 million, with over $14 million from external customers. Furr's serviced almost 11 million guests in 2013, with an unadjusted EBITDA for 2013 of $2.7 million. In 2012 the Company's EBITDA approximated $5.8 million and guest count approximated 12.8 million. Reduction in sales, EBITDA and guest count are attributed in part to the closure of several stores.

**Assets, Liabilities, & Capital Structure**

12.     Furr's assets consist primarily of the 29 operating restaurants, each leased from multiple different landlords, and the real estate, personal property, vehicles, and other assets at the Lubbock, Texas, Dynamic Foods facility, and the Plano corporate headquarters. Furr's liabilities consist primarily of $39 million in senior, secured debts of Chatham Capital Partners ("Chatham"), and its affiliated funds, as well as approximately $4 million in trade payables to miscellaneous vendors, suppliers and other parties, and undetermined liabilities to landlords of closed store locations. All of Furr's assets, to include its cash, are pledged to Chatham on a senior, secured basis. Upon belief, the value of the Company's assets, whether valued in a liquidation or as a going concern, are materially below the aggregate amount of the Chatham debt.

**Reasons for Filing Chapter 11**

13.     Furr's has weathered the macro-economic storm that began in 2008, but the credit constraints resulting from the financial crisis impacted the Company's ability to finance growth and improvements in process, and subjected the Debtors to higher interest and leasing rates. Further, commodity and transportation prices increased, and the recessionary climate limited the Company's ability to raise prices to cover increasing costs, and impacted guest counts. Certain locations began to suffer and the Company became increasingly undercapitalized. One of the most successful cash flow locations was lost in an eminent domain proceeding, and a major competitor began direct attacks on the Company. Specific locations subject to these factors began to lose money. The Company did not act to close stores quickly while assessing losses and duration of the recession, wanting to preserve jobs, investment and store locations. The

economic climate and onerous lease terms however could not sustain continued operation of stores producing losses, and these stores were closed.

14. Furr's has begun implementation of a footprint rationalization strategy to streamline its restaurant portfolio and focus on its strongest locations, while maintaining strong revenue of $113 million for the year ending 2013. In implementing this strategy, net store closures of 16 units in the last three years resulted in a decrease in revenues of approximately $19.6 million. The decline was offset partially by new, high revenue Furr's Fresh Buffet units and strong external sales at Dynamic. While gross margin remained flat at around 60%, EBITDA decreased approximately $3.0 million from $5.8 million to $2.7 million in 2013 due primarily to the effect of the store closures, a drop in guest count of almost 2 million, increased G&A expense, deferred maintenance, and continuing economic uncertainty.

15. Overall liquidity was impacted by capital spending on new stores in support of expansion of the scatter-line buffet concept and needed maintenance that had been deferred on older stores. In December the Texas market suffered an ice storm and unusually cold weather, causing a significant loss in guest count and hundreds of thousands of dollars in lost profit. This was detrimental to already tenuous liquidity, and with no available line of credit, the Debtors were unable to continue to weather the financial storm, eventually leading to the chapter 11 filing.

16. Under my leadership, new operating initiatives and cost saving programs are positively impacting sales and operating profits at the restaurants. The Company is developing and implementing strategies to buy more efficiently, and improve credit and terms with its vendor base. Dynamic Foods external sales continue to be strong and the business is actively pursuing several opportunities with new customers.

17.     On December 31, 2013, the Company decided to retain Bridgepoint Consulting, LLC ("Bridgepoint") as financial advisor, to assist the Company with cash management, restructuring analysis and other similar financial advisory services.   While Bridgepoint's expertise in these areas greatly improved the Company's cash management, the ongoing liabilities of the Company were deemed unsustainable with the current diminished cash flow and lack of vendor credit.   Accordingly, on February 4, 2014, the Company commenced these proceedings to afford it an opportunity to restructure its affairs.

18.     I believe that the core, operating business is sustainable and will be successful over the long term, so long as it has the ability to restructure its balance sheet and de-lever the Company.

## "FIRST DAY" MOTIONS

19.     I have reviewed the various pleadings filed contemporaneously herewith and discussed herein (the "First Day Motions").[2]  The allegations contained in each of the First Day Motions are true and correct to the best of my knowledge, information and belief, and as more specifically described herein:

### Debtors' Emergency Motion to Extend Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs

20.     On the Petition Date, each of the Debtors filed with this Court a list of its twenty (20) largest unsecured creditors.   However, the volume of material that must be compiled and reviewed by the Debtors' staff to complete the Schedules and Statement of Financial Affairs (the "Schedules and Statement") for the Debtors during the early days of these Cases provides ample cause justifying this requested extension.

---

[2] Capitalized terms not defined herein shall have the meaning given to them in their respective First Day Motions.

21.     The Debtors must compile information from books, records, and documents relating to a large number of trade vendors, employees, customers, assets, organizational documents, loan documents, contracts, and real estate and equipment leases to prepare their Schedules and Statements.  This required information is voluminous and is located in various places in which the Debtors conduct their businesses, including Plano, Lubbock and with the third party accounting services provider, ISS.  Thus, collecting and processing the necessary information requires the Debtors' staff to expend an enormous amount of time and effort.

22.     Further, while the Debtors are organizing their employees to work diligently and expeditiously to prepare the Schedules and Statements, the Debtors' resources are limited.  As a result of the amount of work required to complete the Schedules and Statements and the competing demands upon the Debtors' employees and professionals to assist in efforts to stabilize business operations and communicate with creditors and customers, during the initial postpetition period, the Debtors will not be able to properly and accurately complete the Schedules and Statements within the required fourteen (14) day time period.  Given the significant burdens already imposed on the Debtors' management by the commencement of these chapter 11 cases, the Debtors request additional time to complete and file the required Schedules and Statements.  The Debtors currently anticipate that it will require until March 3, 2014 to complete its Schedules and Statements.  Therefore, the Debtors request that the Court extend the 14-day period until March 3, 2014.  While the Debtors believe that the requested extension will provide sufficient time to permit the Debtors to complete and file the Schedules and Statements, the Debtors reserve the right to seek additional extensions on appropriate notice and motion to the Court.

