John E. Mitchell, SBT # 00797095
David W. Parham, SBT# 15459500
Rosa A. Shirley, SBT # 24056313
**BAKER & McKENZIE LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 2300
Dallas, Texas 75201
Tel: (214) 978-3000
Fax: (214) 978-3099
john.mitchell@bakermckenzie.com
david.parham@bakermckenzie.com
rosa.shirley@bakermckenzie.com

**ATTORNEYS FOR THE DEBTORS**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 14-30699-11** |
| | § | |
| **BUFFET PARTNERS, L.P., et al.** | § | **CHAPTER 11** |
| | § | |
| **DEBTORS.**[1] | § | **Jointly Administered** |
| | § | |
| | | **(Expedited Hearing Requested)** |

**DEBTORS' EXPEDITED MOTION FOR AN ORDER (I) APPROVING THE
PROCEDURES FOR (A) THE SALE OF SUBSTANTIALLY ALL ASSETS
(B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES (C) THE ESTABLISHMENT OF CURE
AMOUNTS, (II) APPROVING FORM OF NOTICE AND
(III) SETTING A HEARING DATE FOR THE APPROVAL OF THE SALE**

Buffet Partners, L.P. and Buffet G.P., Inc., the above-captioned debtors and

debtors-in-possession (the "Debtors") in the above-captioned chapter 11 case (the "Chapter 11

Case"), hereby move (the "Motion") this Court pursuant to sections 363 and 365 of chapter 11 of

title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") and Rules

6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an

---

[1]     The Debtors in these chapter 11 cases are Buffet Partners, L.P. and Buffet G.P., Inc.

order (I) approving the procedures for (a) the sale of substantially all of Buffet Partners, L.P.'s (the "Debtor" or "Furr's" or the "Company") assets pursuant to section 363 of the Bankruptcy Code (the "Sale Procedures"), (b) the assumption and assignment of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code, (c) the establishment of cure amounts, (II) setting a hearing date for the approval of the sale (the "Sale Hearing") and (III) approving the form of notice of the Sale Hearing.  In support of this Motion, the Debtors respectfully represent as follows:

## **BACKGROUND**

**A.     The Chapter 11 Filing**

1.     On February 4, 2014, (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code").  The Debtors continue to manage and operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.     A creditors' committee (the "UCC") has been appointed in this chapter 11 case (the "Chapter 11 Case") by the United States Trustee.  No trustee or examiner has been appointed in the Chapter 11 Case.

3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.     The statutory predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006.

B.     **Background and Business Operations**

5.     Headquartered in Plano, Texas, the Company is a well-recognized, value oriented restaurant chain with 29 restaurants in Arizona, Arkansas, New Mexico, Oklahoma and Texas, generating in excess of $100 million in revenue.  With a rich, 65+ year operating history and strong brand awareness, Furr's operates straight-line and scatter-bar buffet units that feature a wide variety of "all-you-can-eat," "home-cooked," high quality foods served with personalized service at an affordable price ($9.00 average guest check).

6.     Furr's provides a compelling price-to-value relationship which results in high average sales per restaurant, relatively low labor costs and attractive unit economic returns.  The Company enjoys a unique competitive advantage through its Dynamic Foods division ("Dynamic Foods" or "Dynamic"), a fully integrated food processing, manufacturing, warehousing and distribution operation centrally located in Lubbock, Texas, that services Furr's restaurants and a host of external customers.

7.     Furr's is one of the longest-tenured and most recognized restaurant brands in the Southwest.  The restaurant was founded in 1946 by Roy Furr, and expanded to approximately 60 locations as a family-owned business for over 35 years.  In 1980, it was acquired by Kmart Corporation.  Kmart ultimately sold Furr's in a leveraged buy-out which subsequently went public in 1986.  Following a take private transaction, the Company entered a period of decline due to its debt burden, culminating in a restructuring and reorganization under chapter 11 in 2003 in Dallas, Texas (*In re Cafeteria Operators, L.P.*, Case No. 03-30179-HDH-11, Bankr. N.D. Tex).

