Draft of March 13, 2014

# EXHIBIT A

Draft of March 13, 2014

**ASSET PURCHASE AGREEMENT**

**by and between**

**Chatham Credit Management III, LLC (or its designee)**

**and**

**Buffet Partners, L.P.**

_____

**March \_\_\_\_\_, 2014**

# TABLE OF CONTENTS

**Page**

ARTICLE 1      DEFINITIONS AND CONSTRUCTION ................................................................. 1

     Section 1.1      Definitions ......................................................................................... 1

     Section 1.2      Additional Defined Terms ................................................................ 5

     Section 1.3      Construction ...................................................................................... 7

ARTICLE 2      THE TRANSACTION .......................................................................................... 7

     Section 2.1      Sale and Purchase of Purchased Assets ............................................ 7

     Section 2.2      Excluded Assets ................................................................................ 8

     Section 2.3      Assumed Liabilities .......................................................................... 9

     Section 2.4      Excluded Liabilities ......................................................................... 9

     Section 2.5      Consideration ................................................................................. 10

     Section 2.6      Allocation of Purchase Price .......................................................... 10

     Section 2.7      Closing ........................................................................................... 10

     Section 2.8      Closing Deliveries .......................................................................... 10

     Section 2.9      Payment of Cure Amounts ............................................................. 11

     Section 2.10      Consents ......................................................................................... 11

ARTICLE 3      REPRESENTATIONS AND WARRANTIES OF THE SELLER ........................... 12

     Section 3.1      Organization ................................................................................... 12

     Section 3.2      Authority and Enforceability .......................................................... 12

     Section 3.3      No Conflict ..................................................................................... 12

     Section 3.4      Disclaimer of Other Representations and Warranties ................................. 12

ARTICLE 4      REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ................. 13

     Section 4.1      Organization and Good Standing ................................................... 13

     Section 4.2      Authority and Enforceability .......................................................... 13

     Section 4.3      No Conflict ..................................................................................... 13

     Section 4.4      Legal Proceedings .......................................................................... 13

     Section 4.5      Brokers Fees ................................................................................... 13

     Section 4.6      Financial Capacity .......................................................................... 13

     Section 4.7      No Knowledge of Breach or Inaccuracy ........................................ 13

     Section 4.8      Independent Investigation .............................................................. 14

ARTICLE 5      COVENANTS .................................................................................................... 14

     Section 5.1      Access and Investigation ................................................................ 14

     Section 5.2      Operation of the Business ............................................................... 14

-i-

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 5.3 | Consents and Filings; Best Efforts | 15 |
| Section 5.4 | Supplements to Disclosure Schedules | 16 |
| Section 5.5 | Confidentiality | 16 |
| Section 5.6 | Public Announcements | 16 |
| Section 5.7 | Further Actions | 16 |
| Section 5.8 | Bulk Transfer Laws | 17 |
| Section 5.9 | Bankruptcy Court Filings | 17 |
| Section 5.10 | Exclusivity; Solicitation | 17 |
| Section 5.11 | Other Bids | 18 |
| Section 5.12 | Assumption & Rejection of Executory Contracts | 18 |
| ARTICLE 6 | CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE | 19 |
| Section 6.1 | Conditions to the Obligation of the Purchaser | 19 |
| Section 6.2 | Conditions to the Obligation of the Seller | 20 |
| ARTICLE 7 | TERMINATION | 20 |
| Section 7.1 | Termination Events | 20 |
| Section 7.2 | Effect of Termination | 21 |
| Section 7.3 | Certain Effects of Termination | 21 |
| ARTICLE 8 | NO SURVIVAL | 21 |
| Section 8.1 | No Survival of Representations and Warranties and Certain Covenants | 21 |
| ARTICLE 9 | TAX MATTERS | 22 |
| Section 9.1 | Transfer Taxes | 22 |
| ARTICLE 10 | EMPLOYEE MATTERS | 22 |
| Section 10.1 | Employees | 22 |
| Section 10.2 | Defined Contribution Plan | 22 |
| Section 10.3 | Welfare Arrangements | 23 |
| Section 10.4 | WARN Act | 23 |
| ARTICLE 11 | GENERAL PROVISIONS | 24 |
| Section 11.1 | Notices | 24 |
| Section 11.2 | Amendment | 24 |
| Section 11.3 | Waiver and Remedies | 24 |
| Section 11.4 | Entire Agreement | 25 |
| Section 11.5 | Assignment, Successors and No Third Party Rights | 25 |

-ii-

# TABLE OF CONTENTS
(continued)

**Page**

Section 11.6          Severability ................................................................................. 25

Section 11.7          Exhibits and Schedules ................................................................ 25

Section 11.8          Interpretation .............................................................................. 25

Section 11.9          Expenses ..................................................................................... 26

Section 11.10        Governing Law ........................................................................... 26

Section 11.11        Limitation on Liability ............................................................... 26

Section 11.12        Specific Performance ................................................................. 26

Section 11.13        Jurisdiction and Service of Process ............................................ 26

Section 11.14        Waiver of Jury Trial ................................................................... 27

Section 11.15        No Joint Venture ......................................................................... 27

Section 11.16        Counterparts ............................................................................... 27

Section 11.17        Waiver and Release of Avoidance Actions against the Purchaser .............. 27

Exhibits

Exhibit A – Form of Sale Order

Exhibit B – Form of Bill of Sale

Exhibit C – Form of Assignment and Assumption Agreement

Exhibit D – Form of Bidding Procedure Order

738245-v7\DALDMS

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is made as of March [____], 2014, by and between Buffet Partners, L.P., a Texas limited partnership (the "Seller"), and Chatham Credit Management III, LLC (or its designee) (the "Purchaser").

The Seller is engaged in the restaurant business, including food processing, manufacturing, warehousing and distribution of products used in its restaurants and certain restaurants owned by third parties and on behalf of other third party customers (the "Business").

On February 4, 2014 (the "Petition Date"), the Seller commenced a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), which case is being administered under Case No. 14-30699-11 (the "Bankruptcy Case").

Since the Petition Date, the Seller has been a debtor and debtor-in-possession in the Bankruptcy Case and is operating its business and managing its properties pursuant to section 1108 of the Bankruptcy Code.

The Seller desires to sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser desires to purchase and acquire from the Seller, all of the Purchased Assets pursuant to the Sale Order approving such sale free and clear of all Liens and Claims, all as more specifically provided in this Agreement, and in accordance with sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bidding Procedures Order.

NOW, THEREFORE, intending to be legally bound and in consideration of the mutual provisions set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION

Section 1.1    Definitions.  For the purposes of this Agreement:

"Acquisition Proposal" means any inquiry, proposal or offer from any Person relating to any sale, transfer or other disposition, in one transaction or a series of transactions, of all or any substantial portion of the Purchased Assets or the Business to one or more Persons other than Purchaser or its Affiliates or designees, whether proposed to be effected pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed or advanced by the Seller.

"Affiliate" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person.  In addition to the foregoing, if the specified Person is an individual, the term "Affiliate" also includes (a) the individual's spouse, (b) the members of the immediate family (including parents, siblings and children) of the individual or of the individual's spouse and (c) any corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity that directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with any of the foregoing individuals.  For purposes of this definition, the term "control"

(including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Auction" means the auction conducted by the Seller pursuant to the Bidding Procedures Order.

"Business Day" means any day other than Saturday, Sunday or any day on which banking institutions in Dallas, Texas are closed either under applicable Law or action of any Governmental Authority.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Code" means the Internal Revenue Code of 1986.

"Contract" means any contract, agreement, lease, license, commitment, understanding, franchise, warranty, guaranty, mortgage, note, bond or other instrument or consensual obligation that is legally binding.

"Cure Amount" means, for any Executory Contract, the amount required to be paid under Section 365 of the Bankruptcy Code or otherwise to effectuate the assumption and assignment of such Executory Contract by the Seller to the Purchaser.

"Environmental Law" means any Law concerning (a) the treatment, disposal, emission, discharge, Release or threatened Release of Hazardous Material or (b) the protection of the environment (including natural resources, air and surface or subsurface land or waters).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Executory Contract" means a Contract that is an "executory contract" or "unexpired lease", as such terms are used in section 365 of the Bankruptcy Code.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024(b) shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) calendar days of the entry of the order at issue. In the case of the Sale Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings a fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed with Closing.

"GAAP" means United States generally accepted accounting principles.

"Governmental Authority" means any (a) nation, region, state, county, city, town, village, district or other jurisdiction, (b) federal, state, local, municipal, foreign or other government, (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or other entity and any court or other tribunal), (d) multinational organization exercising judicial, legislative or regulatory power or (e) body exercising, or entitled to exercise, any administrative, executive, judicial,

legislative, police, regulatory or taxing authority or power of any nature of any federal, state, local, municipal, foreign or other government.

"Governmental Authorization" means any approval, consent, ratification, waiver, license, permit, registration or other authorization issued or granted by any Governmental Authority.

"Hazardous Material" means any waste or other substance that is listed, defined, designated or classified as hazardous, radioactive or toxic or a pollutant or a contaminant under any Environmental Law, including any admixture or solution thereof, and including petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos or asbestos-containing materials in any form or condition and polychlorinated biphenyls.

"Intellectual Property" means all of the following anywhere in the world and all legal rights, title or interest in the following arising under Law: (a) all patents and applications for patents and all related reissues, reexaminations, divisions, renewals, extensions, provisionals, continuations and continuations in part; (b) all copyrights, copyright registrations and copyright applications, copyrightable works and all other corresponding rights; (c) all mask works, mask work registrations and mask work applications and all other corresponding rights; (d) all trade dress and trade names, logos, Internet addresses and domain names, trademarks and service marks and related registrations and applications, including any intent to use applications, supplemental registrations and any renewals or extensions, all other indicia of commercial source or origin and all goodwill associated with any of the foregoing; (e) all inventions (whether patentable or unpatentable and whether or not reduced to practice), know how, technology, technical data, trade secrets, confidential business information, manufacturing and production processes and techniques, research and development information, financial, marketing and business data, pricing and cost information, business and marketing plans, advertising and promotional materials, customer, distributor, reseller and supplier lists and information, correspondence, records, and other documentation, and other proprietary information of every kind; (f) all computer software (including source and object code), firmware, development tools, algorithms, files, records, technical drawings and related documentation, data and manuals; (g) all databases and data collections; (h) all licenses and permits to the extent transferable; and (i) all other intellectual property rights.