23.     I am informed by my counsel that the United States Trustee has consented to the extension.

**Debtors' Emergency Motion to Authorize Maintenance of Certain Prepetition Bank Accounts and Cash Management System (the "Cash Management Motion")**

24.     Prior to commencing the Cases, the Debtors managed their cash, receivables, and payables through a cash management system (the "Cash Management System") consisting of four (4) banks, eight (8) active main accounts, and twenty nine (29) sub-accounts for operating stores maintained by the Debtors primarily at Wells Fargo ("Wells Fargo"), with additional local bank accounts maintained at Bank of America ("BA"), City National Bank ("CB"), and Simmons First Bank ("Simmons") (collectively, the "Banks").  The Debtors also maintain several other Wells Fargo accounts for stores that have been recently closed or dormant accounts, which are in the process of being closed.  A schedule of the Debtors' accounts at the Banks (collectively, the "Bank Accounts") is attached as **Exhibit A** to the Cash Management Motion.  The Bank Accounts and the transfer of funds through the Cash Management System are described below and illustrated on the diagram attached as **Exhibit B** to the Cash Management Motion.

25.     Store level receipts are generated through local acceptance of cash, checks and credit cards ("Daily Store Sales").  Dynamic Foods receives funds for external sales to third-party customers ("DF External Sales").  The Debtors' corporate office receives payment for accounts receivable, and processes all disbursements.  The Debtors also utilize a third-party service provider ("ISS") for certain outsourced accounting activities and reporting, including the physical production of certain check runs.

26.     Cash and checks for Daily Store Sales are deposited daily into the depository accounts of local banks in close proximity to the stores, or are taken by armored car service.

Most stores maintain depository accounts at Wells Fargo; however, three (3) stores utilize other banks where Wells Fargo is either not convenient or not available. There are currently twenty nine (29) open stores and twenty nine (29) related depository accounts that roll-up and are swept into the Master Operating Account. Credit card purchases are processed through a separate Wells Fargo account which are also swept into the Master Operating Account. Funds received by Dynamic Foods are deposited locally and are swept into the Master Operating Account. Funds received by the Debtors' corporate office are deposited directly to the Master Operating Account.

27.     The Debtors' Master Operating Account is maintained at Wells Fargo. All depository accounts are swept to this account, which in turn funds all obligations and disbursement accounts of the Debtors. Funds within the Master Operating Account are utilized to fund the Payroll Account, two general disbursement accounts, a worker's compensation claims account, and to facilitate any wires or ACH payments. The Debtors also have a dormant investment account which is being closed.

28.     The Debtors are filing a separate motion requesting authorization to continue to pay employees, which payroll checks will clear against the Payroll Account. Accordingly, it is necessary to maintain the Payroll Account and this account is anticipated to remain open so that employee paychecks will clear without incident (subject to the relief granted in the motion).

29.     The Debtors also maintain a separate account to fund worker's compensation claims. The Debtors are asking that this account remain open as well to clear worker's compensation checks.

30.     Two separate disbursement accounts are maintained by the Debtors to fund payables and obligations of a) Dynamic Foods, and b) the stores and corporate (collectively the

"Disbursement Accounts"). Checks for Dynamic Foods are generally processed by the Debtors' accounting department with input from Dynamic management, and the balance of checks are generally cut by ISS and forwarded to the Debtors for distribution. To ensure the Debtors are able to comply with the requirements of the United States Trustee regarding the non-payment of prepetition obligations, these two Disbursement Accounts will be closed immediately, and new Debtors in Possession accounts will be opened.

31.     The Debtors' Cash Management System constitutes an ordinary course and essential business practice and provides significant benefits to the Debtors and their estate including, among other things, the ability to control corporate funds, ensure the maximum availability of funds when necessary, and reduce borrowing costs and administrative expenses by facilitating the movement of funds and by providing more timely and accurate account balance information.

32.     Having to replace the current Cash Management System entirely would be costly and disruptive of the orderly collection of revenues by the Debtors, resulting in a significant adverse effect on the Debtors' reorganization efforts.

33.     To ensure that all transfers and transactions will be documented in its books and records, the Debtors will maintain records of all transfers within the Cash Management System. Based upon the foregoing, maintenance of the existing Cash Management System is in the best interests of the Debtors and their estate.

34.     To guard against improper transfers resulting from the post-petition honoring of prepetition obligations, the Debtors requests that their banks be directed not to honor, subject to certain exceptions approved by this Court, any disbursements, including automatic or "ACH" withdrawals drawn on the Debtors' continuing bank accounts authorized, or for obligations, prior

to the Petition Date, and not to honor any checks or disbursements drawn on the Disbursement Accounts while in the process of closing these accounts. The Debtors will notify each of their banks not to pay any debts incurred prior to the Petition Date, subject to certain exceptions approved by this Court.

35.     The maintenance of the Cash Management System as modified herein (together with the reporting discussed above) will accomplish the dual goals of minimizing the disruption to the Debtors' operations and satisfying the United States Trustee's operating guidelines. The reporting would afford a complete accounting of the Debtors' funds and would provide the United States Trustee comfort that the spirit of the operating guidelines would be observed.

36.     As discussed above, the relief requested herein would minimize disruption to the Debtors' operations. Such disruption to the Debtors' operations and additional expense could otherwise result in immediate and irreparable harm to the Debtors' estate, given the Debtors' very limited resources at this time.