8.     Recognizing the strength of the brand, attractive restaurant locations and vertically integrated food processing capabilities, Buffet Partners, L.P. was formed to purchase Furr's in September of 2003.  Under Buffet Partners' ownership, management systematically

shifted the business to the Furr's Fresh Buffet (scatter-bar) concept while closing underperforming straight-line units. Furr's has a highly experienced and committed management team with over 160 years of combined restaurant experience and an average of 14 years with Furr's.

9.      Today, the Company operates 29 restaurants, of which 12 are scatter-bar concepts and 17 are straight-line concepts, in five states throughout the Southwest. All restaurants are Company owned, and all are assets of Buffet Partners, L.P., including Dynamic Foods. Restaurants are supported by Dynamic Foods, a captive, vertically integrated food processing and distribution operation. Approximately 2080 persons are employed at the restaurants, 200 are employed by Dynamic Foods, and approximately 20 persons are employed at the corporate headquarters in Plano, Texas.

10.     Furr's continues to strategically convert its restaurant portfolio to the Furr's Fresh Buffet (scatter-bar) concept that generates over $4 million in average annual unit volume, and higher profit per store. Additionally, Dynamic's sales have nearly doubled since 2009, and with capacity utilization only near 50%, Dynamic and the Company have substantial upside growth opportunities, to service both an increased number of Furr's units as well as external customers.

11.     For the year ending December 2013, Furr's total net sales for restaurant operations exceeded $100 million. Dynamic's total net sales for the same period exceeded $59 million, with over $14 million from external customers. Furr's serviced almost 11 million guests in 2013, with an unadjusted EBITDA for 2013 of $2.7 million. In 2012 the Company's EBITDA approximated $5.8 million and guest count approximated 12.8 million. Reduction in sales, EBITDA and guest count are attributed in part to the closure of several stores.

**C.    Prepetition Capital Structure**

12.    Furr's assets consist primarily of the 29 operating restaurants, each leased from multiple different landlords, and the real estate, personal property, vehicles, and other assets at the Lubbock, Texas, Dynamic Foods facility, and the Plano corporate headquarters.  Furr's liabilities consist primarily of $39 million in senior, secured debts of Chatham Capital Partners ("Chatham"), and its affiliated funds, as well as approximately $5-10 million in trade payables to miscellaneous vendors, suppliers and other parties, and undetermined liabilities to landlords of closed store locations.  All of Furr's assets, to include its cash, are pledged to Chatham on a senior, secured basis.  Upon belief, the value of the Company's assets, whether valued in a liquidation or as a going concern, are materially below the aggregate amount of the Chatham debt.

**D.    Events Leading to a Chapter 11 Filing and Additional Background**

13.    Furr's has weathered the macro-economic storm that began in 2008, but the credit constraints resulting from the financial crisis impacted the Company's ability to finance growth and improvements in process, and subjected the Debtors to higher interest and leasing rates. Further, commodity and transportation prices increased, and the recessionary climate limited the Company's ability to raise prices to cover increasing costs, and impacted guest counts.  Certain locations began to suffer and the Company became increasingly undercapitalized.  One of the most successful cash flow locations was lost in an eminent domain proceeding, and a major competitor began direct attacks on the Company. Specific locations subject to these factors began to lose money.  The Company did not act to close stores quickly while assessing losses and duration of the recession, wanting to preserve jobs, investment and store locations.  The economic climate and onerous lease terms however could not sustain continued operation of stores producing losses, and these stores were closed.

14.     Furr's has begun implementation of a footprint rationalization strategy to streamline its restaurant portfolio and focus on its strongest locations, while maintaining strong revenue of $113 million for the year ending 2013. In implementing this strategy, net store closures of 16 units in the last three years resulted in a decrease in revenues of approximately $19.6 million. The decline was offset partially by new, high revenue Furr's Fresh Buffet units and strong external sales at Dynamic. While gross margin remained flat at around 60%, EBITDA decreased approximately $3.0 million from $5.8 million to $2.7 million in 2013 due primarily to the effect of the store closures, a drop in guest count of almost 2 million, increased G&A expense, deferred maintenance, and continuing economic uncertainty.

15.     Overall liquidity was impacted by capital spending on new stores in support of expansion of the scatter-line buffet concept and needed maintenance that had been deferred on older stores. In December the Texas market suffered an ice storm and unusually cold weather, causing a significant loss in guest count and hundreds of thousands of dollars in lost profit. This was detrimental to already tenuous liquidity, and with no available line of credit, the Debtors were unable to continue to weather the financial storm, eventually leading to the chapter 11 filing.