"IRS" means the United States Internal Revenue Service and, to the extent relevant, the United States Department of Treasury.

"Judgment" means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"Law" means any federal, state, local, municipal, foreign, international, multinational, or other constitution, law, statute, treaty, rule, regulation, ordinance or code.

"Liability" means any liability or obligation, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due.

"Lien" means any charge against or interest in property to secure payment of a debt or performance of an obligation; including any mortgage, pledge, security interest, attachment, easement, restriction, encumbrance, lien (statutory or otherwise), option, tax, conditional sale agreement, right of first refusal or right of first offer (including any agreement to give any of the foregoing).

"Loss" means any direct and actual Liabilities, losses, damages, Judgments, fines, penalties, costs or expenses (including reasonable attorney's or other professional fees and expenses) but excluding any special, incidental, indirect, exemplary, punitive or consequential damages (including lost profits, loss

of revenue or lost sales, or amounts calculated as a multiple of earnings, profits, revenue, sales or other measure).

"Material Adverse Effect" means any event, change, circumstance, effect or other matter that has a material adverse effect on (a) the financial condition or results of operations of the Business, taken as a whole, or (b) the ability of the Seller to consummate timely the transactions contemplated by this Agreement; provided, however, that none of the following, either alone or in combination, will constitute, or be considered in determining whether there has been, a Material Adverse Effect:  any event, change, circumstance, effect or other matter resulting from or related to (i) any outbreak or escalation of war or major hostilities or any act of terrorism, (ii) changes in Laws, GAAP or enforcement or interpretation thereof, (iii) changes that generally affect the industries and markets in which the Business operates, (iv) changes in financial markets, general economic conditions (including prevailing interest rates, exchange rates, commodity prices and fuel costs) or political conditions, (v) any failure, in and of itself, of the Business to meet any published or internally prepared projections, budgets, plans or forecasts of revenues, earnings or other financial performance measures or operating statistics (it being understood that the facts and circumstances underlying any such failure that are not otherwise excluded from the definition of a "Material Adverse Effect" may be considered in determining whether there has been a Material Adverse Effect), (vi) any action taken or failed to be taken pursuant to or in accordance with this Agreement or at the request of, or consented to by, the Purchaser, (vii) the filing of the Bankruptcy Case or any action approved by the Bankruptcy Court (or any other Governmental Authority in connection with any such Proceeding), or (viii) the execution or delivery of this Agreement, the consummation of the transactions contemplated by this Agreement or the public announcement or other publicity with respect to any of the foregoing.

"Permitted Exceptions" shall mean all claims and liens arising under the Perishable Agricultural Commodities Act ("PACA")

"Person" means an individual or an entity, including a corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity, or any Governmental Authority.

"Pre-Petition Financing" means financing evidenced by the Second Amended and Restated Loan and Security Agreement (as amended, the "Restated Loan Agreement") entered into as of April 3, 2009, by and among, on the one hand, Chatham Credit Management III, LLC, a Georgia limited liability company, not individually, but as agent for Chatham Investment Fund QPIII, LLC and Chatham Investment Fund III, LLC ("Chatham III"), as administrative agent for the lenders under the Restated Loan Agreement (in such capacity, together with its successors and assigns in such capacity, "Administrative Agent"); and Chatham III and Chatham Capital Management II, LLC, not individually, but as agent for Chatham Investment Fund QPII, LLC and Chatham Investment Fund II, LLC, as lenders, and, on the other hand, Seller, as borrower, and the promissory notes issued under the Restated Loan Agreement described on Schedule 1.1.

"Proceeding" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Release" means the release, spill, emission, leaking, pumping, pouring, emptying, escaping, dumping, injection, deposit, disposal, discharge, dispersal, leaching or migrating of any Hazardous Material into the environment.

"Sale Order" means the order of the Bankruptcy Court, substantially in the form attached as Exhibit A, to be entered by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code, which order approves the sale of the Business and the Purchased Assets to the Purchaser on the terms and conditions set forth in this Agreement, free and clear of all Claims and Liens pursuant to section 363(f) of the Bankruptcy Code, and the assumption and assignment of the Included Contracts to the Purchaser, and containing a finding that the transactions contemplated by this Agreement are undertaken by the Seller and the Purchaser at arm's length, without collusion and in good faith by the Purchaser within the meaning of section 363(m) of the Bankruptcy Code.

"Schedule" means the Seller Disclosure Schedule or the Purchaser Disclosure Schedule, as the context requires.

"Seller Employee Benefit Plan" means any "employee benefit plan" (as defined in Section 3(3) of ERISA) and any other material plan, Contract or arrangement involving direct or indirect compensation, including insurance coverage, severance benefits, deferred compensation, bonuses, stock options, stock purchase, phantom stock, stock appreciation or other forms of incentive compensation or post-retirement compensation maintained or contributed to by the Seller for the benefit of any employee.

"Subsidiary" means, with respect to a specified Person, any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred) are held by the specified Person or one or more of its Subsidiaries. When used in this Agreement without reference to a particular Person, "Subsidiary" means a Subsidiary of the Seller.

"Tax" means (a) any federal, state, local, foreign or other tax, charge, fee, duty (including customs duty), levy or assessment, including any income, gross receipts, net proceeds, alternative or add-on minimum, corporation, ad valorem, turnover, real property, personal property (tangible or intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, profits, occupational, premium, interest equalization, windfall profits, severance, license, registration, payroll, environmental (including taxes under Section 59A of the Code), capital stock, capital duty, disability, estimated, gains, wealth, welfare, employee's income withholding, other withholding, unemployment or social security or other tax of whatever kind (including any fee, assessment or other charges in the nature of or in lieu of any tax) that is imposed by any Governmental Authority, (b) any interest, fines, penalties or additions resulting from, attributable to, or incurred in connection with any items described in this paragraph or any related contest or dispute and (c) any Liability for the Taxes of another Person.

"Tax Return" means any report, return, declaration, claim for refund, or information return or statement related to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, and any similar foreign, state or local Law.

"Wind-Down Amount" means $600,000, for the benefit of allowed general unsecured claims and wind down expenses of the estate.

Section 1.2    Additional Defined Terms. For purposes of this Agreement, the following terms have the meanings specified in the indicated Section of this Agreement:

| Defined Term | Section |
|---|---|

| Defined Term | Section |
|---|---|
| Agreement | Preamble |
| Allocation Statement | 2.6(a) |
| Assignment and Assumption Agreement | 2.8(a) |
| Assumable Executory Contract | 5.12(a) |
| Assumed Liabilities | 2.3 |
| Assumption Effective Date | 5.12(b) |
| Bankruptcy Case | Preamble |
| Bankruptcy Code | Preamble |
| Bankruptcy Court | Preamble |
| Bidding Procedures | 5.9(a) |
| Bidding Procedures Order | 5.9(a) |
| Bill of Sale | 2.8(a) |
| Business | Preamble |
| Business Information | 5.5(b) |
| Closing | 2.7 |
| Closing Date | 2.7 |
| Confidentiality Agreement | 5.5(a) |
| Contract & Cure Schedule | 5.12(a) |
| Contract Procedures | 5.9(a) |
| Employees | 10.1(a) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Executory Contract Designation Deadline | 5.12(a) |
| Governmental Antitrust Authority | 5.3(a) |
| Included Contracts | 2.1(b) |
| Interim Balance Sheet | 3.4(a) |
| IP Assignments | 2.8(a) |
| Leased Real Property | 2.1(d) |
| Owned Real Property | 2.1(d) |
| Petition Date | Preamble |
| Purchase Price | 2.5 |
| Purchased Assets | 2.1 |
| Purchased Intellectual Property | 2.1(e) |
| Purchaser | Preamble |
| Purchaser Disclosure Schedule | Article 4 |
| Rejection Effective Date | 5.12(c) |
| Sale and Procedures Motion | 5.9(a) |
| Savings Plan | 10.2(a) |
| Seller | Preamble |
| Seller Disclosure Schedule | Article 3 |
| Transfer Taxes | 9.1(a) |
| Transferred Employees | 10.1(a) |
| Welfare Plans | 10.3 |

Section 1.3    Construction.   Any reference in this Agreement to an "Article," "Section," "Exhibit" or "Schedule" refers to the corresponding Article, Section, Exhibit or Schedule of or to this Agreement, unless the context indicates otherwise.  The table of contents and the headings of Articles and Sections are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement.  All words used in this Agreement are to be construed to be of such gender or number as the circumstances require.  The words "including," "includes" or "include" are to be read as listing non-exclusive examples of the matters referred to, whether or not words such as "without limitation" or "but not limited to" are used in each instance.  Where this Agreement states that a party "shall", "will" or "must" perform in some manner or otherwise act or omit to act, it means that the party is legally obligated to do so in accordance with this Agreement.  Any reference to a statute is deemed also to refer to any amendments or successor legislation as in effect at the relevant time.  Any reference to a Contract or other document as of a given date means the Contract or other document as amended, supplemented and modified from time to time through such date.