**Debtor's Emergency Motion to Authorize Payment of Prepetition Wages, Salaries, Commissions, Reimbursable Employee Expenses and Benefits in the Ordinary Course of Business (Employees)**

37.     The Debtors' 29 stores and food processing facility are heavily dependent on labor-intensive processes including service and cooking at the store level, and food processing, manufacturing, warehousing and distribution operations at Dynamic Foods, which services Furr's restaurants and a host of external customers. To staff this labor-intensive network, the Debtors employ approximately 2,300 people including approximately 2100 part-time/hourly employees, and process payrolls every week. If the Company does not pay its employees any wages owed when due, employees will quit and the Debtors will suffer irreparable harm. The Debtors do not operate under any collective bargaining agreements.

38.    The Company provides its full-time employees with a choice of insurance options, including several medical and dental plans, vision care, disability, and optional life insurance.  Both the Debtors and the employees contribute to the premium payment requirements for these plans, however, a significant portion of the medical premiums are paid by the Debtors. This is a significant cost to the Debtors, but also a material benefit to the employees and a part of employment and hiring incentives.  Without the Debtors subsidizing a significant portion of the premiums, many employees likely would not have been able to afford the health care coverage provided under the existing plans on their own.  The Company pays these premiums monthly, and withholds employee portions from wages.  If the Debtors are not permitted to continue and pay the insurance premiums, employees will lose their health care and likely suffer economic hardship.

39.    The Debtors do not believe any employee is owed wages of more than $12,475 for the pre-petition period.  The success of the Debtors' efforts to reorganize effectively will be dependent on the continued employment and sustained morale of the Debtors' employees.  To maintain employee stability and productivity, it is important that Employee Claims be paid, in full, and the Employee Programs be continued post-petition.  If these employees' wages, commissions, bonuses, reimbursements and benefits are not received in the ordinary course of business or the Employee Programs are discontinued, employee morale would deteriorate, employees would likely quit, and employees could become personally liable for non-reimbursed business or medical claims expenses, which, in turn, would substantially and adversely affect the Debtors' ability to complete a successful reorganization.  Therefore, the Debtors have demonstrated that the payment of the Employee Claims and the continuation of the Employee Programs are necessary to the effective reorganization of the Debtors.

40.     If the Employee Claims are not paid in the ordinary course of business, the employees undoubtedly would suffer personal hardship, would potentially not receive needed medical services, and in some cases, would be unable to pay basic living expenses. Such a result would be to the detriment of the employees, destabilize the Debtors and harm the Debtors' business and reorganization efforts. Any loss of employees would disrupt the Debtors' business and would deplete the value of the estate. Accordingly, if the employees do not receive the payments herein described, the Debtors may experience difficulty in preserving and protecting their assets.

Payment of Prepetition Salaries, Wages, Bonuses, and Commissions

41.     As of January 2014, the Debtors employed approximately 2300 employees. Of these employees, approximately 200 work on a salaried basis and approximately 2100 work on an hourly basis. Certain employees also receive bonuses and commissions in addition to their base salary. Approximately 20 employees work at the Corporate office in Plano, TX, approximately 2,080 employees work in the Debtors' 29 operating restaurants and approximately 200 employees are dedicated to the manufacturing and processing facility in Lubbock, TX.

42.     Each employee is paid his or her salary, wages, bonuses, and commissions on a bi-weekly basis, though certain bonuses or commissions may be paid less often. Salaried employees are paid current every other Tuesday for the immediately preceding two-week pay period while hourly employees are paid one week in arrears every other Tuesday for the previous two-week pay period. Accordingly, the Debtors made their usual payroll overnight on February 3, 2014 for salaried employees, which employees received on February 4th. Therefore, no salaried employees are owed prepetition regular wages (though checks for the few employees whom do not receive direct deposit may not have cleared as of the Petition Date), however,

certain prior accrued bonuses, commissions or expense reimbursements may remain outstanding as of the Petition Date. Hourly employees have prepetition wages that need to be paid post-petition. The next payroll date is February 11, 2014 and includes compensation for services rendered by hourly employees from January 22, 2014 through February 4, 2014. The Debtors estimate that wages, salaries, commissions, and bonuses paid in the February 11th payroll will be approximately $550,000, all of which will relate to prepetition salaries, wages, bonuses, and commissions.

43. Certain employees have accrued vacation pay that has not been utilized. In the ordinary course of its business, the Debtors generally do not pay employees for unused vacation except upon termination. Full-time employees earn 2 weeks of vacation after one year, and up to 4 weeks for tenured employees. Vacation benefits are "use it or lose it", and must be used in the year following the anniversary date. The Debtors estimate that as of the Petition Date, the Debtors have accrued vacation pay in the amount of approximately $275,000, which will generally be paid out in the ordinary course in lieu of regular wages as vacation days are taken.

**Payment of Reimbursable Business Expenses**

44. Prior to the Petition Date and in the ordinary course of business, certain employees incurred business expenses including, but not limited to, travel, lodging, meals, and expenses associated with the recent closing of several store locations. Employees pay for certain expenses with a corporate American Express card, and other expenses may be paid directly by the employee and submitted for reimbursement. The Debtors pay the American Express charges directly, however, the employee maintains personal liability for any amounts not paid by the Company.

45.     It would be inequitable, cause harm to employee morale, and cause an undue hardship to deny reimbursement of such expenses.  All such expenses were incurred on behalf of the Debtors in the ordinary course of business and with the expectation that such expenses would be reimbursed in accordance with past practice.  The Debtors estimate that the prepetition expense reimbursements, including employee American Express charges, will be approximately $20,000.

46.     The Debtors request authority to pay any such prepetition reimbursement obligations immediately as and when presented for reimbursement by employees, including such related American Express card expenses, in the ordinary course of business.