16.     New operating initiatives and cost saving programs are positively impacting sales and operating profits at the restaurants. The Company is developing and implementing strategies to buy more efficiently, and improve credit and terms with its vendor base. Dynamic Foods external sales continue to be strong and the business is actively pursuing several opportunities with new customers.

17.     On December 31, 2013, the Company decided to retain Bridgepoint Consulting, LLC ("Bridgepoint") as financial advisor, to assist the Company with cash management,

restructuring analysis and other similar financial advisory services. While Bridgepoint's expertise in these areas greatly improved the Company's cash management, the ongoing liabilities of the Company were deemed unsustainable with the current diminished cash flow and lack of vendor credit. Accordingly, on February 4, 2014, the Company commenced these proceedings to afford it an opportunity to restructure its affairs.

18.     The Debtors believe that the best way to maximize the value of its estate for the benefit of its creditors is to preserve the going concern value of the Debtors' business through a sale of substantially all of the Debtors' assets. The Debtors' tenuous liquidity position, as described above, dictates that the Debtors seek a sale of substantially all of their assets at the current time. Simply put, the Debtors do not have the liquidity to finance a lengthy chapter 11 case. In fact, if the assets are not sold, the Debtors anticipate severe liquidity crisis in late April or early May that could result in a substantial negative impact on the Debtors' business. Accordingly, the Debtors are seeking approval of bid procedures and a sale to the Stalking Horse bidder at the current time in order to avert any liquidity crisis.

19.     As a result, and as more fully described below, the Debtors have negotiated an agreement with the Prepetition Secured Lenders that provides for the Prepetition Secured Lenders (or their designee) to purchase the Debtors' assets through a credit bid of the obligations under the Prepetition Facility. Notably, the agreement negotiated with the Prepetition Secured Lenders does far more than simply hand the Prepetition Secured Lenders the keys to the Debtors' assets. The Prepetition Secured Lenders have also agreed to, among other things, enter into arrangements satisfactory to the Debtors that provide for funding of the costs associated with conducting this Chapter 11 Case by agreeing to the payment of allowed administrative claims arising prior to the closing of the sale of the Debtor's assets to the Prepetition Secured Lenders

(including reasonable professional fees and expenses of the Debtor's restructuring professionals up to an amount not to exceed $600,000 in the aggregate from the Petition Date through Closing of the Sale, and $150,000 for reasonable professional fees and expenses of the Creditors Committee from the Petition Date through Closing of any sale)[2] and an additional $600,000 for the benefit of allowed general unsecured claims and wind down expenses of the estate arising after the closing of the sale. In addition, the Buyer is assuming certain liabilities including lease cure costs for rent and ad valorem taxes, ad valorem taxes of the Lubbock facility, pre-petition sales tax liability and personal property taxes for 2013, estimated at $2.9 million.. These agreements provide significant benefit to creditors of the Debtors other than the Prepetition Secured Lenders, and ensure that this Chapter 11 Case can be conducted and concluded consistent with the objectives and requirements of the Bankruptcy Code.

## **RELIEF REQUESTED**

20. Because the Prepetition Secured Lenders hold claims secured by liens on substantially all of the Debtors' assets, and are owed amounts that vastly exceed the value of the Debtors (determined on a going-concern basis or otherwise), the Prepetition Secured Lenders are today the economic owners of the Debtors' assets. Due to the liquidity issues described above, the Debtors have filed this Motion and are requesting an expedited hearing seeking approval of the procedures described herein for the sale of substantially all of the Company's assets (the "Sale Procedures Hearing").