# ARTICLE 2
# THE TRANSACTION

Section 2.1    Sale and Purchase of Purchased Assets.   In accordance with the provisions of this Agreement and the Sale Order, and except as set forth in Section 2.2, at the Closing, the Seller will, to the extent transferable under applicable Law, sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Seller, all of the Seller's right, title and interest in and to all of the properties and assets of every kind and description of the Seller, whether real, personal or mixed, tangible or intangible, and wherever located (collectively, the "Purchased Assets"), including the following:

(a)    all inventory as of the Closing Date, including all finished goods, work in process and raw materials;

(b)    all of the rights of the Seller under all Contracts to which the Seller is a party, by which the Seller or any of the Purchased Assets is bound or affected or pursuant to which Seller is a beneficiary, including any rights the Seller may have under nondisclosure, confidentiality, non-solicitation, non-competition and similar agreements and those Contracts set forth in Schedule 2.1(b) to the extent such Contracts are assumed pursuant to Section 5.12 (collectively, the "Included Contracts"); provided, however, that if any Contract is recharacterized by a Final Order as a secured financing, then the real property or personal property that is subject to such Contract shall be a Purchased Asset;

(c)    all machinery, equipment, furniture, fixtures, rolling stock and other items of tangible personal property;

(d)    (i) the real property set forth on Schedule 2.1(d)(i) (collectively, the "Owned Real Property") and (ii) all rights in respect of the real property set forth on Schedule 2.1(d)(ii) (collectively, the "Leased Real Property"), to the extent such rights may be transferred under applicable Law;

(e)    all Intellectual Property, including the Intellectual Property set forth on Schedule 2.1(e) (collectively, the "Purchased Intellectual Property");

(f)    all goodwill of the Seller;

(g)    to the extent transferable under applicable Law, all Governmental Authorizations held by the Seller;

(h)     to the extent transferable under applicable Law, all books, records, files and papers, including all advertising materials, client and customer lists, supplier and vendor lists, purchase orders, sales and purchase invoices, production reports, personnel and employment records, and financial and accounting records other than the corporate books and records of the Seller;

(i)     all the assets of the Seller Employee Benefit Plans transferred pursuant to Article 10;

(j)     all of the Seller's claims, rights, credits, causes of action, defenses and rights of set-off against third parties relating to or arising from any of the Business, the Purchased Assets, or Assumed Liabilities, including unliquidated rights under manufacturers' and vendors' warranties;

(k)     all cash, cash equivalents, bank deposits, investment accounts, lockboxes, certificates of deposit, marketable securities, bank accounts, corporate credit cards and other similar cash items;

(l)     all notes, accounts receivable and other receivables;

(m)     all insurance policies, binders and claims and rights thereunder and proceeds thereof;

(n)     all deposits and pre-payments made by the Seller;

(o)     all rights to refunds, credits or similar benefits relating to Taxes and other governmental charges of whatever nature for any period, or portion of any period, ending on or prior to the Closing Date;

(p)     all surveys, plans, specifications, engineering studies, marketing studies and similar items with respect to the Business;

(q)     any and all claims or causes of action, whether filed or not, against the Purchaser or its Affiliates and against the Debtors' present and former directors, officers, or employees, including without limitation, any causes of action arising as a result of the commencement of the Bankruptcy Case, whether pursuant to the Bankruptcy Code or otherwise, and including all proceeds therefrom, to the extent related to activities or time periods prior to the Closing Date; and

(r)     any and all claims of the Seller under chapter 5 of the Bankruptcy Code.

Section 2.2     Excluded Assets.   Notwithstanding the terms of Section 2.1, the Seller will not sell, convey, assign, transfer or deliver to the Purchaser, and the Purchaser will not purchase or acquire, and the Purchased Assets do not include, any of the following assets (the "Excluded Assets"):

(a)     all minute books, records, stock ledgers, Tax records and all other materials that the Seller is required by Law to retain; provided, however, that at the Closing, Seller shall provide a copy to Purchaser of any such materials it is required by Law to retain;

(b)     all rights under all Contracts set forth on Schedule 2.2(b), including the leases described on Schedule 2.2(b) and the machinery, equipment, furniture and other items of tangible personal property located on the properties subject to such leases;

(c)     all assets of the Seller Employee Benefit Plans which are not transferred pursuant to Article 10;

(d)     all claims of the Seller under chapter 5 of the Bankruptcy Code that are not acquired by the Purchaser prior to the Closing Date;

(e) all rights arising under any Excluded Liability; and

(f) all rights of the Seller under this Agreement or any of the ancillary agreements to which the Seller is a party.

Section 2.3 Assumed Liabilities.  In accordance with the provisions of this Agreement and the Sale Order, at the Closing, the Purchaser will assume and pay or perform and discharge when due the following Liabilities of the Seller, in each case other than the Excluded Liabilities (the "Assumed Liabilities"):

(a) all (i) trade accounts payable of the Seller to third parties set forth on Schedule 2.3(a) or incurred by the Seller in the ordinary course of business after the Petition Date and remain unpaid prior to the Closing (ii) the then outstanding unpaid fees and expenses of the Debtors' retained restructuring professionals that are incurred prior to Closing and allowed by the Bankruptcy Court, in an amount not to exceed $600,000 in the aggregate, reduced by amounts actually paid to such restructuring professionals prior to Closing, and (iii) the then outstanding unpaid fees and expenses of the Creditors' Committee's retained restructuring professionals that are incurred prior to Closing and allowed by the Bankruptcy Court, in an amount not to exceed $150,000 in the aggregate, reduced by amounts actually paid to such restructuring professionals prior to Closing;

(b) all Liabilities for Taxes imposed on the Purchaser pursuant to Section 9.1;

(c) all Liabilities of the Seller arising after the Closing under the Included Contracts and the Governmental Authorizations included in the Purchased Assets;

(d) to the extent set forth next to any Included Contract on Schedule 2.3(d), any Cure Amount with respect to such Included Contract;

(e) all Liabilities relating to the employment of Transferred Employees arising after the Closing;

(f) all Liabilities assumed by the Purchaser pursuant to Article 10;

(g) all Liabilities associated with the Owned Real Property and the Leased Real Property arising after the Closing;

(h) all Liabilities associated with the Purchased Assets relating to or arising out of environmental matters, including those arising under any Environmental Law, and arising after the Closing Date;

(i) all Liabilities specifically identified on Schedule 2.3(i); and

(j) all other Liabilities arising out of, relating to or incurred in connection with the Business or the Purchased Assets arising after the Closing including (i) the operation of the Business after the Closing, (ii) the use by the Purchaser or its permitted licensees of Purchased Intellectual Property and (iii) any other condition arising after the Closing with respect to the Purchased Assets.

Section 2.4 Excluded Liabilities.  Notwithstanding any other provision of this Agreement or any other writing to the contrary, the Purchaser is assuming only the Assumed Liabilities and is not assuming any other Liability of the Seller of whatever nature, whether presently in existence or arising hereafter (the "Excluded Liabilities").  Such Excluded Liabilities include the following:

(a)    any Liability for Taxes of the Seller or attributable to the Business or the Purchased Assets for any period, or any portion of any period, ending on or prior to the Closing Date (other than Taxes imposed on the Purchaser pursuant to Section 9.1) except to the extent specifically identified on Schedule 2.3(i);

(b)    any Liability arising out of or related to any Excluded Asset;

(c)    any litigation claims arising prior to the Closing Date, including, without limitation, any breach of contract claims, environmental claims and assessments; and

(d)    any Liabilities arising prior to Closing under any Environmental Law.

Section 2.5    Consideration.    The consideration for the Purchased Assets (the "Purchase Price") consists of (a) cash in the amount of the Wind-Down Amount, (b) the assumption of the Assumed Liabilities and (c) a credit bid of the Pre-Petition Financing in the amount of $21,900,000 (the "Credit Bid").

Section 2.6    Allocation of Purchase Price.

(a)    Within 60 days after the Closing Date, the Purchaser will deliver to the Seller an allocation statement (the "Allocation Statement"), setting forth its calculation of the allocation of the sum of the Purchase Price and the Assumed Liabilities to the Purchased Assets.  The Seller will review the Allocation Statement and, to the extent the Seller disagrees in good faith with the content of the Allocation Statement, the Seller will inform the Purchaser of such disagreement within 30 days after receipt of the Allocation Statement.  The Seller and the Purchaser will attempt to resolve any such disagreement.  If the Seller and the Purchaser are unable to reach a good faith agreement on the content of the Allocation Statement within 90 days of the Closing Date, the Seller and the Purchaser will each use its own allocation statement.

(b)    If the Purchaser and the Seller agree on the Allocation Statement, the Purchaser and the Seller will report the allocation of the Purchase Price in a manner consistent with the Allocation Statement and will act in accordance with the Allocation Statement in the preparation and filing of all Tax Returns and for all other Tax, financial accounting or other purposes, in any litigation, or otherwise.

(c)    The Purchaser and the Seller will promptly inform one another of any challenge by any Governmental Authority to any allocation made pursuant to this Section 2.6 and agree to consult with and keep each other informed with respect to the status of, and any discussion, proposal or submission with respect to, such challenge.

Section 2.7    Closing.    The closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of Baker & McKenzie LLP, 2001 Ross Avenue, Suite 2300, Dallas, Texas 75201, at 10:00 a.m., local time, as soon as practicable, but in no event later than thirty (30) days after entry of the Sale Order.  The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 2.8    Closing Deliveries.

(a)    At the Closing, the Seller will deliver or cause to be delivered to the Purchaser:

(i)    a bill of sale in the form of Exhibit B (the "Bill of Sale") executed by the Seller;

(ii)     an assignment and assumption agreement in the form of <u>Exhibit  C</u> (the "<u>Assignment and Assumption Agreement</u>") executed by the Seller;

(iii)     for each parcel of Owned Real Property, a recordable warranty deed or such other appropriate document or instrument of transfer in accordance with local custom, each in form and substance reasonably satisfactory to the Purchaser and its counsel and executed by the Seller;

(iv)     a certificate, dated as of the Closing Date, executed by the Seller confirming the satisfaction of the conditions specified in Sections 6.1(a) and 6.1(b); and

(v)     such other instruments of sale, transfer, conveyance and assignment as the Purchaser reasonably requests for the purpose of consummating the transactions contemplated by this Agreement.

(b)     At the Closing, the Purchaser will deliver or cause to be delivered to the Seller:

(i)     the Purchase Price by delivery of (a) cash in an amount equal to the Wind Down Amount; (b) an Assignment and Assumption Agreement executed by the Purchaser; and (c) the Credit Bid;

(ii)     the Bill of Sale executed by the Purchaser;

(iii)     a certificate, dated as of the Closing Date, executed by the Purchaser confirming the satisfaction of the conditions specified in Sections 6.2(a) and 6.2(b); and

(iv)     such other instruments of assumption as the Seller reasonably requests for the purpose of consummating the transactions contemplated by this Agreement.