Payment of Prepetition Healthcare and Insurance Claims

47.     The Debtors maintain a self-insured health insurance program for certain of their employees (the "Insurance Program").  Through the Insurance Program, certain of the Debtors' employees receive health and dental insurance, life insurance, short term and long term disability insurance, and flexible spending accounts for which their employees make payroll deductions. The Debtors maintain the following plans with the administrators listed below (the "Administrators"):

| Benefit Plan | Administrator |
|---|---|
| Medical | United Healthcare |
| Dental | Cigna |
| Vision | VSP |
| Life (Group Plan) | Lincoln International |
| AD&D | Lincoln International |
| Short Term Disability | Lincoln International |
| Long Term Disability | Lincoln International |
| Voluntary Life | Lincoln International |

48.     The Company provides medical benefits, together with group life and accidental death and dismemberment ("AD&D") coverage through United Healthcare, and offers multiple

plans for employees to choose from. Dental benefits through Cigna and vision benefits through Vision Service Plan ("VSP") are also offered, in addition to disability and voluntary additional life insurance coverages. The Debtors pay a portion of premiums, and employees make contributions via salary deduction, both in varying amounts depending on plans chosen.

49. As of February 4th, 2014, the Debtors estimate that it has no prepetition liabilities on account of unpaid premiums. The Debtor is required to pay weekly approximately $25,000 in healthcare claims under their existing self-insured policy; however, all claim payments are current as of February 2nd, 2014.

Payment of Prepetition Expenses Related to 401(k) Plan

50. The Debtors maintain a 401(k) plan (the "401(k) Plan") administered by Fidelity Investments, which participating employees may defer a portion of their salary to help meet their future financial goals. The Debtors withhold from employee wages for contributions, but do not match or contribute to the 401(k) Plan.

51. The Debtors seek authorization to continue to collect and distribute any and all prepetition amounts attributable to the 401(k) Plan.

Payment of Trust Fund Taxes

52. The Debtors are required by law to withhold from an employee's wages amounts related to federal, state, and local income taxes, social security taxes, and Medicare taxes (the "Employee Taxes"). The Debtors are required to (i) match the social security and Medicare taxes; (ii) based on a percentage of gross payroll, pay additional amounts for state and federal unemployment insurance; and (iii) remit these payroll taxes to various taxing authorities. The Debtors estimate that the Employee Taxes relating to the February 4th payroll will total

approximately $150,000 of which approximately 100% will relate to prepetition Employee Taxes.

53.     The Debtors submit that, because the Employee Taxes constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the Debtors' estate, given that the relevant taxing authorities would hold priority claims pursuant to Bankruptcy Code § 507(a)(8) in respect of such obligations.  Moreover, the monies payable for trust fund taxes generally are not property of a debtors' estate.  *See Begier v. IRS*, 496 U.S. 53 (1990).

54.     Accordingly, the Debtors seek authorization to collect and pay any and all taxes attributable to prepetition wages as required by state and federal law in the ordinary course of business.

Other Programs

55.      Workers compensation insurance for all Debtor employees outside of the state of Texas is provided through an insurance policy with Zurich NA ("Zurich").  The annual premium for the Zurich policy is $242,412 and is a "Guaranteed Cost" (fully insured) policy with no annual deductible.  Zurich administers the claims for all states other than Texas.  Wells Fargo Insurance Services ("Wells Fargo") is the Debtors's insurance broker.   All insurance payments related to the Zurich policy are paid to Wells Fargo which then pays Zurich.  The Debtor's current monthly premium cost paid to Wells Fargo is $67,800, which includes both the worker's comp policy as well as other insurance policies.

56.     For employees inside the state of Texas, the Debtor is self-insured and carries a non-subscriber reinsurance umbrella policy through North American Company Life Insurance ("North American").  The annual North American reinsurance policy premium is $121,250 and carries an annual deductible of $250,000.  Premium Assignment Corp ("Premium Assignment")

finances the Texas insurance policies, including other non-worker's comp insurance.    The Debtor makes monthly payments to Premium Assignment for approximately $58,600, for the related insurances.

57.    The workers compensation claims within the state of Texas are administered through a third-party claims administration firm, Providence Insurance and Administration Services ("Providence").  The approximate cost to administer claims for the 2013 premium year was $43,500.  Monthly claims are paid under the reinsurance policy for workers within the state of Texas.

58.    Because payment of the workers' compensation claims is essential to employees who are affected, whom are essential to the Debtors' business, the Debtors seek authorization to pay workers compensation claims as they arise, as ongoing claims payment will cover prepetition periods.

Honoring Prepetition Checks and Electronic Transfers

59.    The Debtors request that, to the extent of funds on deposit, all applicable banks and other financial institutions shall be directed to receive, process, honor and pay all checks presented for payment and to honor all funds transfer requests made by the Debtors relating to the Employee Claims, whether such checks were presented or fund transfer requests were submitted prior to, or subsequent to, the Petition Date.  The Debtors estimate prepetition checks in transit aggregate $65,000.  Further, the Debtors request authority to issue post-petition checks, or to effect post-petition funds transfer requests in replacement of any checks or funds transfer requests with respect to its prepetition employee obligations dishonored or denied as a consequence of the commencement of these Cases.

60.     As discussed above, failure to pay prepetition wages and benefits to the Debtors' employees could result in immediate and irreparable harm to the Debtors' estate because the Debtors' ability to reorganize successfully is dependent upon the continued services of their employees.  Specifically, if the Employee Claims are not paid and the Employee Programs are discontinued post-petition, employee morale would deteriorate and the Debtors could lose valuable employees.

61.     Further, it is necessary that the Debtors continue all Employee Programs including, but not limited to, all medical, dental, life and disability insurance, flexible spending account programs, 401(k) investment programs and workers compensation programs.  The provision of Employee Programs is standard within the Debtors' industry and their continued offering is necessary to ensure the undisturbed loyalty of the Debtors' current employees.  Consequently, the Debtors should be authorized to continue to make all payments, deductions and transfers to third parties as necessary to continue the Employee Programs that existed as of the Petition Date.

**Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, 362, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b), and (II) Granting Adequate Protection to the Prepetition Secured Lender (the "<u>Cash Collateral Motion</u>")**

62.     The Debtors maintain a lending relationship with Chatham Capital under that certain Second Amended and Restated Loan and Security Agreement dated as of April 3, 2009 (together with four Amendments thereto, collectively hereinafter referred to as the "<u>Loan Agreement</u>").  Pursuant to the Loan Agreement, Chatham Capital extended financing to the Debtors and the Debtors executed and delivered six promissory notes to evidence certain of the Debtors' repayment obligations with respect to the money loaned by Chatham Capital.  Pursuant

to the Loan Agreement, Chatham Capital asserts a security interest and lien upon substantially all assets of the Debtors, including cash collateral.

63.     The Debtors require the use of the cash to pay their necessary operating expenses, including, but not limited to, salaries, rent, supplies, inventory and insurance, and to preserve and increase the value of their assets for the benefit of all creditors and parties- in- interest.  The Debtors and Chatham have reached an agreement on the use of Cash Collateral and the provision of adequate protection.  The Debtors request use of cash, on an interim basis, pursuant to the proposed agreed interim cash collateral order (the "Proposed Interim Order") attached to the Cash Collateral Motion as **Exhibit A**, and the proposed agreed interim budget attached to the Cash Collateral Motion as **Exhibit B** (the "Proposed Interim Budget").

64.     As of the Petition Date, the Debtors do not have sufficient (or any) unencumbered cash to fund the Debtors' operations during these Cases.  Accordingly, the Debtors face "immediate and irreparable harm to the estate" absent the emergency consideration of the relief requested in this Motion.  The immediate use is necessary, and it will stabilize  the Debtors' operation an revenue by paying ordinary, post-petition operating expenses, as well as any court approved prepetition expenses that may be at issue.  Without authority to use Cash Collateral, the Debtors will not be able to function as a going concern, and will not be able to proceed to consideration of a plan of reorganization.

65.     Furthermore, authority to use Cash Collateral is necessary to avoid the shutdown of the Debtors' businesses, and will be in the best interests of the Debtors, their estates and their creditors.

66.     An immediate need exists for the Debtors to obtain approval of the use of Cash Collateral in order to meet key operating expenses as described above and as identified in

the Proposed Interim Budget.  Without the immediate use of the Cash Collateral for an interim period, the Debtors will essentially be forced to cease operations and liquidate.  Obviously this would have a severe negative impact upon the Debtors' going concern value and ability to successfully create value for all creditors.  The Debtors' business, as a going concern, has a value far in excess of any value that might be obtained in a chapter 7 liquidation.  A complete shutdown of the Debtors' business, even for a short period, would result in the loss of employees and creditors receiving substantially less from the enterprise than going concern value.

### Debtors' Emergency Motion for Interim and Final Order Providing Adequate Assurance of Utility Payments (the "Utility Motion")

67.     The Debtors currently use electric, water, and other similar services from numerous Utilities.[3]  A list of each Utility is attached as **Exhibit A** to the Utility Motion (the "Utility Service List").  The Debtors estimate that their average monthly obligations for services rendered by Utilities currently approximate $400,000.

68.     Uninterrupted utility service is critical to the ability of the Debtors to operate and maintain the value of their business and to maximize value for the benefit of their creditors.  The Debtors currently pay for utilities at twenty-nine (29) restaurants, the Dynamic Foods facility, and their corporate office.  The Debtors could not operate these facilities without utility service.  Should any Utility refuse or discontinue service, the Debtors would be forced to cease operations at the affected location.  Such a cessation would substantially disrupt operations and result in loss of revenues, which could irreparably harm and jeopardize the reorganization efforts or other objectives of the Debtors.

---

[3] The Utilities provide traditional utility services necessary for continued operation of the Debtors' restaurants.

69.     The Debtors propose that a total of $200,000 be allocated pro rata among the Utilities, and provided as deposit to each Utility (each, an "Adequate Assurance Deposit") based on each such Utility's average monthly bills to the Debtors.

70.     The Debtors submit that the Adequate Assurance Deposit together with their demonstrated ability to pay future utility service in the ordinary course of business (collectively, the "Proposed Adequate Assurance") constitutes sufficient adequate assurance of future payment by the Debtors.

71.     The Debtors have generally paid their utility bills on a timely basis, and there are no material pre-petition payment defaults or arrearages, other than: (i) accrued pre-petition charges which had not yet been billed or which were not yet due or payable as of the Petition Date; or (ii) amounts whose payment may have been delayed or interrupted by the filing of these Cases.

**Debtors' Emergency Motion for an Order Pursuant to 11 U.S.C. §105(a) and Fed. R. Bankr. P. 6003 Authorizing the Debtor to Honor Certain Prepetition Obligations to Customers and to Continue Certain Customer Programs and Practices**

72.     The Debtors sell gift cards in varying amounts which customers can buy and use themselves, or give as gifts, for use at a future date.   Gift card purchases increase over the holidays, and are then heavily redeemed in the first few months of the year.   In some cases the user of the gift card has never been to a Furr's restaurant before, and in other cases, the user is a frequent diner.   Senior citizens will often buy or receive gift cards in large amounts, and then use the card to fund their meal expenses on a regular basis.   Whether the customer is the buyer or the recipient of the gift card, new to Furr's or a frequent diner, an inability to use the card would likely cause irreparable harm to the Debtors through negative publicity and viral internet postings, and immediate decreases in the Debtors' guest count.

73.    The Debtors also offer discounts and coupons, many of which are available through the purchase of gift cards or electronic media.  Discount programs include such things as 'buy one, get one free', kids meals, senior citizen discounts, 10% - 25% off meals, loyalty programs that offer 1 free meal for 8 prior purchases, among other things.  Coupons and loyalty program benefits were issued or accrued prior to the Debtors' chapter 11 filing, via direct mail, flyers and e-blasts (electronic distribution via the web).  If customers are unable to use their coupons or discounts, it also could cause similar irreparable harm to the Debtors.