21. The Debtors' retained Duff & Phelp, prepetition, to marked the Debtors' assets for sale. Duff & Phelps marketed the Debtors' assets for 2-3 months prepetiton. No viable purchaser was identified. Given the lack of success of prior efforts to sell the Debtor's assets to

---

[2] None of Baker & McKenzie, LLP, Bridgepoint Consulting, or James Sargent have agreed to an aggregate cap on their professional fee claims in these Bankruptcy Cases.

third parties, and given the Debtor's precarious liquidity position, the Debtors believe that the best way to maximize the value of its estate for the benefit of creditors is to preserve the going concern value of the Company and to conduct a sale of substantially all the Debtors' assets, to the Prepetition Secured[3] Lender's, or a third party submitting a competing proposal with superior terms, with the goal of stabilizing and deleveraging the Company.  As a result, the Debtors have negotiated an agreement with the Prepetition Secured Lenders, which provides for the Prepetition Secured Lenders to purchase substantially all of the Debtors' assets through payment in cash of the amount of the Wind-Down Amount, plus the assumption of the Assumed Liabilities, and a credit bid (the "<u>Credit Bid</u>") in the amount of $21,900,000 (the "<u>Purchase Agreement</u>") (an executed copy will be filed with this Court prior to the Sale Procedures Hearing and an unexecuted version of the agreement in substantially final form is attached hereto as **<u>Exhibit A</u>**).

22.    As noted above, the Purchase Agreement will do far more than simply hand the Prepetition Senior Lenders the keys to the Debtors' assets.  The Prepetition Secured Lenders have agreed to provide other benefits to other stakeholders as discussed previously in paragraph 19 above.  These agreements provide significant benefit to creditors of the Debtor other than the Prepetition Secured Lenders, and ensure that this Chapter 11 Case can be conducted and concluded consistent with the objectives and requirements of chapter 11 of the Bankruptcy Code.

23.    Accordingly, by this Motion, the Debtors seek approval of the procedures for the sale (the "<u>Sale</u>") of substantially all of its assets (the "<u>Assets</u>"), pursuant to the Purchase

---

[3] The Prepetition Secured Lenders have agreed to act as stalking horse on the material terms contained herein and in the draft Asset Purchase Agreement attached hereto as Exhibit A.  A final, executed verions of the Asset Purchase Agreement will be submitted to the Court at the Sale Procedures Hearing.

Agreement to Chatham Credit Management III, LLC, or its designee (the "Buyer"),[4] free and clear of liens, claims and encumbrances. Before closing, the Prepetition Secured Lenders may assign all or a portion of the Prepetition Secured Lenders' secured claims (the "Prepetition Secured Claims") to the Buyer. At closing, Buyer will agree to extinguish and discharge the Prepetition Secured Claims up to the amount of the credit bid in exchange for the purchase of the Assets. The Prepetition Secured Lenders are not, however, by this Motion or as a part of the Sale, waiving their deficiency claims they might have against the Debtors' estate. The Prepetition Secured Lenders are, however, agreeing to subordinate any deficiency claim they might have to the first $500,000 distributed, post Closing (as defined in the Asset Purchase Agreement) to creditors in these Bankruptcy Cases.

24.     At the Sale Procedures Hearing, the Debtor will seek to implement a formal auction and bidding process for the Assets (the "Auction") pursuant to approved Bidding Procedures attached hereto as **Exhibit B.**

25.     As described more fully below, the Debtor will provide notice of the Auction and Sale (the "Sale Notice") to any parties who have previously expressed an interest in the Assets or who may be interested in purchasing the Assets. In addition, the Debtor will publish the Sale Notice (the form of such publication notice is attached hereto as Exhibit C) in Nations Restaurant News, a widely circulated industry publication which is distributed in both print and electronic form and any other publication that this Court deems appropriate.

26.     The Debtors request that this Court set April 14, 2014, 5:00 p.m. prevailing central time, as the deadline (the "Bid Deadline") by which a competing bid for the Assets must be submitted in writing to the Interest Notice Parties referenced in paragraph 28 below.

---

[4]     Buyer will in all likelihood be a new limited liability company that will be formed by the Prepetition Secured Lenders for the purpose of acquiring the Assets as set forth more fully in purchase agreement attached hereto as Exhibit A.

Additionally, the Debtor requests that, April 17, 2014, be set as the date for the Auction (the "Auction Date") with such Auction to occur at the offices of Debtor's counsel, Baker & McKenzie LLP, 2001 Ross Avenue, Suite 2300, Dallas, Texas 75201, at 10:00 a.m. (prevailing central time) and a hearing to approve a sale (the "Sale Hearing") pursuant to such Auction not more than five (5) business days following the Auction Date. A proposed order approving the terms of the Sale is attached hereto as **Exhibit C**.