<u>Section 2.9</u>     <u>Payment of Cure Amounts</u>.  The Purchaser will pay any and all Cure Amounts with respect to the Included Contracts, in cash on the Assumption Effective Date (as defined herein), or in such other manner as agreed by the Purchaser and the counterparty to such Included Contract.

<u>Section 2.10</u>     <u>Consents</u>.    Notwithstanding any other provision of this Agreement, this Agreement does not effect an assignment of any Included Contract to the extent that such Included Contract is not assignable under the Bankruptcy Code without the consent of the other party or parties thereto, and the consent of such other party has not been given or received, as applicable, as of the Closing.  As to any such Included Contract so designated in writing by the Purchaser, the Seller and the Purchaser will use commercially reasonable efforts to obtain as promptly as practicable after the Closing the consent of the other parties to such Included Contract or, if required, novation thereof to the Purchaser or, alternatively, written confirmation from such parties reasonably satisfactory to the Seller and the Purchaser that such consent is not required.  In no event, however, will the Seller be obligated to pay any money to any Person or to offer or grant other financial or other accommodations to any Person in connection with obtaining any consent, waiver, confirmation, novation or approval with respect to any such Included Contract.  If any consent, waiver, confirmation, novation or approval is not obtained with respect to any such Included Contract, then the Seller and the Purchaser will cooperate to establish an agency type or other similar arrangement reasonably satisfactory to the Seller and the Purchaser under which the Purchaser would obtain (including by means of subcontracting, sublicensing or subleasing arrangement), to the extent practicable, all rights, and assume the corresponding Liabilities thereunder or under which the Seller would enforce, for the benefit of the Purchaser, with the Purchaser assuming and agreeing to pay the Seller's Liabilities and expenses, any and all rights of the Seller against a third party to any such Included Contract.  In such event (i) the Seller will promptly pay to the Purchaser when

received all moneys relating to the period on or after the Closing Date received by it under any Included Contract not transferred pursuant to this Section 2.10 and (ii) the Purchaser will promptly pay, perform or discharge when due any Liabilities arising thereunder after the Closing Date but not transferred to the Purchaser pursuant to this Section 2.10. The failure by the Purchaser or the Seller to obtain any required consent, waiver, confirmation, novation or approval with respect to any Included Contract will not relieve any party from its obligation to consummate at the Closing the transactions contemplated by this Agreement. The Purchaser acknowledges that no adjustment to the Purchase Price will be made for any such Included Contracts that are not assigned and that the Purchaser will have no claim against the Seller in respect of any such unassigned Contracts. The Seller's obligations under this Section 2.10 will terminate on the date that is 90 days after the Closing Date.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Purchaser as follows, except as set forth on the disclosure schedule delivered by the Seller to the Purchaser concurrently with the execution and delivery of this Agreement and dated as of the date of this Agreement (the "Seller Disclosure Schedule"):

Section 3.1    Organization.   The Seller is a limited partnership duly organized and validly existing under the Laws of the state of its organization and has all requisite power and authority to conduct its business as presently conducted.

Section 3.2    Authority and Enforceability.

(a)    Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Order, the Seller has all requisite corporate power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement. Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Order, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement by the Seller have been duly authorized by all necessary action on the part of the Seller. The Seller has duly and validly executed and delivered this Agreement. Assuming the due authorization, execution and delivery of this Agreement by the Purchaser and subject to the entry and effectiveness of the Sale Order, this Agreement constitutes the valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

Section 3.3    No Conflict.   Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Order and except in any case that would not have a Material Adverse Effect, neither the execution, delivery and performance of this Agreement by the Seller, nor the consummation by the Seller of the transactions contemplated by this Agreement, will (a) conflict with or violate the Seller's organizational documents, (b) result in a breach or default under, or create in any Person the right to terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any material Contract, (c) violate any Law or Judgment applicable to the Seller, the Business or the Purchased Assets or (d) require the Seller to obtain any Governmental Authorization or make any filing with any Governmental Authority.

Section 3.4    Disclaimer of Other Representations and Warranties.   The representations and warranties set forth in this Article 3 are the only representations and warranties made by the Seller with respect to the Business, the Purchased Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement. Except as specifically set forth in this Article 3, (a) the Seller is selling the Purchased Assets to the Purchaser "as is" and "where is" and with all faults, and makes no warranty, express or implied, as to any matter whatsoever relating to the Business, the Purchased Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to (i) merchantability or fitness for any particular use or purpose, (ii) the

operation of the Business by the Purchaser after the Closing in any manner or (iii) the probable success or profitability of the Business after the Closing, and (b) none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders will have, or will be subject to, any Liability or indemnification obligation to the Purchaser or any other Person resulting from the distribution to the Purchaser or its Affiliates or representatives of, or the Purchaser's use of, any information relating to the Business, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to the Purchaser or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions submitted on behalf of the Purchaser or in any other form in expectation of the transactions contemplated by this Agreement.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller as follows, except as set forth on the disclosure schedule delivered by the Purchaser to the Seller concurrently with the execution and delivery of this Agreement and dated as of the date of this Agreement (the "Purchaser Disclosure Schedule"):

Section 4.1    Organization and Good Standing.  The Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of _____ and has all requisite company power and authority to conduct its business as it is presently conducted.

Section 4.2    Authority and Enforceability.  The Purchaser has all requisite company power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Purchaser.  The Purchaser has duly and validly executed and delivered this Agreement.  Assuming the due authorization, execution and delivery of this Agreement by the Seller, this Agreement constitutes the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to (a) Laws of general application relating to bankruptcy, insolvency and the relief of debtors and (b) Laws governing specific performance, injunctive relief and other equitable remedies.

Section 4.3    No Conflict.  Except in any case that would not have a material adverse effect on the ability of the Purchaser to perform its obligations under this Agreement or on the ability of the Purchaser to consummate the transactions contemplated by this Agreement, neither the Purchaser's execution, delivery and performance of this Agreement, nor the consummation by the Purchaser of the transactions contemplated by this Agreement, will (a) conflict with or violate the Purchaser's organizational documents, (b) result in a breach or default under or create in any Person the right terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any Contract to which the Purchaser is a party or by which the Purchaser is bound, in any case with or without due notice or lapse of time or both, (c) result in the imposition of any lien or other encumbrance on any of the assets of the Purchaser, (d) violate any Law or Judgment applicable to the Purchaser or (e) require the Purchaser to obtain any Governmental Authorization or make any filing with any Governmental Authority.

Section 4.4    Legal Proceedings.   There is no Proceeding pending or, to the Purchaser's knowledge, threatened against the Purchaser that questions or challenges the validity of this Agreement or that may prevent, delay, make illegal or otherwise interfere with the ability of the Purchaser to consummate any of the transactions contemplated by this Agreement.

Section 4.5    Brokers Fees.  Neither the Purchaser nor any Person acting on its behalf has incurred any Liability to pay any fees or commissions to any broker, finder or agent in connection with any of the transactions contemplated by this Agreement.

Section 4.6    Financial Capacity.  The Purchaser has immediately available cash in an amount sufficient to allow the Purchaser to perform all of its obligations under this Agreement and immediately prior to Closing will own the Pre-Petition Financing.

Section 4.7    No Knowledge of Breach or Inaccuracy.  The Purchaser has no knowledge of any breach of, or inaccuracy in, or any fact, event, breach, condition or occurrence that may constitute a breach of, or inaccuracy in, any representation or warranty made by the Seller in this Agreement.

Section 4.8    Independent Investigation.  The Purchaser has conducted its own independent investigation, review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Business as it has deemed appropriate, which investigation, review and analysis was done by the Purchaser and its representatives.  The Purchaser acknowledges that it and its representatives have been provided adequate access to the personnel, properties, premises and records of the Business for such purpose.  In entering into this Agreement, the Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations or opinions of the Seller or its representatives (except the representations and warranties set forth in Article 3).  The Purchaser hereby acknowledges and agrees that (a) other than the representations and warranties set forth in Article 3, none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders make or have made any representation or warranty, express or implied, at law or in equity, as to any matter whatsoever relating to the Business, the Purchased Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to (i) merchantability or fitness for any particular use or purpose, (ii) the operation of the Business by the Purchaser after the Closing in any manner or (iii) the probable success or profitability of the Business after the Closing, and (b) none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders will have or will be subject to any Liability or indemnification obligation to the Purchaser or any other Person resulting from the distribution to the Purchaser or its Affiliates or representatives of, or the Purchaser's use of, any information relating to the Business or any other matter relating to the transactions contemplated by this Agreement, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to the Purchaser or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions submitted on behalf of the Purchaser or in any other form in expectation of the transactions contemplated by this Agreement.

## ARTICLE 5
## COVENANTS

Section 5.1    Access and Investigation.  Until the Closing and upon reasonable advance notice from the Purchaser, the Seller will allow the Purchaser and its representatives reasonable access during normal business hours and without unreasonable interference with the operation of the Business to (a) such materials and information about the Business as the Purchaser may reasonably request and (b) specified members of management of the Business as the parties may reasonably agree.

Section 5.2    Operation of the Business.

(a)    Until the Closing, except (i) as required by Law or as a result of the Bankruptcy Case (it being understood that no provision of this Section 5.2 will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code), (ii) as otherwise set forth in this Agreement or the Seller Disclosure Schedule or (iii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), the Seller will, and will conduct the Business in the

ordinary course of the Business in all material respects and use its commercially reasonable efforts to keep available the services of the Employees and to preserve the Business' relationships with its customers and others doing business with it.

(b)        Until the Closing, except (i) as required by Law or as a result of the Bankruptcy Case (it being understood that no provision of this Section 5.2 will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code), (ii) as otherwise set forth in this Agreement or the Seller Disclosure Schedule or (iii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), the Seller will not:

(i)        incur any indebtedness for borrowed money that constitutes an Assumed Liability other than in the ordinary course of the Business in amounts in excess of 115% of the aggregate amount budgeted in cash collateral orders approved by Chatham III or the Purchaser and entered by the Bankruptcy Court;

(ii)        materially and adversely amend any material Contract;

(iii)        waive or release any right or claim of a material value to the Business other than in the ordinary course of the Business;

(iv)        sell, lease or license, or permit any Lien on, any material portion of the Purchased Assets other than in the ordinary course of the Business;

(v)        acquire, by merger or consolidation with, or by purchase of all or a substantial portion of the assets or stock of, or by any other manner, any business or entity, or enter into any joint venture, partnership or other similar arrangement for the conduct of the Business;

(vi)        materially change the remuneration or terms of employment of any Employee other than (A) in the ordinary course of the Business, (B) as required by Law or as a result of the Bankruptcy Case or (C) for retention, incentive and similar payments relating to the consummation of the transactions contemplated by this Agreement; or

(vii)        agree in writing to take any of the foregoing actions.