74.    The Debtors maintain certain customer practices in the ordinary course of business to sustain existing customers' needs (the "<u>Customer Programs and Obligations</u>").   The Customer Programs and Obligations promote customer loyalty and sustained revenue for the Debtors.  The success and viability of the Debtors' business is totally dependent upon the loyalty of the Debtors' customers.   Consequently, continuation of the Customer Programs and Obligations is vital to maintaining the Debtors' value in the highly competitive food services industry, and thus the Debtors' reorganization process.

75.    In the Debtors' business judgment, the uninterrupted maintenance of its Customer Programs and Obligations is essential to maintaining customer satisfaction and loyalty.  Failure to satisfy obligations to customers or the discontinuation of the Customer Programs and Obligations would disrupt business operations, generate adverse publicity, undermine the Debtors' customer base, and could cause irreparable harm to the Debtors' business.  Honoring pre-petition Customer Programs and Obligations are core to the Debtors' normal business operations. The Debtors feel that it is necessary to honor the Customer Programs and Obligations to develop and maintain a good standing with existing and future customers.  Therefore, the Debtors seek authorization to continue and maintain the Customer Programs and Obligations.

76. The Debtors anticipate the following Customer Programs and Obligations to produce potential claims in the following amounts based on historical data: (1) gift card purchases increase over the holiday period and are redeemed at a high rate in the first quarter of the calendar year, estimated at approximately $100,000 in January, $40,000 - $75,000 over each of February and March, and a nominal amount thereafter; and (2) coupons are redeemed at an average monthly rate of approximately $100,000.

77. The Debtors submit that the cost associated with continuation of the Customer Programs and Obligations is *de minimis* when compared to the harm and losses the Debtors could suffer if the Customer Programs and Obligations were terminated. The Debtors' continuation of the Customer Programs and Obligations will likely generate positive cash flow over the business cycle. Accordingly, such relief is necessary and appropriate to carry out the rehabilitative provisions of title 11, and necessary to maintain the Debtors' going concern value.

78. The Debtors submit that the foregoing demonstrates that substantial benefits will inure to their estate, creditors and interest holders as a result of the maintenance and continuation of the Customer Programs and Obligations. Further, maintenance and continuation of the Customer Programs and Obligations is crucial to the Debtors' businesses. In the heavily competitive food service industry, the Debtors' success depends a great deal on their reputation and their goodwill with customers.

79. Failure by the Debtors to honor gift cards and coupons issued prepetition would irreparably harm the Debtors' reputation and could result in loss of customer confidence, loyalty and patronage in favor of one of the Debtors' competitors.

**Debtors' Emergency Motion to Pursuant to 11 U.S.C. §§ 105(a) and 1107(a) and 7 U.S.C. § 499a *et seq*. to Establish Critical Vendor and PACA Vendor Payment Procedures (the "<u>Critical Vendor Motion</u>")**

80.        In their day-to-day operations, the Debtors heavily rely on many suppliers and service providers.  Like many cafeteria and buffet restaurants in the heavily competitive food service industry, the Debtors rely on vendors to provide them with goods, including "<u>Perishable Agricultural Commodities</u>" (as defined by the Perishable Agriculture Commodities Act ("<u>PACA</u>")), and services.

81.    The Debtors believe that the goods and services supplied by certain of their vendors are critical to their operations in that their business, or some arm of their business, could not continue to operate without access to such goods, including Perishable Agricultural Commodities, and services.  As of the Petition Date, many of the vendors deemed critical by the Debtors have outstanding claims, including claims under PACA, against the Debtors arising from prepetition deliveries of goods and prepetition performance of services.  The Debtors anticipate they will be able to continue to transact with a majority of the vendors on which their day-to-day business operations depend despite nonpayment by the Debtors of such vendors' prepetition claims.  Nonpayment of the prepetition claims of certain of the Debtors' vendors, however, creates a significant risk of disruption to the Debtor's operations.  Thus, the Debtors anticipate there will be instances in which payment of the prepetition claims, including claims under PACA, of certain vendors will benefit all creditors because such payment will allow the Debtors' business to continue and avoid a likely loss, or to gain a likely economic advantage, disproportionate to the amount of such vendors' prepetition claims.

82.        Accordingly, the Debtors request that the Court establish Critical Vendor and PACA Payment Procedures by which the Debtors may pay certain amounts to Critical Vendors

and PACA Vendors. In exchange for payment by the Debtors of any Critical Vendor Claim or any PACA Vendor Claim, the debtors intend to require such Critical Vendor or such PACA Vendor to agree to transact with the Debtors, for such duration of time as agreed between the Debtors and such Critical Vendor or such PACA Vendor on Customary Trade Terms, unless otherwise agreed by the Debtors and the Critical Vendor or the PACA Vendor.

83. In preparation for filing their chapter 11 Cases, the Debtors evaluated the several thousands of goods and services vendors likely to have outstanding claims against the Debtors as of the Petition Date. The Debtors analyzed whether there were any providers of goods, including Perishable Agriculture Commodities, or services that are critical to their ability to operate their business. The Debtors distinguished certain of their vendors as either Critical Vendors or PACA Vendors.

84. The Debtors distinguished "Critical Vendors" according to the following criteria:

    a. Whether (i) the goods and services supplied by a particular vendor are essential to the continued operation of the Debtors' business or some arm thereof and cannot be obtained from any other vendor, or, could be obtained from another vendor only at such extra cost or at such delay as to outweigh the cost of paying the prepetition claim, or (ii) whether the vendor was in possession of valuable property of the Debtors that is necessary to their ability to generate revenue;

    b. Whether the cost of paying the prepetition claim of such vendor, to the extent that such claim is fixed, noncontingent, liquidated, and undisputed (the "Critical Vendor Claim"), is outweighed by the benefit such payment is likely to secure on behalf of the Debtors' estates and other creditors; and

    c. Whether such vendor would likely continue doing business with the Debtors notwithstanding nonpayment of prepetition claims, such as those vendors subject to long-term, non-terminable contractual commitments.