## THE BIDDING PROCEDURES

27.     The Bid Procedures are as set forth on Exhibit  B . Generally, the Debtor shall be represented by Brookwood Associates and the Debtor's CEO, Barry Barron (collectively the "Debtor Auction Team") for all purposes in evaluating bids and in making decisions in the course of the auction process. The Debtor Auction Team, in consultation with the UCC, will consider bids from interested parties pursuant to the Auction process, provided that any such bid is: (i) received by the Auction Bid Deadline; (ii) delivered in writing to the Interest Notice Parties referenced in paragraph 28 below, (iii) is accompanied by an executed copy of an alternative purchase agreement that reflects any substantive changes to the Purchase Agreement, (iv) indicates the amount of cash consideration the party is willing to pay for the Assets, which amount must be at least $24,750,000; (v) includes written evidence of available cash or a commitment for financing and such other evidence of ability to consummate the transaction as the Debtor Auction Team (in consultation with the UCC) may request; (vi) includes all of the Assets proposed to be purchased by the Prepetition Secured Lenders; (vii) assumes at least the same liens and claims as the Prepetition Secured Lenders proposed to assume; (viii) includes a copy of a board resolution or similar document demonstrating the authority of the bidding party to make a binding and irrevocable bid on the terms proposed; (ix) is not conditional on the

outcome of any unperformed due diligence, the receipt of equity or debt financing, or the approval of any Board of Directors, shareholder, or other corporate approval; (x) includes any pertinent factual information regarding the proposed bidder's operations that would assist the Debtor Auction Team's analysis of issues (if any) arising with respect to any regulatory or statutory issues; (xi) includes evidence regarding ability to adequately perform the terms of any Executory Contract (as defined below) sought to be assumed or assigned; and (xii) is reasonably likely to close no later than the date that the transaction contemplated herein with the Prepetition Secured Lenders would close (xiii) includes a deposit as described in the Bid Procedures (collectively and as described in more detail in the Bid Procedures, a "Qualified Bid"). The Prepetition Secured Lenders Bid is a Qualified Bid. In addition, the Prepetition Secured Lenders shall have the right, but not the obligation, pursuant to § 363(k) of the Bankruptcy Code to credit bid up to the full amount of their secured claim.

28. Bids must be delivered in writing by the Bid Deadline to (a) the Debtor's counsel, Baker & McKenzie LLP, 2001 Ross Avenue, Suite 2300, Dallas, Texas 75201 (Attn: John E. Mitchell, john.mitchell@bakermckenzie.com); (b) the counsel to the Prepetition Secured Lenders, Burr & Forman, 171 17th Street, NW, Suite 1100, Atlanta, Georgia 30363 (Attn: Erich Durlacher, edurlacher@burr.com); (c) counsel for the Official Committee of Unsecured Creditors, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067 (Attn: Jeffrey N. Pomerantz, jpomerantz@pszjlw.com); and (d) Brookwood Associates, 3575 Piedmont Road, 15 Piedmont Center, Suite 820, Atlanta, Georgia 30305 (Attn: Amy V. Forrestal, af@brookwoodassociates.com) (collectively, the "Interest Notice Parties") in order to be considered.

29.     Any overbids shall be made in overbid increments of at least $250,000.00 greater than the Best Qualified Bid.

30.     Furthermore, in connection with the Sale and as described in the Purchase Agreement, the Debtor will also seek to assume and assign certain of the Debtor's executory contracts and unexpired leases (collectively, the "Executory Contracts") to Buyer.  The Buyer will cure all monetary defaults under such Executory Contracts to the extent required by Section 365(b) of the Bankruptcy Code and as set forth in the Purchase Agreement.

## THE SALE

31.     The Debtor proposes to sell the Assets, in accordance with section 363(b) of the Bankruptcy Code, free and clear of all liens, claims and encumbrances.[5]  Subject to the limitations set forth in the Purchase Agreement, and as set forth below, the Assets are generally comprised of all of the Seller's right, title and interests in and to all of the properties and assets of every kind and description of the Seller, whether real, personal, mixed, tangible or intangible, and wherever located including the following (as more fully described and as referenced in the Asset Purchase Agreement):

(a)     all inventory as of the Closing Date, including all finished goods, work in process and raw materials;

(b)     all of the rights of the Seller under all Contracts to which the Seller is a party, by which the Seller or any of the Purchased Assets is bound or affected or pursuant to which Seller is a beneficiary, including any rights the Seller may have under nondisclosure, confidentiality, non-solicitation, non-competition and similar agreements and those Contracts set forth in Schedule 2.1(b) to the extent such Contracts are assumed pursuant to Section 5.12

---

[5] Baker & McKenzie LLP has not agreed to any sale of the Debtors' assets free and clear of any carveout rights granted pursuant to any cash collateral orders entered by this Bankruptcy Court.