Section 5.3        Consents and Filings; Best Efforts.

(a)        Subject to the terms and conditions of this Agreement, each of the parties will use their respective best efforts (i) to take promptly, or cause to be taken, all actions, and to do promptly, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement and (ii) as promptly as practicable after the date of this Agreement, to obtain all Governmental Authorizations from, and make all filings with, all Governmental Authorities, and to obtain all other consents, waivers, approvals and other authorizations from, all other third parties, that are necessary or advisable in connection with the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement.

(b)        The Seller and the Purchaser will promptly notify the other of any communication it or any of its Affiliates receives from any Governmental Authority relating to the transactions contemplated by this Agreement, and will permit the other party to review in advance any proposed communication by such party to any Governmental Authority.  Neither party will agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other party in advance and, to the extent permitted by such Governmental Authority, gives the

other party the opportunity to attend and participate at such meeting.  The Seller and the Purchaser will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other party may reasonably request in connection with the foregoing.  The Seller and the Purchaser will provide each other with copies of all correspondence, filings or communications between them or any of their representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement.

Section 5.4     Supplements to Disclosure Schedules.  The Seller may, from time to time prior to the Closing by written notice to the Purchaser, supplement the Seller Disclosure Schedule or add a schedule to the Seller Disclosure Schedule (such added schedule to be deemed a supplement hereunder) in order to disclose any matter which, if occurring prior to the date of this Agreement, would have been required to be set forth or described in the Seller Disclosure Schedule or to correct any inaccuracy or breach in the representations and warranties made by the Seller in this Agreement.  Subject to this Section 5.4, none of such supplements to the Seller Disclosure Schedule will be deemed to cure the representations and warranties to which such matters relate with respect to satisfaction of the conditions set forth in Section 6.1(a) or otherwise affect any other term or condition contained in this Agreement; provided, however, that unless the Purchaser will have delivered a notice of termination with respect to such matter as contemplated by Section 7.1(b) (to the extent the Purchaser is entitled to deliver such notice pursuant to Section 7.1(b)) within ten Business Days of the receipt by the Purchaser of any supplement to the Seller Disclosure Schedule pursuant to this Section 5.4, then the Purchaser will have waived any and all rights to terminate this Agreement pursuant to Section 7.1(b) or otherwise arising out of or relating to the contents of such supplement and the resulting breach or breaches of the representations and warranties and the Purchaser will be deemed to have accepted the contents of such supplement for all purposes of this Agreement; and provided, further, that from and after the Closing, the Seller will have no Liability pursuant to this Agreement for any matters arising out of or relating to any of the matters disclosed on the Seller Disclosure Schedule, as supplemented or amended by the Seller prior to the Closing.

Section 5.5     Confidentiality.

(a)     After the Closing, the Seller will, and will instruct its directors, officers, employees and advisors to, hold in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all non-public documents and information relating to the Business (the "Business Information"), except to the extent that such Business Information (i) must be disclosed in connection with the obligations of the Seller pursuant to this Agreement, (ii) can be shown to have been in the public domain through no fault of the Seller, (iii) becomes a matter of public record as a result of the Bankruptcy Case and filings made with the Bankruptcy Court with respect thereto or (iv) was later lawfully acquired by the Seller from sources other than those related to its prior ownership of the Business.  Notwithstanding the foregoing, in no event will this Section 5.5(b) limit or otherwise restrict the right of the Seller to disclose such Business information (w) to its and its Affiliates' respective directors, officers, employees, agents and advisors to the extent reasonably required to facilitate the negotiation, execution, delivery or performance of this Agreement, (x) to any Governmental Authority or arbitrator to the extent reasonably required in connection with any Proceeding relating to the enforcement of this Agreement, (y) in connection with the Bankruptcy Case and filings made with the Bankruptcy Court with respect thereto, and (z) as permitted in accordance with Section 5.6.

Section 5.6     Public Announcements.  Prior to the Closing, neither the Purchaser nor the Seller will issue any press release or make any other public announcement relating to this Agreement or the transactions contemplated hereby without the prior written approval of the other party (which approval will not be unreasonably withheld, conditioned or delayed), unless required by applicable Law or in

connection with filings to be made with the Bankruptcy Court in connection with the Bankruptcy Case. Prior to issuing any such press release or making any such other public announcement as required by applicable Law, the disclosing party will give the other party a copy of the proposed press release or other announcement and reasonable opportunity to comment on the same.

Section 5.7    Further Actions.  Subject to the other express provisions of this Agreement, upon the request of either party to this Agreement, the other party will execute and deliver such other documents, instruments and agreements as the requesting party may reasonably require for the purpose of carrying out the intent of this Agreement and the transactions contemplated by this Agreement.

Section 5.8    Bulk Transfer Laws.  The Purchaser hereby waives compliance by the Seller with any applicable bulk sale or bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement.

Section 5.9    Bankruptcy Court Filings.

(a)    The Seller will file with the Bankruptcy Court a motion (the "Sale and Procedures Motion") seeking entry of an order substantially in the form attached hereto as Exhibit D and reasonably acceptable in form and substance to Purchaser and the Seller (the "Bidding Procedures Order") approving (i) bidding procedures to govern the solicitation of bids and the conduct of an auction for the Purchased Assets under the supervision of the Bankruptcy Court (the "Bidding Procedures"); and (ii) procedures for the assumption and assignment of Executory Contracts as contemplated in this Agreement (the "Contract Procedures").

(b)    The Seller will use its commercially reasonable efforts to have the Bankruptcy Court (i) schedule a hearing on the Sale and Procedures Motion as promptly as practicable following the date of this Agreement, (ii) enter the Bidding Procedures Order as promptly as practicable following the date of this Agreement, (iii) provide that bids are due no later than April 14, 2014, (iv) provide that the Auction during which the Seller will solicit Qualified Bids (as defined in the Bidding Procedures) from other prospective purchasers in accordance with the procedures set forth in the Bidding Procedures Order, will be held no later than April 17, 2014, (v) obtain entry of the Sale Order as promptly as practicable following the date on which the Auction is closed and (vi) consummate the Closing as promptly as practicable after the approval of the Sale Order.  The Purchaser and the Seller will use their respective commercially reasonable efforts to cause the Bidding Procedures Order and the Sale Order to become Final Orders as soon as practicable after their entry.

(c)    The Purchaser will cooperate with and promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Bidding Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by the Purchaser under this Agreement, adequate assurance of performance by the Purchaser from and after the Closing under the Included Contracts, and demonstrating that the Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  The Seller will not, without the prior written consent of the Purchaser, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Assets hereunder.

(d)    If an appeal is taken, or a stay pending appeal is requested from either the Bidding Procedures Order or the Sale Order, the Seller will promptly notify the Purchaser of such appeal or stay request and the Purchaser and the Seller will take all steps as may be reasonable or appropriate to defend against such appeal or stay request.  Notwithstanding the foregoing, nothing in this Agreement precludes the parties from consummating the transactions contemplated by this Agreement if the Sale Order has

been entered and has not been stayed and the Purchaser, in its sole discretion, waives in writing the condition set forth in Section 6.1(e) that the Sale Order be a Final Order.

Section 5.10    Exclusivity; Solicitation.

(a)    The Purchaser and the Seller acknowledge that under the Bankruptcy Code the sale of Purchased Assets is subject to approval of the Bankruptcy Court. The Purchaser and the Seller acknowledge that to obtain such approval the Seller must demonstrate that it has taken reasonable steps to obtain the highest or best value possible for the Purchased Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Purchased Assets to prospective bidders, entertaining higher or better offers from prospective bidders and, if necessary, conducting an Auction.

(b)    The Seller acknowledges it has solicited other potential bids for the sale of the Business through the date of this Agreement.  Pursuant to such efforts, and as consideration for substantial expenditures of time, effort and expense undertaken and continuing by the Purchaser in connection with the completion of its due diligence review of the Business and the preparation, negotiation, and execution of this Agreement, the Seller acknowledges and agrees that (i) the Purchaser will be the stalking horse bidder at the Auction, (ii) no Person other than the Purchaser will be the stalking horse bidder at the Auction and the Seller will not participate in any negotiations for the purpose of naming any Person other than the Purchaser as the stalking horse bidder in the Auction, and (iii) the Seller will actively oppose any effort by any other Person to be the stalking horse bidder; provided, however, that consistent with its fiduciary duties to elicit the highest and best offer for the Purchased Assets and to conduct the Auction, notwithstanding any provision in this Agreement to the contrary, the Seller and its representatives and Affiliates may solicit, encourage and negotiate higher or better offers for the Purchased Assets under the terms of the Bidding Procedures Order, and provided further that the Seller and its representatives and Affiliates may (A) in response to an Acquisition Proposal for some or all of the Purchased Assets that was not solicited after the date hereof, participate in negotiations or discussions with, request clarifications from, or furnish information to, any Person which makes such Acquisition Proposal, and (B) continue discussions and negotiations and continue to provide information to any Person, group or other entity with which Seller has been conducting such discussions or negotiations.

Section 5.11    Other Bids.  The Purchaser acknowledges that both before and after the filing of the Sale and Procedures Motion, the Seller and its representatives and Affiliates may solicit bids from other prospective purchasers for the sale of the Purchased Assets, on terms and conditions substantially the same in all respects to this Agreement (or improved terms) and in accordance with the procedures set forth in the proposed Bidding Procedures prior to the entry of the Bidding Procedures Order on the docket in the Bankruptcy Case, or pursuant to the Bidding Procedures Order after entry thereof on the docket in the Bankruptcy Case.