85. The Debtors distinguished "PACA Vendors" according to the following criteria:

    a. Whether the vendor sold goods qualifying as Perishable Agricultural Commodities within interstate or foreign commerce to Debtors pursuant to short-term credit arrangements; and

b.  Whether the vendor provided Debtors with adequate written notice and filed such notice with the Secretary of Agriculture that it intends to preserve its PACA trust rights (the "PACA Vendor Claim") within 30 days after expiration of (1) the time payment is due, (2) any other time negotiated between the vendor and the Debtors, or (3) the time that the vendor receives notice that payment instrument that was presented was dishonored.

86.    According to the above criteria, the Debtors were able to distinguish, from the several thousands of vendors with whom the Debtors deal, a small group of vendors that the Debtors deem to be Critical Vendors or PACA Vendors.  These vendors provide goods, including Perishable Agricultural Commodities, and services to the Debtors necessary to enable the Debtors to retain their reputation, customer loyalty, and goodwill within the highly competitive food service industry.  As many of the Debtors' restaurants are located in small and rural communities, several of the Critical Vendors and PACA Vendors are either sole-source suppliers or are the only vendors able to meet the Debtors' volume requirements such that it would take weeks to months for the Debtors to find alternate suppliers or service providers.  In addition, many of the Critical Vendors and PACA Vendors are small companies and any one payment by the Debtors represents a significant portion of their income.

87.    Failure to obtain the necessary goods, including Perishable Agricultural Commodities, and services from such vendors would irreparably harm the Debtors' reputation and could result in loss of customer confidence, loyalty and patronage in favor of one of the Debtors' competitors.  The Debtors' perceive a risk that, for certain of their Critical Vendors and PACA Vendors, a default by the Debtors would extinguish the Debtors' access to necessary goods, including Perishable Agricultural Commodities, and services, because (i) the vendor providing the particular good or service will be put out of business by the Debtors' nonpayment, (ii) because the vendor will refuse to continue doing business with the Debtors if its prepetition claim remains unpaid, or (iii) because the vendor may choose to continue doing business with the

Debtors only upon the condition that the Debtors provide trade term accommodations such as advance deposits or payments by wire transfer prior to delivery. Additionally, the Debtors believe that vendors in possession of the Debtors' property may assert liens on such property and/or will not return such property to the Debtors in the ordinary course of business as long as their prepetition claims remain unpaid.

88.    The Debtors anticipate that there may be instances in which the Debtors will require authority to pay the prepetition claim of a Critical Vendor or a PACA Vendor that has refused to continue to deal with the Debtors, that is at risk of going out of business, or that has demanded trade term accommodations the Debtors cannot meet, because the Debtors will be unable to operate their business or an arm thereof without the goods, including Perishable Agricultural Commodities, and services provided by such Critical Vendor or PACA Vendor. The Debtors feel they will not be able to fulfill their duty to their estate and creditors to preserve the value of their businesses without the authority to pay the prepetition claims of those vendors the Debtors have identified as Critical Vendors and PACA Vendors as and when such payments prove necessary.

89.    Accordingly, the Debtors propose the establishment of the following procedures for payment of prepetition claims of Critical Vendors and PACA Vendors if and when such payments become necessary (the "Critical Vendor and PACA Vendor Payment Procedures"):

    a.    First, to the extent an entity claims a lien against property of any of the Debtors' estate to secure a Critical Vendor Claim (which lien, upon advice of counsel, the Debtors reasonably believe to be valid) and to the extent payment of such Critical Vendor Claim is, in the exercise of the Debtors' business judgment, in the best interests of their estates (to include agreeing to Customary Trade Terms, defined herein), or to the extent an entity provides adequate written notice to Debtors that it intends to assert a PACA Vendor Claim (which claim, upon advice of counsel, the Debtors reasonably believe to be valid) and to the extent payment of such PACA Vendor Claim is, in the exercise of the Debtors' business judgment, in the best interests of their estates (to include agreeing to Customary Trade Terms,

defined herein), the Debtors are authorized to pay up to 75% of such Critical Vendor Claim (with the balance agreed to be treated as an unsecured claim) or up to 100% of any (with treatment of any balance to be negotiated) PACA Vendor Claim. The Debtors shall file with the Court and provide to the United States Trustee for the Northern District of Texas (the "U.S. Trustee"), Chatham, and any committee approved under section 1102 of the Code (the "Creditors Committee," and, together with the U.S. Trustee, the "Notice Parties") an accounting, itemized by claims paid, of any debts so paid.

b.  To the extent an entity asserts any Critical Vendor Claim, the payment of which the Debtors, upon advice of counsel, reasonably believe would be authorized under existing laws related to critical vendors and payment is in the best interests of the estates (to include agreeing to Customary Trade Terms, defined herein), the Debtors may pay up to 75% of such claim (with the balance to be treated as an unsecured claim). The Debtors shall file with the Court, and provide to the Notice Parties an accounting of each such claim paid, including the bases on which payment of such claim is warranted under existing law. Upon motion of any party in interest filed within thirty (30) days of such accounting, the Debtors (and the creditor paid) shall be required to show cause why payment of such claim should be deemed by the Court to be properly authorized. If the Court determines that a payment was not properly authorized, the Debtors are authorized to, in their discretion and without further order of the Court, declare that payments made to such Critical Vendor on account of its Critical Vendor Claim shall be deemed to have been in payment of then outstanding postpetition claims of such vendor without further order of the Court or action by any person or entity. In addition, such Critical Vendor shall immediately repay to the Debtors any payments made to it on account of its prepetition claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

90.  As a prerequisite to payment of any Critical Vendor Claim or PACA Vendor Claim, the Debtors intend to require Critical Vendors and PACA Vendors to agree to transact with the Debtors postpetition on Customary Trade Terms (as defined below) for such duration of time as agreed to by the Debtors and the particular Critical Vendor or PACA Vendor, unless otherwise agreed to by the Debtors and the particular Critical Vendor or PACA Vendor.