(collectively, the "Included Contracts"); provided, however, that if any Contract is recharacterized by a Final Order as a secured financing, then the real property or personal property that is subject to such Contract shall be a Purchased Asset;

(c)     all machinery, equipment, furniture, fixtures, rolling stock and other items of tangible personal property;

(d)     (i) the real property set forth on Schedule 2.1(d)(i) (collectively, the "Owned Real Property") and (ii) all rights in respect of the real property set forth on Schedule 2.1(d)(ii) (collectively, the "Leased Real Property"), to the extent such rights may be transferred under applicable Law;

(e)     all Intellectual Property, including the Intellectual Property set forth on Schedule 2.1(e) (collectively, the "Purchased Intellectual Property");

(f)     all goodwill of the Seller;

(g)     to the extent transferable under applicable Law, all Governmental Authorizations held by the Seller;

(h)     to the extent transferable under applicable Law, all books, records, files and papers, including all advertising materials, client and customer lists, supplier and vendor lists, purchase orders, sales and purchase invoices, production reports, personnel and employment records, and financial and accounting records other than the corporate books and records of the Seller;

(i)     all the assets of the Seller Employee Benefit Plans transferred pursuant to Article 10;

(j)     all of the Seller's claims, rights, credits, causes of action, defenses and rights of set-off against third parties relating to or arising from any of the Business, the

Purchased Assets, or Assumed Liabilities, including unliquidated rights under manufacturers' and vendors' warranties;

(k)    all cash, cash equivalents, bank deposits, investment accounts, lockboxes, certificates of deposit, marketable securities, bank accounts, corporate credit cards and other similar cash items;

(l)    all notes, accounts receivable and other receivables;

(m)    all insurance policies, binders and claims and rights thereunder and proceeds thereof;

(n)    all deposits and pre-payments made by the Seller;

(o)    all rights to refunds, credits or similar benefits relating to Taxes and other governmental charges of whatever nature for any period, or portion of any period, ending on or prior to the Closing Date;

(p)    all surveys, plans, specifications, engineering studies, marketing studies and similar items with respect to the Business;

(q)    any and all claims or causes of action, whether filed or not, against the Purchaser or its Affiliates and against the Debtors' present and former directors, officers, or employees, including without limitation, any causes of action arising as a result of the commencement of the Bankruptcy Case, whether pursuant to the Bankruptcy Code or otherwise, and including all proceeds therefrom, to the extent related to activities or time periods prior to the Closing Date; and

(r)    any and all claims of the Seller under chapter 5 of the Bankruptcy Code.

32. Pursuant to the Purchase Agreement, the following, among other things, would be excluded from the Assets(as more fully described and as referenced in the Asset Purchase Agreement):

(a) all minute books, records, stock ledgers, Tax records and all other materials that the Seller is required by Law to retain; provided, however, that at the Closing, Seller shall provide a copy to Purchaser of any such materials it is required by Law to retain;

(b) all rights under all Contracts set forth on <u>Schedule 2.2(b)</u>, including the leases described on Schedule 2.2(b) and the machinery, equipment, furniture and other items of tangible personal property located on the properties subject to such leases;

(c) all assets of the Seller Employee Benefit Plans which are not transferred pursuant to Article 10;

(d) all claims of the Seller under chapter 5 of the Bankruptcy Code that are not acquired by the Purchaser prior to the Closing Date;

(e) all rights arising under any Excluded Liability; and

(f) all rights of the Seller under this Agreement or any of the ancillary agreements to which the Seller is a party.

33. The Debtor will not make any representation or warranty as to the Assets to be sold, or their suitability for any particular purpose or merchantability, except as set forth in the Purchase Agreement.