Section 5.12    Assumption & Rejection of Executory Contracts.

(a)    Schedule 5.12 (the "Contract & Cure Schedule") sets forth a list of Executory Contracts that the Seller may assume and assign to the Purchaser in accordance with Section 5.12(b) below (each, an "Assumable Executory Contract") or reject under Section 365 of the Bankruptcy Code. From the date of this Agreement until the Executory Contract Designation Deadline, the Seller and the Purchaser, by mutual agreement, may amend the Contract & Cure Schedule to (i) add or remove any Executory Contract or (ii) modify the treatment of any Executory Contract.  The term "Executory Contract Designation Deadline" means the later of (x) the Closing Date or (y) the third Business Day following the date upon which any objection to assumption of the Executory Contract or the proposed cure amount is resolved.

(b)        All Executory Contracts that are assumed will be deemed and assigned to the Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the Closing Date or (ii) (A) the date following expiration of the deadline for objecting to assumption and assignment of the Executory Contract or to a proposed cure amount, if no such objection is submitted or (B) the third Business Day following the date of resolution of any such objection.  On the Assumption Effective Date, such Executory Contract will be deemed to be an Included Contract under this Agreement.  If it is determined that the Seller may not assume and assign to the Purchaser any Executory Contract under the Contract Procedures or the Sale Order, then such Executory Contract will be deemed to be an Excluded Contract under this Agreement.  From the date of this Agreement until the Executory Contract Designation Deadline, the Seller and the Purchaser, by mutual consent, may amend Schedule 2.1(b) or Schedule 2.3(d) to add or remove any Executory Contract or modify the Assumption Effective Date for any Executory Contract listed therein, if such date has not passed.

(c)        All Executory Contracts that are listed on the Contract & Cure Schedule, but are not assumed under Section 5.12(b), will be rejected on the date (the "Rejection Effective Date") that is the later of (i) the Closing Date or (ii) (A) the date following expiration of the deadline for objecting to assumption and assignment of the Executory Contract, if no such objection is submitted or (B) the date of resolution of any such objection provided the contract is not assumed.  On the Rejection Effective Date, such Executory Contract will be deemed to be an Excluded Contract under this Agreement.

(d)        At and after Closing and until the Executory Contract Designation Deadline, the Purchaser will be obligated to pay or cause to be paid all amounts due in respect of the Seller's performance under each Executory Contract listed on the Contract & Cure Schedule  until the Rejection Effective Date or the removal of such Executory Contract from the Contract & Cure Schedule.

(e)        The Seller and the Purchaser will comply with the procedures set forth in the Contract Procedures and the Bidding Procedures Order with respect to the assumption and assignment or rejection of any Executory Contract pursuant to, and in accordance with, this Section 5.12.

(f)        No designation of any Executory Contract for assumption and assignment or rejection in accordance with this Section 5.12 will give rise to any right to any adjustment to the Purchase Price.

## ARTICLE 6
## CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE

Section 6.1        Conditions to the Obligation of the Purchaser.   The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Purchaser, in whole or in part):

(a)        Accuracy of Representations and Warranties.  The representations and warranties of the Seller in Article 3 must be true and correct in all respects as of the Closing (except to the extent any such representation or warranty speaks as of the date of this Agreement or any other specific date, in which case such representation or warranty must have been true and correct in all respects as of such date), except where the failure of such representations and warranties to be so true and correct (without regard for any "material," "Material Adverse Effect" or similar qualification) would not, individually or in the aggregate, constitute a Material Adverse Effect;

(b)        Performance of Covenants.  All of the covenants and obligations that the Seller is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)    <u>No Action</u>. There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement or cause the transactions contemplated by this Agreement to be rescinded following consummation;

(d)    <u>Bidding Procedures Order</u>. The Bidding Procedures Order must be a Final Order;

(e)    <u>Sale Order</u>. The Sale Order, which shall be in form and substance agreeable to Purchaser in its sole and absolute discretion, must be a Final Order; and

(f)    <u>Transaction Documents</u>. The Seller must have delivered or caused to be delivered each document that Section 2.8(a) requires it to deliver.

    <u>Section 6.2</u>    <u>Conditions to the Obligation of the Seller</u>. The obligation of the Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Seller, in whole or in part):

(a)    <u>Accuracy of Representations and Warranties</u>. The representations and warranties of the Purchaser in Article 4 must be true and correct in all material respects as of the Closing (except to the extent any such representation or warranty speaks as of the date of this Agreement or any other specific date, in which case such representation or warranty must have been true and correct in all material respects as of such date);

(b)    <u>Performance of Covenants</u>. All of the covenants and obligations that the Purchaser is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)    <u>No Action</u>. There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement or cause the transactions contemplated by this Agreement to be rescinded following consummation;

(d)    <u>Bidding Procedures Order</u>. The Bidding Procedures Order must have been entered and must not have been stayed as of the Closing Date;

(e)    <u>Sale Order</u>. The Sale Order must be a Final Order; and

(f)    <u>Transaction Documents</u>. The Purchaser must have delivered or caused to be delivered to the Seller each document that Section 2.8(b) requires it to deliver.

## ARTICLE 7
## TERMINATION

    <u>Section 7.1</u>    <u>Termination Events</u>. This Agreement may, by written notice given before or at the Closing, be terminated:

(a)    by mutual consent of the Purchaser and the Seller;

(b)    by the Purchaser (so long as the Purchaser is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if (i) there has been a breach of any of the Seller's representations or warranties contained in this Agreement, which would result in the failure of a condition set forth in Section 6.1(a) or (ii) there has been a breach of any of the Seller's covenants contained in this Agreement, which would result in the failure of a condition set forth in Section 6.1(b), and which breach, in case of either clause (i) or (ii) of this Section 7.1(b) has not been

cured within 10 days after written notice of the breach has been delivered to the Seller from the Purchaser;

(c)  by the Seller (so long as the Seller is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if there has been a breach of any of the Purchaser's representations, warranties or covenants contained in this Agreement, which would result in the failure of a condition set forth in Section 6.2(a) or Section 6.2(b), and which breach has not been cured within 10 days after written notice of the breach has been delivered to the Purchaser from the Seller;

(d)  by either the Purchaser or the Seller, if there is in effect a Final Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; provided, however, that the right to terminate this Agreement under this Section 7.1(d) will not be available to any party whose failure to fulfill any covenant under this Agreement has been the cause of or resulted in the action or event described in this Section 7.1(d) occurring;

(e)  by either the Purchaser or the Seller, if the Seller consummates an Acquisition Proposal with any Person other than the Purchaser;

(f)  by either the Purchaser or the Seller, if (i) the Sale Order has not been entered by the Bankruptcy Court on or prior to 7 days after the Sale Hearing;

(g)  by the Purchaser, if the Closing has not occurred (other than through the failure of the Purchaser to comply fully with its obligations under this Agreement) on or before 30 days following entry of the Sale Order; or

(h)  by the Seller, if the Closing has not occurred (other than through the failure of the Seller to comply fully with its obligations under this Agreement) on or before 30 days following entry of the Sale Order.

Section 7.2    Effect of Termination.  If this Agreement is terminated pursuant to Section 7.1, this Agreement and all rights and obligations of the parties under this Agreement automatically end without Liability against any party or its Affiliates, except that (i) Section 5.5(a) (*Confidentiality*), Section 5.6 (*Public Announcements*), Section 7.3 (*Certain Effects of Termination*), Article 11 (*General Provisions*) (except for Section 11.12 (*Specific Performance*)) and this Section 7.2 will remain in full force and survive any termination of this Agreement and (ii) if this Agreement is terminated by a party because of the knowing and intentional breach of this Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's knowing and intentional failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

Section 7.3    Certain Effects of Termination.  If the Purchaser or the Seller terminates this Agreement pursuant to Section 7.1, the Purchaser will comply with the Confidentiality Agreement.

# ARTICLE 8
# NO SURVIVAL

Section 8.1    No Survival of Representations and Warranties and Certain Covenants.  The representations, warranties and covenants (other than covenants that, by their terms, survive the Closing or termination of this Agreement) in this Agreement terminate at the Closing, or upon termination of this Agreement pursuant to Section 7.1 and, following the Closing or the termination of this Agreement, as the

case may be, no party will make any claim whatsoever for any breach of any such representation, warranty or covenant hereunder, subject to Sections 7.2 and 7.3.

## ARTICLE 9
## TAX MATTERS

Section 9.1    Transfer Taxes.  The Purchaser will pay in a timely manner all applicable sales, use, ad valorem, property, transfer, conveyance, documentary, recording, notarial, value added, excise, registration, stamp, gross receipts and similar Taxes and fees ("Transfer Taxes"), arising out of or in connection with or attributable to the transactions effected pursuant to this Agreement, including expenses and fees relating to registering Purchased Intellectual Property in the name of the Purchaser or its designee, regardless of whether such Transfer Taxes, expenses and fees are imposed by Law on the Purchaser, the Purchased Assets or the Seller.  Any Tax Returns that must be filed in connection with any Transfer Taxes will be prepared by the party that customarily has primary responsibility for filing such Tax Returns pursuant to the applicable Law under and according to which the respective Tax Returns are due to be filed; provided, however, that the preparing party will deliver such Tax Returns for the other party's review and approval (not to be unreasonably withheld, conditioned or delayed) at least ten Business Days prior to the applicable due date.  The parties will cooperate with each other in the provision of any information or preparation of any documentation that may be necessary or useful for obtaining any available mitigation, reduction or exemption from any such Transfer Taxes.

## ARTICLE 10
## EMPLOYEE MATTERS

Section 10.1    Employees.