91.  "Customary Trade Terms" are those trade terms, which include, but are not limited to, credit terms, credit limits, historical pricing conventions, historical product volumes, cash discounts, timing of payments, allowances, rebates, normal product mix, and availability

and other applicable terms and programs acceptable to the Debtors, that were most favorable to the Debtors and in effect between such Critical Vendor or such PACA Vendor and the Debtors at any time during the 12 month period preceding the Petition Date; provided however, notwithstanding the foregoing, payment terms shall be no less favorable than either "net 30" (paid 30 days from invoice date) or "net 10 – 2%" (which provides for a 2% invoice discount if the invoice is paid 10 days from invoice date). If after receipt of payment for any Critical Vendor Claim or PACA Vendor Claim, a Critical Vendor or PACA Vendor refuses to continue to provide product, supplies or services upon the Customary Trade Terms as agreed to with the Debtors, then the Debtors may (i) declare that any payment made to such Critical Vendor or such PACA Vendor on account of its prepetition claim shall be deemed to have been in payment of then outstanding postpetition claims of such Critical Vendor or such PACA Vendor without further order of the Court or action by any person or entity; (ii) require that the Critical Vendor or the PACA Vendor immediately repay to the Debtors any payments made to it on account of its prepetition claim, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise; and (iii) seek redress with the Court for failure to comply with the Customary Trade Terms.

92. Establishment of the Critical Vendor and PACA Vendor Payment Procedures by which the Debtors may pay the claims of those vendors whom the Debtors have distinguished as Critical Vendors or PACA Vendors is warranted. The Critical Vendor and PACA Vendor Payment Procedures will also ensure that no Critical Vendor or PACA Vendor holds the Debtors hostage and unreasonably demands payment of their prepetition claims. The Debtors believe that authority, but not direction, to pay the Critical Vendor Claims and PACA Vendor Claims, as such payments become necessary, is crucial for the Debtors' seamless transition into chapter 11,

will avoid immediate and irreparable harm, and will serve the best interests of the Debtors, their estate, and their creditors.

### Debtors' Emergency [First] Motion to Reject Unexpired Leases of Non-Residential Real Property and Related Equipment Leases Pursuant to 11 U.S.C. § 365 *Nunc Pro Tunc* to the Petition Date ("<u>Lease Rejection Motion</u>")

93.     Prepetition, certain store locations of the Debtors were not profitable.  In some instances, rent and lease terms were too onerous and could not be renegotiated to an amount those locations could sustain.   In other cases, direct competition or macro-economic circumstances that impacted the Debtors' customer base caused certain locations to become unprofitable.  The Debtors were unable to attract the necessary volume of business to sustain and justify continued operations at restaurant locations subject to the Real Property Leases and Related Equipment Leases, and made the determination to close those locations to mitigate losses.  As operations have ceased, it is appropriate for the Debtors to reject the Real Property Leases, and reject the Related Equipment Leases. Continuation of the leases would cause the Debtors to incur expenses for which their estates would receive no value.  Therefore, rejection of the Real Property Leases and Related Equipment Leases is necessary.

94.     Specifically, the Real Property Leases and Related Equipment Leases set forth in Exhibit A to the Lease Rejection Motion must be rejected as the Debtors determined pre-petition, in their business judgment, to close the restaurants associated with the Real Property Leases and terminate the equipment leases associated with the Related Equipment Leases.  The restaurants were all closed immediately prior to the Petition Date, the premises surrendered to the respective landlords, and the equipment surrendered to the respective lessors.  Accordingly, relief *nunc pro tunc* to the Petition Date is warranted.

95.    In the Debtors' business judgment, rejection of the Real Property Leases and Related Equipment Leases is in the best interests of the Debtors' estate and their creditors and should be authorized by this Court.

96.    In these cases, the Debtors respectfully request that the Court enter an order rejecting the Real Property Leases and Related Equipment Leases set forth in Exhibit A to the Lease Rejection Motion effective as of the Petition Date.  The locations were unprofitable, and the Debtors no longer have any ongoing operations at the leased premises under the Real Property Leases, are no longer in use of the related equipment, and thus cannot continue to service the obligations under the Real Property Leases and Related Equipment Leases. Possession of each premises and the related equipment was surrendered to the applicable lessor during the weeks leading up to or immediately prior to the Petition Date.

97.    Accordingly, in an exercise of their business judgment, the Debtors have determined that rejecting the Real Property Leases and Related Equipment Leases listed in Exhibit A to the Lease Rejection Motion is in the best interests of the Debtors' estates, their creditors and all parties-in-interest in these bankruptcy cases.  Furthermore, the Debtors submit that their decision to reject the Real Property Leases and Related Equipment Leases is a critical component of the reorganization of the Debtors' overall business, represents an exercise of the Debtors' sound business judgment.  The Debtors' determination to reject the Real Property Leases and Related Equipment Leases is based upon valid business justifications, as the Real Property Leases and Related Equipment Leases will not be necessary to the Debtors' operations and will not provide positive revenue.  The Debtors therefore seek to reject the Real Property Leases and Related Equipment Leases effective as of the Petition Date.  Rejection will minimize

rejection damage claims and any administrative claims that may be asserted by the non-Debtor party to the Real Property Leases and Related Equipment Leases.

### Request for Emergency Consideration of Certain "First Day" Matters

98.     Emergency consideration of the First Day Matters is critical to the maintenance of the Debtors' estates.  The Debtors currently lack sufficient liquidity to support its operations.  The Debtors need emergency consideration of the First Day Matters to meet payroll and other current expenses, including, but not limited to, vendor, employee, lease, utility, and tax obligations.  Without emergency consideration of the First Day Matters, the Debtors operations and the value of their estates could be negatively affected.

99.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 4th day of February, 2014.

/s/ Barry M. Barron, Sr.
Barry M. Barron, Sr.
Chief Executive Officer of Buffet G.P., Inc.