34. The obligations of the Buyer under the Purchase Agreement to consummate the transactions contemplated therein at the Closing are subject to the satisfaction of the conditions precedent set forth in the Purchase Agreement.

35.     Without any further order of the Bankruptcy Court, if for any reason the Successful Bidder fails to consummate the Sale within such time as is determined reasonable by the Debtor's Auction Team, in their sole discretion after consultation with the UCC, the Backup Bidder will be deemed to have submitted the highest or best bid and the Debtors and the Debtors are authorized to effect the Sale to the Backup Bidder as soon as is commercially reasonable. If the Stalking Horse is neither the Successful Bidder nor the Backup Bidder, but is a Qualified Bidder, and the Backup Bidder fails to consummate the Sale within such time as is determined reasonable by the Debtor's Auction Team, in its sole discretion after consultation with the UCC, the Debtor and the Stalking Horse are authorized to effect the Sale to the Stalking Horse.

36.     Following the Sale, (i) if such failure to consummate the Sale is the result of a breach by the Successful Bidder or the Backup Bidder, the Successful Bidder or the Backup Bidder, as the case may be, shall be deemed to have forfeited its deposit and the Debtor additionally reserves the right to seek all available damages from any defaulting Bidder, and (ii) if such failure to consummate the Sale is the result of a breach by the Debtor, the Successful Bidder or Backup Bidder, as the case may be, shall have no recourse against the Debtor other than for recovery of its deposit.

## ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

37.     As part of the Sale, the Debtors will seek authority to assume and assign to the Buyer certain Executory Contracts, as designated by the Buyer and which the Debtor may assume and assign under applicable law.  The proposed form of such assignment will be set forth in the Purchase Agreement to be filed with this Court.

38.     Not less than twenty (20) days before the Sale Hearing, the Debtor will file with the Court and serve on each party to an Executory Contract a notice setting forth the amount of

cure owed thereunder according to the Debtor's books and records (the "Cure Notice"). The Cure Notice will state the amount that the Debtors believe is necessary to assume such contract or lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount"), and notify each party that such party's lease or contract may be assumed and assigned to the Buyer.

39.     The Cure Notice will require that any objection to the Cure Amount be filed on or before the date that is five (5) days before the Sale Hearing (the "Cure Objection Deadline"). The Cure Notice will also provide that any objection to the Cure Amount must state with specificity what cure the party to the Executory Contract believes is required with appropriate documentation in support thereof. The Debtors request that, if an objection is timely filed, the Court resolve any dispute regarding the amount of any disputed Cure Amount or objection to the assumption and assignment of an Executory Contract at the Sale Hearing. If no objection is timely received, the Debtors request that the Cure Amount set forth in the Cure Notice be controlling notwithstanding anything to the contrary in any assumed contract or other document as of the date of the Cure Notice.

## BASIS FOR RELIEF AND APPLICABLE AUTHORITY

**A.      The Sale**

40.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363(b), does not provide an express standard for determining whether the Court should approve any particular purchase or sale.

41.     The Fifth Circuit has however set forth the standard for authorization of a sale, acknowledging that each hearing on a Section 363(b) transaction "cannot become a mini-hearing on plan confirmation." *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1227 (5th Cir. 1986). Specifically, according to the Fifth Circuit:

> We also agree with the Second Circuit that implicit in section 363(b) is the further requirement of justifying the proposed transaction. *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business...whether the proffered business justification is sufficient depends on the case.

*Id.* at 1226.

42. Thus where the proposed sale is merely a transfer of assets for value not effectively short circuiting the requirements of Chapter 11, and the Debtors' decision represents a reasonable business judgment, the court should authorize the transaction. *See id; In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983). Indeed, court approval of a proposed transaction "should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. . . ." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (quoting *Allied Technology, Inc. v. R.B. Brunemann & Sons*, 25 Bankr. 484, 495 (Bankr.S.D. Ohio 1982)). Requiring a debtor to justify its actions beyond the "business judgment" standard if creditors object "would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control in case impartially. Id. at 1311 (*citing In re Airlift International, Inc.*, 18 Bankr. 787, 789 (Bankr. S.D.Fla. 1982); *In re Curlew Valley Assocs.*, 14 Bankr. 506, 509-514 (Bankr. D. Utah 1981)); s*ee also In re Condere Corp.,* 228 B.R. 615 (Bankr. S.D. Miss. 1998) (granting debtor's motion to sell assets under section 363 where the court found the debtor met the requisite business justification for the sale, including a lack of any offer to purchase the debtor in prior prepetition attempts to sell the company).