(a)    At least 5days prior to the Closing Date (or such lesser time as may be appropriate for employees who are hired or return from a leave of absence within 5days of the Closing Date or as the parties may otherwise agree), the Purchaser will extend a written offer of employment to each of the employees identified on Schedule 10.1 (the "Employees") (which schedule will be updated by the Seller prior to the Closing Date by deleting those individuals no longer employed in connection with the Business and adding any individuals who have become so employed since the schedule was first prepared or the last revision thereto, as the case may be).  Effective as of the Closing Date, the Purchaser will hire each Employee who timely accepts the offer of employment extended by the Purchaser (such Employees, the "Transferred Employees").  An offer of employment extended by the Purchaser to an Employee in accordance with the foregoing provisions of this Section 10.1 will be for a position with job duties substantially similar to the job duties of the position that the Employee held immediately prior to the Closing Date and on at least the same terms and conditions as those in effect immediately prior to the Closing Date including any terms and conditions required by any applicable employment agreement; provided, however, that such offer of employment shall not include any option or equity benefits that were in existence prior to the Closing Date.  The Purchaser will extend an offer of employment to Employees who are on an approved leave of absence for workers compensation, disability, military, family illness or parental leave as of the Closing Date to at least the same extent, if any, as such Employees would be entitled to reemployment under either applicable Law or the Seller's policies and procedures in existence immediately prior to the Closing Date, and any such Person who accepts such an offer will be treated as a Transferred Employee.

(b)    To the extent that service is relevant for purposes of eligibility, vesting or benefit accrual under any employee benefit plan, program or arrangement established or maintained by the Purchaser for the benefit of Transferred Employees, such plan, program or arrangement will credit such employees or former employees for service on or prior to the Closing with the Seller and its Affiliates.

Section 10.2    Defined Contribution Plan.

(a)    Effective as of the Closing Date, the Transferred Employees will no longer participate in the Seller's savings plan (the "Savings Plan"), and the Seller will have taken all such action prior to the Closing Date as may be required to achieve this result. As of the Closing Date, the Seller will cause each Transferred Employee to be 100% vested in his or her account balance. As soon as practicable after the Closing Date, the Seller will cause the transfer of an amount representing the entire account balances of the Transferred Employees who participated in the Savings Plan immediately prior to the Closing Date determined as of the plan valuation date coinciding with or next preceding the date of the account balance transfer, together with the actual return thereon from such valuation date to the date of account balance transfer, to the trustee, designated by the Purchaser, of the qualified trust established or maintained by the Purchaser in accordance with the following sentence.

(b)    After the Closing Date, the Purchaser will establish or provide the Transferred Employees with a new savings plan intended to be qualified under Sections 401(a) and 401(k) of the Code, which shall provide (i) for immediate eligibility for participation for each Transferred Employee who participated in the Savings Plan immediately prior to the Closing Date, (ii) each such Transferred Employee with an initial account balance equal to the amount transferred to the Purchaser's savings plan in respect of such Transferred Employee's interest in the Savings Plan and (iii) vesting and eligibility provisions that are no less favorable than those of the Savings Plan as in effect immediately prior to the Closing Date, applied by aggregating service with the Seller and its Affiliates prior to the Closing Date with service with the Purchaser and its Affiliates on and after the Closing Date.  The Seller and the Purchaser agree to cooperate fully with respect to the actions necessary to effect the transactions contemplated in this Section 10.3, including the provision of records and information as each may reasonably request from the other.

(c)    Following the date of the asset transfer described in this Section 10.2, the Purchaser will assume all Liabilities of the Seller and its Affiliates under the Savings Plan with respect to accrued benefits of the Transferred Employees, and the Seller and its Affiliates will have no further Liability to the Purchaser or any Transferred Employees with respect thereto following the date of transfer.

Section 10.3    Welfare Arrangements.  To the extent that any medical, dental, hospitalization, life or other similar health, welfare or insurance benefits are provided to Transferred Employees through one or more Seller Employee Benefit Plans (the "Welfare Plans"), the Purchaser agrees to designate or establish, effective as of the Closing, one or more benefit plans, programs or arrangements for the purpose of providing such benefits to Transferred Employees.  The Purchaser will cause such benefit plans, programs or arrangements to (i) waive any preexisting condition limitations for conditions covered under the applicable Welfare Plans available to the Transferred Employees immediately prior to the Closing and any applicable waiting periods, and (ii) credit Transferred Employees with any deductible and out-of-pocket expenses incurred by such employees and their dependents under the Welfare Plans during the portion of [current year] preceding the Closing Date for purposes of satisfying any applicable deductible or out-of-pocket requirements under any similar plan, program or arrangement in which such employees may be eligible to participate after the Closing Date.  With respect to aggregate lifetime maximum benefits available under the Purchaser's welfare benefit plans, a Transferred Employee's prior claim experience under any of the Welfare Plans will not be taken into account.  Effective as of the Closing Date, the Transferred Employees (and their dependents) will no longer participate in the Welfare Plans and the Seller will have taken all such action prior to the Closing Date as may be required to achieve this result.

Section 10.4    WARN Act.  The Purchaser and the Seller agree to cooperate in good faith to determine whether any notification may be required under the WARN Act as a result of the transactions

contemplated by the Agreement and, if such notices are required, to provide such notice in a manner that is reasonably satisfactory to each of the Purchaser and the Seller.

## ARTICLE 11
## GENERAL PROVISIONS

Section 11.1    Notices.   All notices and other communications under this Agreement must be in writing and are deemed duly delivered when (a) delivered if delivered personally or by nationally recognized overnight courier service (costs prepaid), (b) sent by facsimile with confirmation of transmission by the transmitting equipment (or, the first Business Day following such transmission if the date of transmission is not a Business Day) or (c) received or rejected by the addressee, if sent by United States of America certified or registered mail, return receipt requested; in each case to the following addresses or facsimile numbers and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number or individual as a party may designate by notice to the other party):

If to the Seller:

Buffet Partners, L.P.
2701 E. Plano Parkway, Suite 200
Plano, Texas  75074
United States of America
Facsimile:        214-291-2473
Attention:        Barry M. Barron, Sr.


with a copy (which will not constitute notice) to:

Baker & McKenzie LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
United States of America
Facsimile:        214-978-3099
Attention:        John Mitchell

If to the Purchaser:

Chatham Capital
Brian G. Reynolds
400 Galleria Parkway, Suite 1950
Atlanta, GA  30339
Facsimile:  (770) 618-2101
Attention: Brian G. Reynolds

with a copy (which will not constitute notice) to:

Erich N. Durlacher
Burr & Forman LLP
Suite 1100, 171 Seventeenth Street, N.W.
Atlanta, Georgia 30363
(404) 685-4313 [dial]

(404) 214-7387 [telecopier]

Section 11.2    Amendment.  Except as contemplated by Section 5.4, this Agreement may not be amended, supplemented or otherwise modified except in a written document signed by each party to be bound by the amendment and that identifies itself as an amendment to this Agreement.

Section 11.3    Waiver and Remedies.  The parties may (a) extend the time for performance of any of the obligations or other acts of the other party to this Agreement, (b) waive any inaccuracies in the representations and warranties of the other party to this Agreement contained in this Agreement or (c) waive compliance with any of the covenants or conditions for the benefit of such party contained in this Agreement.  Except as contemplated by Section 5.4: (i) any such extension or waiver by a party to this Agreement will be valid only if set forth in a written document signed on behalf of the party against whom the extension or waiver is to be effective; (ii) no extension or waiver will apply to any time for performance, inaccuracy in any representation or warranty, or noncompliance with any covenant or condition, as the case may be, other than that which is specified in the written extension or waiver; and (iii) no failure or delay by a party in exercising any right or remedy under this Agreement or any of the documents delivered pursuant to this Agreement, and no course of dealing between the parties, operates as a waiver of such right or remedy, and no single or partial exercise of any such right or remedy precludes any other or further exercise of such right or remedy or the exercise of any other right or remedy.  Except as provided in Section 5.4, any enumeration of a party's rights and remedies in this Agreement is not intended to be exclusive, and a party's rights and remedies are intended to be cumulative to the extent permitted by law and include any rights and remedies authorized in law or in equity.

Section 11.4    Entire Agreement.  This Agreement (including the Schedules and Exhibits hereto and the documents and instruments referred to in this Agreement that are to be delivered at the Closing) constitutes the entire agreement between the parties and supersedes any prior understandings, agreements or representations by or between the parties, or either of them, written or oral, with respect to the subject matter of this Agreement.  Notwithstanding the foregoing, the Confidentiality Agreement will remain in effect in accordance with its terms as modified pursuant to Section 5.5.

Section 11.5    Assignment, Successors and No Third Party Rights.  This Agreement binds and benefits the parties and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in any respect of the Seller under Chapter 11 or Chapter 7 of the Bankruptcy Code and any entity appointed as a successor to the Seller pursuant to a confirmed Chapter 11 plan).  No party may delegate any performance of its obligations under this Agreement, except that the Purchaser may at any time delegate the performance of its obligations (other than the obligation to pay the Purchase Price) to any Affiliate of the Purchaser so long as the Purchaser remains fully responsible for the performance of the delegated obligation.  Purchaser may designate one or more affiliate entities, including any special purpose entities that may be organized by Purchaser, to take title to the Purchased Assets or a portion thereof and operate the business going forward, and Purchaser and/or such designees may pledge this Agreement as collateral to obtain debt financing.  Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement except such rights as may inure to a successor or permitted assignee under this Section 11.5.

Section 11.6    Severability.    If any provision of this Agreement is held invalid, illegal or unenforceable, the remaining provisions of this Agreement remain in full force and effect, if the essential terms and conditions of this Agreement for each party remain valid, binding and enforceable.

Section 11.7    Exhibits and Schedules.    The Exhibits and Schedules to this Agreement are incorporated herein by reference and made a part of this Agreement.  The Seller Disclosure Schedule and the Purchaser Disclosure Schedule are arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of Article 3 and Article 4, respectively.  The disclosure in any section or paragraph of the Seller Disclosure Schedule or the Purchaser Disclosure Schedule, and those in any amendment or supplement thereto, will be deemed to relate to each other provision of Article 3 or Article 4, respectively.

Section 11.8    Interpretation.    In the negotiation of this Agreement, each party has received advice from its own attorney.  The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no provision of this Agreement will be interpreted for or against either party because that party or its attorney drafted the provision.

Section 11.9    Expenses.    Except as set forth in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, each party will pay its own direct and indirect expenses incurred by it in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated by this Agreement, including all fees and expenses of its advisors and representatives.