43. Thus, the Court should grant the relief requested in this Motion because the Debtors demonstrate a sound business justification therefor.

44. The Debtors have a sound business justifications for selling the Assets at this time pursuant to the Sale Procedures outlined above. The Debtors do not have the financial resources or access to capital necessary to implement a prolonged restructuring or sale process. Prior sale efforts have suggested that that the Debtors' assets are worth substantially less than the amounts owed to the Prepetition Secured Lenders. The Sale Procedures outlined above are necessary as they represent the only viable option likely to maximize value for stakeholders and avoid conversion to a case under chapter 7 of the Bankruptcy Code or a dismissal of the chapter 11 case and subsequent foreclosure proceeding, both of which would result in less value for all parties in interest. The Debtor has therefore determined, based upon its sound business judgment, that the most viable option for maximizing the value of its estate is through a sale of substantially all of its assets based upon the Sale Procedures.

**B.  The Assumption and Assignment of the Executory Contracts Should be Authorized**

45. Section 365(f)(2) of the Bankruptcy Code provides that:

> [t]he trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

46. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor as follows:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

47.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *See*, *e.g.*, *EBG Midtown South Corp. v. McLaren/Hart Env. Engineering Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992); *In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

48.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See*, *e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

49.     To the extent that any defaults exist under any of the Executory Contracts to be assumed and assigned in connection with the Sale, the Buyer shall cure any such default in connection with such assumption and assignment subject to the terms and conditions of the

Purchase Agreement.    Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Buyer, and its willingness and ability to perform under the Executory Contracts to be assumed and assigned.

50.    The Sale Hearing will therefore provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Buyer to provide adequate assurance of future performance under the Executory Contracts to be assumed and assigned.

**C.    Form and Manner of Notice**

51.    The Debtors will provide the Sale Notice to any parties who have previously expressed an interest in the Assets or who may be interested in purchasing the Assets and all creditors of the Debtors and all contract parties, in accordance with Bankruptcy Rule 2002(a)(2), by mailing such notice more than twenty (20) days prior to the date set by this Court for the Sale Hearing.    In addition, the Debtors will publish the Sale Notice (the form of such publication notice is attached hereto as **Exhibit  D** ) in Nations Restaurants News on a date no greater than 7 days after entry of this Order.

52.    The Debtors submit that the form and manner of service of the Sale Notice is appropriate under the circumstances and complies with all applicable Bankruptcy Rules.

**WHEREFORE**, the Debtors respectfully request the Court enter an order: (a) approving the Sale Procedures, (b) setting a date for the Sale Hearing, and (c) approving the Sale Notice and (d) granting such other and further relief as is necessary.

Dated:  March 13, 2014                        Respectfully submitted,

                                           **BAKER & McKENZIE LLP**
                                           Trammell Crow Center
                                           2001 Ross Avenue, Suite 2300
                                           Dallas, Texas 75201
                                           Tel:  (214) 978-3000
                                           Fax:  (214) 978-3099
                                           Emails:  john.mitchell@bakermckenzie.com
                                                          david.parham@bakermckenzie.com
                                                          rosa.shirley@bakermckenzie.com

                                    By:    */s/ John E. Mitchell*
                                        John E. Mitchell, SBT # 00797095
                                        David W. Parham, SBT# 15459500
                                        Rosa A. Shirley, SBT #24056313

                                    **ATTORNEYS FOR THE DEBTORS**

## CERTIFICATE OF CONFERENCE

      This is to certify that on March 13, 2014, I conferred with committee counsel regarding the relief requested herein, to include the request for an expedited setting.  The Creditors' Committee is considering the relief requested herein.

                                    */s/ John E. Mitchell*
                                    John E. Mitchell

## CERTIFICATE OF SERVICE

      This is to certify that on March 14, 2014, a copy of the foregoing document was served on the parties registered to receive electronic notification via the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas, and on those parties on the Master Service List via overnight delivery.

                                    */s/ John E. Mitchell*
                                    John E. Mitchell

                                    **DEBTORS**