Section 11.10    Governing Law.    Except to the extent the mandatory provisions of the Bankruptcy Code apply, the internal laws of the State of Texas (without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any other jurisdiction) govern all matters arising out of or relating to this Agreement and its Exhibits and Schedules and the transactions contemplated by this Agreement, including its validity, interpretation, construction, performance and enforcement and any disputes or controversies arising therefrom or related thereto.

Section 11.11    Limitation on Liability.    **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN NO EVENT WILL ANY PARTY OR ANY OF ITS AFFILIATES BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS, LOSS OF REVENUE OR LOST SALES) IN CONNECTION WITH ANY CLAIMS, LOSSES, DAMAGES OR INJURIES ARISING OUT OF THE CONDUCT OF SUCH PARTY PURSUANT TO THIS AGREEMENT REGARDLESS OF WHETHER THE NONPERFORMING PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR NOT.**

Section 11.12    Specific Performance.    The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by the Purchaser in accordance with their specific terms or were otherwise breached by the Purchaser.  The parties accordingly agree that, prior to the termination of this Agreement pursuant to Section 7.1, in addition to any other remedy to which the Seller is entitled at law or in equity, the Seller is entitled to injunctive relief to prevent breaches of this Agreement by the Purchaser and otherwise to enforce specifically the provisions of this Agreement against the Purchaser; provided that, Seller shall only be entitled to injunctive relief if Seller is not otherwise in breach of this Agreement or if Puchaser is not otherwise entitled to terminate this Agreement.  The Purchaser acknowledges and agrees that it is not entitled to injunctive relief to prevent any breaches of this Agreement by the Seller or to enforce specifically the provisions of this Agreement or otherwise obtain any equitable relief or remedy against the Seller; provided, however, that the Purchaser will be entitled to injunctive relief solely to prevent any breach by the Seller of Section 5.5 (*Confidentiality*) or Section 5.6 (*Public Announcements*).  Each party expressly waives any requirement

that the other party obtain any bond or provide any indemnity in connection with any action seeking injunctive relief or specific enforcement of the provisions of this Agreement.

Section 11.13    Jurisdiction and Service of Process.  Any action or proceeding arising out of or relating to this Agreement or the transactions contemplated by this Agreement must be brought in the Bankruptcy Court; provided, however, that if the Bankruptcy Case is closed, any action or proceeding arising out of or relating to this Agreement or the transactions contemplated by this Agreement must be brought in the courts of the State of Texas, County of Dallas, or, if it has or can acquire jurisdiction, in the United States District Court for the Northern District of Texas.  Each of the parties knowingly, voluntarily and irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding and waives any objection it may now or hereafter have to venue or to convenience of forum.  Each party to this Agreement may make service on the other party by sending or delivering a copy of the process to the party to be served at the address and in the manner provided for the giving of notices in Section 11.1.  Nothing in this Section 11.13, however, affects the right of a party to serve legal process in any other manner permitted by law.

Section 11.14    Waiver of Jury Trial.  **EACH OF THE PARTIES KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE ACTIONS OF EITHER PARTY TO THIS AGREEMENT IN NEGOTIATION, EXECUTION AND DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT.**

Section 11.15    No Joint Venture.  Nothing in this Agreement creates a joint venture or partnership between the parties.  This Agreement does not authorize either party (a) to bind or commit, or to act as an agent, employee or legal representative of, the other party, except as may be specifically set forth in other provisions of this Agreement, or (b) to have the power to control the activities and operations of the other party.  The parties are independent contractors with respect to each other under this Agreement.  Each party agrees not to hold itself out as having any authority or relationship contrary to this Section 11.15.

Section 11.16    Counterparts.  The parties may execute this Agreement in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement.  This Agreement is effective upon delivery of one executed counterpart from each party to the other party.  The signatures of all parties need not appear on the same counterpart.  The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending party's signature(s) is as effective as signing and delivering the counterpart in person.

Section 11.17    Waiver and Release of Avoidance Actions against the Purchaser.  As of the Closing, the Seller, acting on behalf of itself and its successors and assigns, hereby waives, releases and forever discharges any and all avoidance actions under Chapter 5 of the Bankruptcy Code, against the Purchaser and its Affiliates arising out of occurrences before the Closing Date; provided, however, that the Seller does not hereby waive any claims, demands, rights or causes of action arising under this Agreement.

[Signature page follows.]

The parties have executed and delivered this Agreement as of the date indicated in the first sentence of this Agreement.

**BUFFET PARTNERS, L.P.**

By:  _____
     By:  Buffet G.P., Inc.
     Its:  General Partner


     By:_____
     Barry M. Barron, Sr.
     CEO


**CHATHAM CREDIT MANAGEMENT III, LLC**
**By: Chatham Capital Holdings, Inc., its Manager**


By:_____
Name:
Title:

**EXHIBIT A**

**FORM OF SALE ORDER**

**EXHIBIT B**

**FORM OF BILL OF SALE**

This Bill of Sale (the "Bill of Sale") is delivered pursuant to the Closing under the Asset Purchase Agreement (the "Purchase Agreement") dated as of February __, 2014, by and among Buffet Partners, L.P., a Delaware limited partnership, as the "Seller," and _____, as the "Purchaser." Capitalized terms used in this Bill of Sale without definition have the respective meanings given to them in the Purchase Agreement.

Pursuant to the Purchase Agreement, the Purchaser has agreed to acquire the Purchased Assets. The Purchaser and the Seller now seek to consummate the assignment, conveyance and transfer of such Purchased Assets.

NOW, THEREFORE, intending to be legally bound and in consideration of the mutual provisions set forth in this Bill of Sale and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Section 1        Sale and Transfer of Purchased Assets.  The Seller hereby sells, assigns, conveys, transfers and delivers to the Purchaser all of the Purchased Assets.

Section 2        Power of Attorney.  The Seller hereby constitutes and appoints the Purchaser as the Seller's true and lawful agent and attorney-in-fact, with full power of substitution and resubstitution, in whole or in part, in the name and stead of Seller but on behalf and for the benefit of the Purchaser and its successors and assigns, to demand, receive and collect any and all of the Purchased Assets and to give receipts and releases for and in respect of the same, and from time to time to institute and prosecute in the Seller's name, or otherwise for the benefit of the Purchaser and its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Purchaser or its successors or assigns may deem proper for the collection or recovery of any of the Purchased Assets or for the collection and enforcement of any claim or right of any kind hereby sold, assigned, conveyed and transferred, or intended so to be, and to take any other actions and make, sign, execute, acknowledge and deliver any documents and instruments as may from time to time be necessary or appropriate to assign to the Purchaser and its successors and assigns the Purchased Assets and all rights granted to the Purchaser under the Purchase Agreement.  The Seller declares that the foregoing powers are coupled with an interest and are and will be irrevocable by the Seller or by its dissolution or in any manner or for any reason whatsoever.  Nothing in this Section 2 will be deemed a waiver of any remedies otherwise available.

Section 3        General.  This Bill of Sale (a) is irrevocable and effective upon the Seller's signature to and delivery of a manually signed copy of this Bill of Sale or facsimile or email transmission of the signature to this Bill of Sale in connection with the Closing, if and only if the Closing is completed, (b) benefits and binds the parties to the Purchase Agreement and their respective successors and assigns, (c) does not modify or affect, and is subject to, the provisions of the Purchase Agreement and (d) may be signed in counterparts as provided in Section 11.16 of the Purchase Agreement.  In the event of any conflict or inconsistency between the provisions of the Purchase Agreement and the provisions of this Bill of Sale, the provisions of the Purchase Agreement will control.

*[Signature page follows.]*

The undersigned has signed this Bill of Sale on February __, 2014.

**[PURCHASER]**

By:_____
       **[Name]**
       **[Title]**


**BUFFET PARTNERS, L.P.**

By: Buffet G.P., Inc.
Its: General Partner

By:_____
       **[Name]**
       **[Title**]

## EXHIBIT C

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Agreement") is delivered pursuant to the Closing under the Asset Purchase Agreement (the "Purchase Agreement") dated as of February __, 2014, by and among Buffet Partners, L.P., a Delaware limited partnership, as the "Seller," and _____, as the "Purchaser." Capitalized terms used in this Agreement without definition have the respective meanings given to them in the Purchase Agreement.

Pursuant to the Purchase Agreement, the Seller has agreed to assign and the Purchaser has agreed to assume the Assumed Liabilities. The Purchaser and the Seller now seek to consummate the assignment and assumption of such Assumed Liabilities.

NOW, THEREFORE, intending to be legally bound and in consideration of the mutual provisions set forth in this Agreement and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Section 1    Assignment and Assumption of Assumed Liabilities. The Seller hereby assigns, sells, transfers and sets over (collectively, the "Assignment") to the Purchaser the Assumed Liabilities. The Purchaser hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants of, and to pay and discharge when due, all of the Assumed Liabilities. Notwithstanding the foregoing, the Purchaser does not assume, or agree to pay, perform or discharge, any Liabilities of the Seller (including, without limitation, the Excluded Liabilities) other than the Assumed Liabilities, and the parties hereto agree that all such Liabilities, other than the Assumed Liabilities, will remain the sole responsibility of the Seller.

Section 2    General. This Agreement (a) is irrevocable and effective upon the Purchaser's signature to and delivery of a manually signed copy of this Agreement or facsimile or email transmission of the signature to this Agreement in connection with the Closing, if and only if the Closing is completed, (b) benefits and binds the parties to the Purchase Agreement and their respective successors and assigns, (c) does not modify or affect, and is subject to, the provisions of the Purchase Agreement and (d) may be signed in counterparts as provided in Article 11.16 of the Purchase Agreement. In the event of any conflict or inconsistency between the provisions of the Purchase Agreement and the provisions of this Agreement, the provisions of the Purchase Agreement will control.

*[Signature page follows.]*

The undersigned have signed this Agreement on February ___, 2014.

**[PURCHASER]**

By:_____
       **[Name]**
       **[Title]**


**BUFFET PARTNERS, L.P.**

By: Buffet G.P., Inc.
Its: General Partner

By:_____
       **[Name]**
       **[Title**]

**EXHIBIT D**

**FORM OF BIDDING PROCEDURES ORDER**