**ASSET PURCHASE AGREEMENT**

**by and between**

**Chatham Credit Management III, LLC (or its designee)**

**and**

**Buffet Partners, L.P.**

———————

**March 28, 2014**

## TABLE OF CONTENTS

**Page**

ARTICLE 1          DEFINITIONS AND CONSTRUCTION ...................................................................1

    Section 1.1          Definitions ...........................................................................................1

    Section 1.2          Additional Defined Terms ...................................................................5

    Section 1.3          Construction..........................................................................................7

ARTICLE 2          THE TRANSACTION .....................................................................................7

    Section 2.1          Sale and Purchase of Purchased Assets ...............................................7

    Section 2.2          Excluded Assets ...................................................................................8

    Section 2.3          Assumed Liabilities .............................................................................9

    Section 2.4          Excluded Liabilities .............................................................................9

    Section 2.5          Consideration......................................................................................10

    Section 2.6          Allocation of Purchase Price ..............................................................10

    Section 2.7          Closing................................................................................................10

    Section 2.8          Closing Deliveries ..............................................................................10

    Section 2.9          Payment of Cure Amounts..................................................................11

    Section 2.10        Consents..............................................................................................11

ARTICLE 3          REPRESENTATIONS AND WARRANTIES OF THE SELLER ...........12

    Section 3.1          Organization .......................................................................................12

    Section 3.2          Authority and Enforceability ..............................................................12

    Section 3.3          No Conflict .........................................................................................12

    Section 3.4          Disclaimer of Other Representations and Warranties.........................12

ARTICLE 4          REPRESENTATIONS AND WARRANTIES OF THE PURCHASER .................13

    Section 4.1          Organization and Good Standing.........................................................13

    Section 4.2          Authority and Enforceability ..............................................................13

    Section 4.3          No Conflict .........................................................................................13

    Section 4.4          Legal Proceedings...............................................................................13

    Section 4.5          Brokers Fees .......................................................................................13

    Section 4.6          Financial Capacity ..............................................................................13

    Section 4.7          No Knowledge of Breach or Inaccuracy.............................................13

    Section 4.8          Independent Investigation...................................................................14

ARTICLE 5          COVENANTS ................................................................................................14

    Section 5.1          Access and Investigation ....................................................................14

    Section 5.2          Operation of the Business....................................................................14

-i-

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 5.3 | Consents and Filings; Best Efforts | 15 |
| Section 5.4 | Supplements to Disclosure Schedules | 16 |
| Section 5.5 | Confidentiality | 16 |
| Section 5.6 | Public Announcements | 16 |
| Section 5.7 | Further Actions | 16 |
| Section 5.8 | Bulk Transfer Laws | 17 |
| Section 5.9 | Bankruptcy Court Filings | 17 |
| Section 5.10 | Exclusivity; Solicitation | 17 |
| Section 5.11 | Other Bids | 18 |
| Section 5.12 | Assumption & Rejection of Executory Contracts | 18 |
| ARTICLE 6 | CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE | 19 |
| Section 6.1 | Conditions to the Obligation of the Purchaser | 19 |
| Section 6.2 | Conditions to the Obligation of the Seller | 20 |
| ARTICLE 7 | TERMINATION | 20 |
| Section 7.1 | Termination Events | 20 |
| Section 7.2 | Effect of Termination | 21 |
| Section 7.3 | Certain Effects of Termination | 21 |
| ARTICLE 8 | NO SURVIVAL | 21 |
| Section 8.1 | No Survival of Representations and Warranties and Certain Covenants | 21 |
| ARTICLE 9 | TAX MATTERS | 22 |
| Section 9.1 | Transfer Taxes | 22 |
| ARTICLE 10 | EMPLOYEE MATTERS | 22 |
| Section 10.1 | Employees | 22 |
| Section 10.2 | Defined Contribution Plan | 22 |
| Section 10.3 | Welfare Arrangements | 23 |
| Section 10.4 | WARN Act | 23 |
| ARTICLE 11 | GENERAL PROVISIONS | 24 |
| Section 11.1 | Notices | 24 |
| Section 11.2 | Amendment | 24 |
| Section 11.3 | Waiver and Remedies | 24 |
| Section 11.4 | Entire Agreement | 25 |
| Section 11.5 | Assignment, Successors and No Third Party Rights | 25 |

-ii-

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| Section 11.6 | Severability | 25 |
| Section 11.7 | Exhibits and Schedules | 25 |
| Section 11.8 | Interpretation | 25 |
| Section 11.9 | Expenses | 26 |
| Section 11.10 | Governing Law | 26 |
| Section 11.11 | Limitation on Liability | 26 |
| Section 11.12 | Specific Performance | 26 |
| Section 11.13 | Jurisdiction and Service of Process | 26 |
| Section 11.14 | Waiver of Jury Trial | 27 |
| Section 11.15 | No Joint Venture | 27 |
| Section 11.16 | Counterparts | 27 |
| Section 11.17 | Waiver and Release of Avoidance Actions against the Purchaser | 27 |

Exhibits

Exhibit A – Form of Sale Order

Exhibit B – Form of Bill of Sale

Exhibit C – Form of Assignment and Assumption Agreement

Exhibit D – Form of Bidding Procedures Order

738245-v7\DALDMS

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is made as of March 28, 2014, by and between Buffet Partners, L.P., a Texas limited partnership (the "Seller"), and Chatham Credit Management III, LLC (or its designee) (the "Purchaser").

The Seller is engaged in the restaurant business, including food processing, manufacturing, warehousing and distribution of products used in its restaurants and certain restaurants owned by third parties and on behalf of other third party customers (the "Business").

On February 4, 2014 (the "Petition Date"), the Seller commenced a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), which case is being administered under Case No. 14-30699-11 (the "Bankruptcy Case").

Since the Petition Date, the Seller has been a debtor and debtor-in-possession in the Bankruptcy Case and is operating its business and managing its properties pursuant to section 1108 of the Bankruptcy Code.

The Seller desires to sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser desires to purchase and acquire from the Seller, all of the Purchased Assets pursuant to the Sale Order approving such sale free and clear of all Liens and Claims, all as more specifically provided in this Agreement, and in accordance with sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bidding Procedures Order.

NOW, THEREFORE, intending to be legally bound and in consideration of the mutual provisions set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION

Section 1.1      Definitions.  For the purposes of this Agreement:

"Acquisition Proposal" means any inquiry, proposal or offer from any Person relating to any sale, transfer or other disposition, in one transaction or a series of transactions, of all or any substantial portion of the Purchased Assets or the Business to one or more Persons other than Purchaser or its Affiliates or designees, whether proposed to be effected pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed or advanced by the Seller.

"Affiliate" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person.  In addition to the foregoing, if the specified Person is an individual, the term "Affiliate" also includes (a) the individual's spouse, (b) the members of the immediate family (including parents, siblings and children) of the individual or of the individual's spouse and (c) any corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity that directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with any of the foregoing individuals.  For purposes of this definition, the term "control"

(including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Auction" means the auction conducted by the Seller pursuant to the Bidding Procedures Order.

"Business Day" means any day other than Saturday, Sunday or any day on which banking institutions in Dallas, Texas are closed either under applicable Law or action of any Governmental Authority.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Code" means the Internal Revenue Code of 1986.

"Committee Expense Cash" means the aggregate sum of $250,000, as reduced by any payments made by the Debtors to the Creditors' Committee's professionals or members prior to the Closing Date, which sum shall be funded on the Closing Date by the Purchaser to the trust account of Creditors' Committee's counsel, for the payment of the fees and expenses of the Creditors' Committee's professionals (inclusive of expenses of members of the Creditors' Committee). The Committee Expense Cash is inclusive of all amounts incurred or to be incurred by the Creditors' Committee's professionals or members for the period prior to and following the Closing Date. The Committee Expense Cash may be allocated amongst the professionals (and members) of the Creditors' Committee as determined by the Creditors' Committee and its professionals. Neither the Debtors nor the Purchaser shall be obligated to satisfy any amounts incurred by the Creditors' Committee's professionals (or members) in excess of the Committee Expense Cash. The Purchaser's payment of the Committee Expense Cash shall satisfy any and all obligations of the Debtors' pre-petition lenders under any cash collateral orders with respect to the "Carveout" for the Creditors' Committee's professionals (and members).

"Contract" means any contract, agreement, lease, license, commitment, understanding, franchise, warranty, guaranty, mortgage, note, bond or other instrument or consensual obligation that is legally binding.

"Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in this Bankruptcy Case.

"Cure Amount" means, for any Executory Contract, the amount required to be paid under Section 365 of the Bankruptcy Code or otherwise to effectuate the assumption and assignment of such Executory Contract by the Seller to the Purchaser.

"Environmental Law" means any Law concerning (a) the treatment, disposal, emission, discharge, Release or threatened Release of Hazardous Material or (b) the protection of the environment (including natural resources, air and surface or subsurface land or waters).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Executory Contract" means a Contract that is an "executory contract" or "unexpired lease", as such terms are used in section 365 of the Bankruptcy Code.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the

subject order in all respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024(b) shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) calendar days of the entry of the order at issue. In the case of the Sale Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings a fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed with Closing.

"GAAP" means United States generally accepted accounting principles.

"Governmental Authority" means any (a) nation, region, state, county, city, town, village, district or other jurisdiction, (b) federal, state, local, municipal, foreign or other government, (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or other entity and any court or other tribunal), (d) multinational organization exercising judicial, legislative or regulatory power or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature of any federal, state, local, municipal, foreign or other government.

"Governmental Authorization" means any approval, consent, ratification, waiver, license, permit, registration or other authorization issued or granted by any Governmental Authority.

"Hazardous Material" means any waste or other substance that is listed, defined, designated or classified as hazardous, radioactive or toxic or a pollutant or a contaminant under any Environmental Law, including any admixture or solution thereof, and including petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos or asbestos-containing materials in any form or condition and polychlorinated biphenyls.

"Intellectual Property" means all of the following anywhere in the world and all legal rights, title or interest in the following arising under Law: (a) all patents and applications for patents and all related reissues, reexaminations, divisions, renewals, extensions, provisionals, continuations and continuations in part; (b) all copyrights, copyright registrations and copyright applications, copyrightable works and all other corresponding rights; (c) all mask works, mask work registrations and mask work applications and all other corresponding rights; (d) all trade dress and trade names, logos, Internet addresses and domain names, trademarks and service marks and related registrations and applications, including any intent to use applications, supplemental registrations and any renewals or extensions, all other indicia of commercial source or origin and all goodwill associated with any of the foregoing; (e) all inventions (whether patentable or unpatentable and whether or not reduced to practice), know how, technology, technical data, trade secrets, confidential business information, manufacturing and production processes and techniques, research and development information, financial, marketing and business data, pricing and cost information, business and marketing plans, advertising and promotional materials, customer, distributor, reseller and supplier lists and information, correspondence, records, and other documentation, and other proprietary information of every kind; (f) all computer software (including source and object code), firmware, development tools, algorithms, files, records, technical drawings and related documentation, data and manuals; (g) all databases and data collections; (h) all licenses and permits to the extent transferable; and (i) all other intellectual property rights.

"IRS" means the United States Internal Revenue Service and, to the extent relevant, the United States Department of Treasury.

"Judgment" means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"Law" means any federal, state, local, municipal, foreign, international, multinational, or other constitution, law, statute, treaty, rule, regulation, ordinance or code.

"Liability" means any liability or obligation, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due.

"Lien" means any charge against or interest in property to secure payment of a debt or performance of an obligation; including any mortgage, pledge, security interest, attachment, easement, restriction, encumbrance, lien (statutory or otherwise), option, tax, conditional sale agreement, right of first refusal or right of first offer (including any agreement to give any of the foregoing).

"Loss" means any direct and actual Liabilities, losses, damages, Judgments, fines, penalties, costs or expenses (including reasonable attorney's or other professional fees and expenses) but excluding any special, incidental, indirect, exemplary, punitive or consequential damages (including lost profits, loss of revenue or lost sales, or amounts calculated as a multiple of earnings, profits, revenue, sales or other measure).

"Material Adverse Effect" means any event, change, circumstance, effect or other matter that has a material adverse effect on (a) the financial condition or results of operations of the Business, taken as a whole, or (b) the ability of the Seller to consummate timely the transactions contemplated by this Agreement; provided, however, that none of the following, either alone or in combination, will constitute, or be considered in determining whether there has been, a Material Adverse Effect: any event, change, circumstance, effect or other matter resulting from or related to (i) any outbreak or escalation of war or major hostilities or any act of terrorism, (ii) changes in Laws, GAAP or enforcement or interpretation thereof, (iii) changes that generally affect the industries and markets in which the Business operates, (iv) changes in financial markets, general economic conditions (including prevailing interest rates, exchange rates, commodity prices and fuel costs) or political conditions, (v) any failure, in and of itself, of the Business to meet any published or internally prepared projections, budgets, plans or forecasts of revenues, earnings or other financial performance measures or operating statistics (it being understood that the facts and circumstances underlying any such failure that are not otherwise excluded from the definition of a "Material Adverse Effect" may be considered in determining whether there has been a Material Adverse Effect), (vi) any action taken or failed to be taken pursuant to or in accordance with this Agreement or at the request of, or consented to by, the Purchaser, (vii) the filing of the Bankruptcy Case or any action approved by the Bankruptcy Court (or any other Governmental Authority in connection with any such Proceeding), or (viii) the execution or delivery of this Agreement, the consummation of the transactions contemplated by this Agreement or the public announcement or other publicity with respect to any of the foregoing.

"Permitted Exceptions" shall mean all claims and liens arising under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a et seq. ("PACA").

"Person" means an individual or an entity, including a corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity, or any Governmental Authority.

"Pre-Petition Financing" means financing evidenced by the Second Amended and Restated Loan and Security Agreement (as amended, the "Restated Loan Agreement") entered into as of April 3, 2009, by and among, on the one hand, Chatham Credit Management III, LLC, a Georgia limited liability company, not individually, but as agent for Chatham Investment Fund QPIII, LLC and Chatham

Investment Fund III, LLC ("Chatham III"), as administrative agent for the lenders under the Restated Loan Agreement (in such capacity, together with its successors and assigns in such capacity, "Administrative Agent"); and Chatham III and Chatham Capital Management II, LLC, not individually, but as agent for Chatham Investment Fund QPII, LLC and Chatham Investment Fund II, LLC, as lenders, and, on the other hand, Seller, as borrower, and the promissory notes issued under the Restated Loan Agreement described on Schedule 1.1.

"Proceeding" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Release" means the release, spill, emission, leaking, pumping, pouring, emptying, escaping, dumping, injection, deposit, disposal, discharge, dispersal, leaching or migrating of any Hazardous Material into the environment.

"Sale Order" means the order of the Bankruptcy Court, substantially in the form attached as Exhibit A, to be entered by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code, which order approves the sale of the Business and the Purchased Assets to the Purchaser on the terms and conditions set forth in this Agreement, free and clear of all Claims and Liens pursuant to section 363(f) of the Bankruptcy Code, and the assumption and assignment of the Included Contracts to the Purchaser, and containing a finding that the transactions contemplated by this Agreement are undertaken by the Seller and the Purchaser at arm's length, without collusion and in good faith by the Purchaser within the meaning of section 363(m) of the Bankruptcy Code.

"Schedule" means the Seller Disclosure Schedule or the Purchaser Disclosure Schedule, as the context requires.

"Seller Employee Benefit Plan" means any "employee benefit plan" (as defined in Section 3(3) of ERISA) and any other material plan, Contract or arrangement involving direct or indirect compensation, including insurance coverage, severance benefits, deferred compensation, bonuses, stock options, stock purchase, phantom stock, stock appreciation or other forms of incentive compensation or post-retirement compensation maintained or contributed to by the Seller for the benefit of any employee.

"Subsidiary" means, with respect to a specified Person, any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred) are held by the specified Person or one or more of its Subsidiaries. When used in this Agreement without reference to a particular Person, "Subsidiary" means a Subsidiary of the Seller.

"Tax" means (a) any federal, state, local, foreign or other tax, charge, fee, duty (including customs duty), levy or assessment, including any income, gross receipts, net proceeds, alternative or add-on minimum, corporation, ad valorem, turnover, real property, personal property (tangible or intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, profits, occupational, premium, interest equalization, windfall profits, severance, license, registration, payroll, environmental (including taxes under Section 59A of the Code), capital stock, capital duty, disability, estimated, gains, wealth, welfare, employee's income withholding, other withholding, unemployment or social security or other tax of whatever kind (including any fee, assessment or other charges in the nature of or in lieu of any tax) that is imposed by any Governmental Authority, (b) any interest, fines, penalties

or additions resulting from, attributable to, or incurred in connection with any items described in this paragraph or any related contest or dispute and (c) any Liability for the Taxes of another Person.

"Tax Return" means any report, return, declaration, claim for refund, or information return or statement related to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Unencumbered Settlement Cash" means the sum of $500,000 to be transferred by the Purchaser free and clear of liens and claims of any person or entity into a trust for the benefit of general unsecured creditors and trust-related expenses, provided that if the trust is not created on or before the Closing Date, the Unencumbered Settlement Cash will be held by the Debtors' estates in a segregated account and in trust for the benefit of general unsecured creditors pending creation of the trust or further order of the Bankruptcy Court.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, and any similar foreign, state or local Law.

"Wind-Down Amount" means the sum of the Unencumbered Settlement Cash and the Committee Expense Cash.

Section 1.2      Additional Defined Terms. For purposes of this Agreement, the following terms have the meanings specified in the indicated Section of this Agreement:

| Defined Term | Section |
| --- | --- |
| Agreement | Preamble |
| Allocation Statement | 2.6(a) |
| Assignment and Assumption Agreement | 2.8(a) |
| Assumable Executory Contract | 5.12(a) |
| Assumed Liabilities | 2.3 |
| Assumption Effective Date | 5.12(b) |
| Bankruptcy Case | Preamble |
| Bankruptcy Code | Preamble |
| Bankruptcy Court | Preamble |
| Bidding Procedures | 5.9(a) |
| Bidding Procedures Order | 5.9(a) |
| Bill of Sale | 2.8(a) |
| Business | Preamble |
| Business Information | 5.5(b) |
| Closing | 2.7 |
| Closing Date | 2.7 |
| Confidentiality Agreement | 5.5(a) |
| Contract & Cure Schedule | 5.12(a) |
| Contract Procedures | 5.9(a) |
| Employees | 10.1(a) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Executory Contract Designation Deadline | 5.12(a) |
| Governmental Antitrust Authority | 5.3(a) |
| Included Contracts | 2.1(b) |

| Defined Term | Section |
|---|---|
| Interim Balance Sheet | 3.4(a) |
| IP Assignments | 2.8(a) |
| Leased Real Property | 2.1(d) |
| Owned Real Property | 2.1(d) |
| Petition Date | Preamble |
| Purchase Price | 2.5 |
| Purchased Assets | 2.1 |
| Purchased Intellectual Property | 2.1(e) |
| Purchaser | Preamble |
| Purchaser Disclosure Schedule | Article 4 |
| Rejection Effective Date | 5.12(c) |
| Sale and Procedures Motion | 5.9(a) |
| Savings Plan | 10.2(a) |
| Seller | Preamble |
| Seller Disclosure Schedule | Article 3 |
| Transfer Taxes | 9.1(a) |
| Transferred Employees | 10.1(a) |
| Welfare Plans | 10.3 |

Section 1.3    Construction.  Any reference in this Agreement to an "Article," "Section," "Exhibit" or "Schedule" refers to the corresponding Article, Section, Exhibit or Schedule of or to this Agreement, unless the context indicates otherwise.  The table of contents and the headings of Articles and Sections are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement.  All words used in this Agreement are to be construed to be of such gender or number as the circumstances require.  The words "including," "includes" or "include" are to be read as listing non-exclusive examples of the matters referred to, whether or not words such as "without limitation" or "but not limited to" are used in each instance.  Where this Agreement states that a party "shall", "will" or "must" perform in some manner or otherwise act or omit to act, it means that the party is legally obligated to do so in accordance with this Agreement.  Any reference to a statute is deemed also to refer to any amendments or successor legislation as in effect at the relevant time.  Any reference to a Contract or other document as of a given date means the Contract or other document as amended, supplemented and modified from time to time through such date.

## ARTICLE 2
## THE TRANSACTION

Section 2.1    Sale and Purchase of Purchased Assets.  In accordance with the provisions of this Agreement and the Sale Order, and except as set forth in Section 2.2, at the Closing, the Seller will, to the extent transferable under applicable Law, sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Seller, all of the Seller's right, title and interest in and to all of the properties and assets of every kind and description of the Seller, whether real, personal or mixed, tangible or intangible, and wherever located (collectively, the "Purchased Assets"), including the following:

(a)    all inventory as of the Closing Date, including all finished goods, work in process and raw materials;

(b) all of the rights of the Seller under all Contracts to which the Seller is a party, by which the Seller or any of the Purchased Assets is bound or affected or pursuant to which Seller is a beneficiary, including any rights the Seller may have under nondisclosure, confidentiality, non-solicitation, non-competition and similar agreements, and those Contracts set forth in Schedule 2.1(b) to the extent such Contracts are assumed pursuant to Section 5.12 (collectively, the "Included Contracts"); provided, however, that if any Contract is recharacterized by a Final Order as a secured financing, then the real property or personal property that is subject to such Contract shall be a Purchased Asset;

(c) all machinery, equipment, furniture, fixtures, rolling stock and other items of tangible personal property;

(d) (i) the real property set forth on Schedule 2.1(d)(i) (collectively, the "Owned Real Property") and (ii) all rights in respect of the real property set forth on Schedule 2.1(d)(ii) (collectively, the "Leased Real Property"), to the extent such rights may be transferred under applicable Law;

(e) all Intellectual Property, including the Intellectual Property set forth on Schedule 2.1(e) (collectively, the "Purchased Intellectual Property");

(f) all goodwill of the Seller;

(g) to the extent transferable under applicable Law, all Governmental Authorizations held by the Seller;

(h) to the extent transferable under applicable Law, all books, records, files and papers, including all advertising materials, client and customer lists, supplier and vendor lists, purchase orders, sales and purchase invoices, production reports, personnel and employment records, and financial and accounting records other than the corporate books and records of the Seller;

(i) all the assets of the Seller Employee Benefit Plans transferred pursuant to Article 10;

(j) all of the Seller's claims, rights, credits, causes of action, defenses and rights of set-off against third parties relating to or arising from any of the Business, the Purchased Assets, or Assumed Liabilities, including unliquidated rights under manufacturers' and vendors' warranties;

(k) all cash, cash equivalents, bank deposits, investment accounts, lockboxes, certificates of deposit, marketable securities, bank accounts, corporate credit cards and other similar cash items;

(l) all notes, accounts receivable and other receivables;

(m) all insurance policies, binders and claims and rights thereunder and proceeds thereof;

(n) all deposits and pre-payments made by the Seller;

(o) all rights to refunds, credits or similar benefits relating to Taxes and other governmental charges of whatever nature for any period, or portion of any period, ending on or prior to the Closing Date;

(p) all surveys, plans, specifications, engineering studies, marketing studies and similar items with respect to the Business;

(q) any and all claims or causes of action, whether filed or not, against the Purchaser or its Affiliates and against the Debtors' present and former directors, officers, or employees, including without limitation, any causes of action arising as a result of the commencement of the Bankruptcy Case, whether

pursuant to the Bankruptcy Code or otherwise, and including all proceeds therefrom, to the extent related to activities or time periods prior to the Closing Date; and

(r)       any and all causes of actions that are property of the Debtors or of the Debtors' estates, including, without limitation, those arising under Chapter 5 of the Bankruptcy Code or any other state or federal law; provided, however, that the Purchaser agrees and covenants not to sue, prosecute, or otherwise assert, any such Seller claims that arise under Chapter 5 of the Bankruptcy Code other than as a defense or offset to an affirmative claim or cause of action brought against the Purchaser based on any conduct, claim, action, or inaction arising prior to the Closing Date.

Section 2.2       Excluded Assets.   Notwithstanding the terms of Section 2.1, the Seller will not sell, convey, assign, transfer or deliver to the Purchaser, and the Purchaser will not purchase or acquire, and the Purchased Assets do not include, any of the following assets (the "Excluded Assets"):

(a)       all minute books, records, stock ledgers, Tax records and all other materials that the Seller is required by Law to retain; provided, however, that at the Closing, Seller shall provide a copy to Purchaser of any such materials it is required by Law to retain;

(b)       all rights under all Contracts set forth on Schedule 2.2(b), including the leases described on Schedule 2.2(b) and the machinery, equipment, furniture and other items of tangible personal property located on the properties subject to such leases;

(c)       all assets of the Seller Employee Benefit Plans which are not transferred pursuant to Article 10;

(d)       all claims of the Seller under chapter 5 of the Bankruptcy Code that are not acquired by the Purchaser prior to the Closing Date;

(e)       all rights arising under any Excluded Liability; and

(f)       all rights of the Seller under this Agreement or any of the ancillary agreements to which the Seller is a party.

Section 2.3       Assumed Liabilities.   In accordance with the provisions of this Agreement and the Sale Order, at the Closing, the Purchaser will assume and pay or perform and discharge when due the following Liabilities of the Seller, in each case other than the Excluded Liabilities (the "Assumed Liabilities"):

(a)       all (i) allowed administrative expenses incurred from the Petition Date through the Closing and remain unpaid as of the Closing (except professional fees and expenses), including Liabilities arising under section 503(b)(9) of the Bankruptcy Code or PACA, and trade accounts payable of the Seller to third parties set forth on Schedule 2.3(a) or incurred by the Seller in the ordinary course of business after the Petition Date and remain unpaid prior to the Closing, and (ii) the then outstanding unpaid fees and expenses of the Debtor's retained restructuring professionals that are incurred prior to Closing and allowed by the Bankruptcy Court, in an amount not to exceed $600,000 in the aggregate, reduced by amounts actually paid to such restructuring professionals prior to Closing; provided that, the Purchaser shall pay such foregoing claims upon the later of the Closing, the entry of an order allowing such claims, or such other date mutually agreed upon by the Purchaser and such claimant; and provided, further, that the Purchaser reserves the right to object, in good faith, to the allowance of such claims;

(b)       all Liabilities for Taxes imposed on the Purchaser pursuant to Section 9.1;

(c) all Liabilities of the Seller arising after the Closing under the Included Contracts and the Governmental Authorizations included in the Purchased Assets;

(d) to the extent set forth next to any Included Contract on Schedule 2.3(d), any Cure Amount with respect to such Included Contract;

(e) all Liabilities relating to the employment of Transferred Employees arising after the Closing;

(f) all Liabilities assumed by the Purchaser pursuant to Article 10;

(g) all Liabilities associated with the Owned Real Property and the Leased Real Property arising after the Closing;

(h) all Liabilities associated with the Purchased Assets relating to or arising out of environmental matters, including those arising under any Environmental Law, and arising after the Closing Date;

(i) all Liabilities specifically identified on Schedule 2.3(i); and

(j) all allowed priority claims arising under Section 507(a)(4),(5), and (8) of the Bankruptcy Code remaining unpaid as of the Closing; provided that, the Purchaser shall pay such foregoing claims upon the later of the Closing, the entry of an order allowing such claims, or such other date mutually agreed upon by the Purchaser and such claimant; and provided, further, that the Purchaser reserves the right to object, in good faith, to the allowance of such claims; and

(k) all other Liabilities arising out of, relating to or incurred in connection with the Business or the Purchased Assets arising after the Closing including (i) the operation of the Business after the Closing, (ii) the use by the Purchaser or its permitted licensees of Purchased Intellectual Property and (iii) any other condition arising after the Closing with respect to the Purchased Assets.

Section 2.4    Excluded Liabilities.   Notwithstanding any other provision of this Agreement or any other writing to the contrary, the Purchaser is assuming only the Assumed Liabilities and is not assuming any other Liability of the Seller of whatever nature, whether presently in existence or arising hereafter (the "Excluded Liabilities"). Such Excluded Liabilities include the following:

(a) any Liability for Taxes of the Seller or attributable to the Business or the Purchased Assets for any period, or any portion of any period, ending on or prior to the Closing Date (other than Taxes imposed on the Purchaser pursuant to Section 9.1) except to the extent specifically identified on Schedule 2.3(i);

(b) any Liability arising out of or related to any Excluded Asset;

(c) any litigation claims arising prior to the Closing Date, including, without limitation, any breach of contract claims, environmental claims and assessments;

(d) any Liability for amounts incurred by the Creditors' Committee's professionals (or members) in excess of the Committee Expense Cash;

(e) any Liabilities arising prior to Closing under any Environmental Law; and

(f) any Liabilities that are not Assumed Liabilities.

Section 2.5     Consideration.   The consideration for the Purchased Assets (the "Purchase Price") consists of (a) cash in the amount of the Wind-Down Amount, (b) the assumption of the Assumed Liabilities and (c) a credit bid of the Pre-Petition Financing in the amount of $21,900,000 (the "Credit Bid").

Section 2.6     Allocation of Purchase Price.

(a)     Within 60 days after the Closing Date, the Purchaser will deliver to the Seller an allocation statement (the "Allocation Statement"), setting forth its calculation of the allocation of the sum of the Purchase Price and the Assumed Liabilities to the Purchased Assets.  The Seller will review the Allocation Statement and, to the extent the Seller disagrees in good faith with the content of the Allocation Statement, the Seller will inform the Purchaser of such disagreement within 30 days after receipt of the Allocation Statement.   The Seller and the Purchaser will attempt to resolve any such disagreement. If the Seller and the Purchaser are unable to reach a good faith agreement on the content of the Allocation Statement within 90 days of the Closing Date, the Seller and the Purchaser will each use its own allocation statement.

(b)     If the Purchaser and the Seller agree on the Allocation Statement, the Purchaser and the Seller will report the allocation of the Purchase Price in a manner consistent with the Allocation Statement and will act in accordance with the Allocation Statement in the preparation and filing of all Tax Returns and for all other Tax, financial accounting or other purposes, in any litigation, or otherwise.

(c)     The Purchaser and the Seller will promptly inform one another of any challenge by any Governmental Authority to any allocation made pursuant to this Section 2.6 and agree to consult with and keep each other informed with respect to the status of, and any discussion, proposal or submission with respect to, such challenge.

Section 2.7     Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of Baker & McKenzie LLP, 2001 Ross Avenue, Suite 2300, Dallas, Texas 75201, at 10:00 a.m., local time, as soon as practicable, but in no event later than thirty (30) days after entry of the Sale Order.  The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 2.8     Closing Deliveries.

(a)     At the Closing, the Seller will deliver or cause to be delivered to the Purchaser:

(i)     a bill of sale in the form of Exhibit B (the "Bill of Sale") executed by the Seller;

(ii)     an assignment and assumption agreement in the form of Exhibit C (the "Assignment and Assumption Agreement") executed by the Seller;

(iii)     for each parcel of Owned Real Property, a recordable warranty deed or such other appropriate document or instrument of transfer in accordance with local custom, each in form and substance reasonably satisfactory to the Purchaser and its counsel and executed by the Seller;

(iv)     a certificate, dated as of the Closing Date, executed by the Seller confirming the satisfaction of the conditions specified in Sections 6.1(a) and 6.1(b); and

(v) such other instruments of sale, transfer, conveyance and assignment as the Purchaser reasonably requests for the purpose of consummating the transactions contemplated by this Agreement.

(b) At the Closing, the Purchaser will deliver or cause to be delivered to the Seller or for the Seller's benefit:

(i) the Purchase Price by delivery of (a) cash to the Seller in an amount equal to the Unencumbered Settlement Cash; (b) cash to the to the trust account of Creditors' Committee's counsel in an amount equal to the Committee Expense Cash; (c) an Assignment and Assumption Agreement executed by the Purchaser; and (d) the Credit Bid;

(ii) the Bill of Sale executed by the Purchaser;

(iii) a certificate, dated as of the Closing Date, executed by the Purchaser confirming the satisfaction of the conditions specified in Sections 6.2(a) and 6.2(b); and

(iv) such other instruments of assumption as the Seller reasonably requests for the purpose of consummating the transactions contemplated by this Agreement.

Section 2.9    Payment of Cure Amounts.  The Purchaser will pay any and all Cure Amounts with respect to the Included Contracts, in cash on the Assumption Effective Date (as defined herein), or in such other manner as agreed by the Purchaser and the counterparty to such Included Contract.

Section 2.10    Consents.  Notwithstanding any other provision of this Agreement, this Agreement does not effect an assignment of any Included Contract to the extent that such Included Contract is not assignable under the Bankruptcy Code without the consent of the other party or parties thereto, and the consent of such other party has not been given or received, as applicable, as of the Closing.  As to any such Included Contract so designated in writing by the Purchaser, the Seller and the Purchaser will use commercially reasonable efforts to obtain as promptly as practicable after the Closing the consent of the other parties to such Included Contract or, if required, novation thereof to the Purchaser or, alternatively, written confirmation from such parties reasonably satisfactory to the Seller and the Purchaser that such consent is not required.  In no event, however, will the Seller be obligated to pay any money to any Person or to offer or grant other financial or other accommodations to any Person in connection with obtaining any consent, waiver, confirmation, novation or approval with respect to any such Included Contract.  If any consent, waiver, confirmation, novation or approval is not obtained with respect to any such Included Contract, then the Seller and the Purchaser will cooperate to establish an agency type or other similar arrangement reasonably satisfactory to the Seller and the Purchaser under which the Purchaser would obtain (including by means of subcontracting, sublicensing or subleasing arrangement), to the extent practicable, all rights, and assume the corresponding Liabilities thereunder or under which the Seller would enforce, for the benefit of the Purchaser, with the Purchaser assuming and agreeing to pay the Seller's Liabilities and expenses, any and all rights of the Seller against a third party to any such Included Contract.  In such event (i) the Seller will promptly pay to the Purchaser when received all moneys relating to the period on or after the Closing Date received by it under any Included Contract not transferred pursuant to this Section 2.10 and (ii) the Purchaser will promptly pay, perform or discharge when due any Liabilities arising thereunder after the Closing Date but not transferred to the Purchaser pursuant to this Section 2.10.  The failure by the Purchaser or the Seller to obtain any required consent, waiver, confirmation, novation or approval with respect to any Included Contract will not relieve any party from its obligation to consummate at the Closing the transactions contemplated by this Agreement.  The Purchaser acknowledges that no adjustment to the Purchase Price will be made for any such Included Contracts that are not assigned and that the Purchaser will have no claim against the Seller

in respect of any such unassigned Contracts. The Seller's obligations under this Section 2.10 will terminate on the date that is 90 days after the Closing Date.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Purchaser as follows, except as set forth on the disclosure schedule delivered by the Seller to the Purchaser concurrently with the execution and delivery of this Agreement and dated as of the date of this Agreement (the "Seller Disclosure Schedule"):

Section 3.1    Organization.    The Seller is a limited partnership duly organized and validly existing under the Laws of the state of its organization and has all requisite power and authority to conduct its business as presently conducted.

Section 3.2    Authority and Enforceability.

(a)    Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Order, the Seller has all requisite corporate power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement. Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Order, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement by the Seller have been duly authorized by all necessary action on the part of the Seller. The Seller has duly and validly executed and delivered this Agreement. Assuming the due authorization, execution and delivery of this Agreement by the Purchaser and subject to the entry and effectiveness of the Sale Order, this Agreement constitutes the valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

Section 3.3    No Conflict.    Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Order and except in any case that would not have a Material Adverse Effect, neither the execution, delivery and performance of this Agreement by the Seller, nor the consummation by the Seller of the transactions contemplated by this Agreement, will (a) conflict with or violate the Seller's organizational documents, (b) result in a breach or default under, or create in any Person the right to terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any material Contract, (c) violate any Law or Judgment applicable to the Seller, the Business or the Purchased Assets or (d) require the Seller to obtain any Governmental Authorization or make any filing with any Governmental Authority.

Section 3.4    Disclaimer of Other Representations and Warranties.    The representations and warranties set forth in this Article 3 are the only representations and warranties made by the Seller with respect to the Business, the Purchased Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement. Except as specifically set forth in this Article 3, (a) the Seller is selling the Purchased Assets to the Purchaser "as is" and "where is" and with all faults, and makes no warranty, express or implied, as to any matter whatsoever relating to the Business, the Purchased Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to (i) merchantability or fitness for any particular use or purpose, (ii) the operation of the Business by the Purchaser after the Closing in any manner or (iii) the probable success or profitability of the Business after the Closing, and (b) none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders will have, or will be subject to, any Liability or indemnification obligation to the Purchaser or any other Person resulting from the distribution to the Purchaser or its Affiliates or representatives of, or the Purchaser's use of, any information relating to the Business, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to the Purchaser or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations,

functional "break-out" discussions, responses to questions submitted on behalf of the Purchaser or in any other form in expectation of the transactions contemplated by this Agreement.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller as follows, except as set forth on the disclosure schedule delivered by the Purchaser to the Seller concurrently with the execution and delivery of this Agreement and dated as of the date of this Agreement (the "Purchaser Disclosure Schedule"):

Section 4.1    Organization and Good Standing. The Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Georgia and has all requisite company power and authority to conduct its business as it is presently conducted.

Section 4.2    Authority and Enforceability. The Purchaser has all requisite company power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Purchaser. The Purchaser has duly and validly executed and delivered this Agreement. Assuming the due authorization, execution and delivery of this Agreement by the Seller, this Agreement constitutes the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to (a) Laws of general application relating to bankruptcy, insolvency and the relief of debtors and (b) Laws governing specific performance, injunctive relief and other equitable remedies.

Section 4.3    No Conflict. Except in any case that would not have a material adverse effect on the ability of the Purchaser to perform its obligations under this Agreement or on the ability of the Purchaser to consummate the transactions contemplated by this Agreement, neither the Purchaser's execution, delivery and performance of this Agreement, nor the consummation by the Purchaser of the transactions contemplated by this Agreement, will (a) conflict with or violate the Purchaser's organizational documents, (b) result in a breach or default under or create in any Person the right terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any Contract to which the Purchaser is a party or by which the Purchaser is bound, in any case with or without due notice or lapse of time or both, (c) result in the imposition of any lien or other encumbrance on any of the assets of the Purchaser, (d) violate any Law or Judgment applicable to the Purchaser or (e) require the Purchaser to obtain any Governmental Authorization or make any filing with any Governmental Authority.

Section 4.4    Legal Proceedings. There is no Proceeding pending or, to the Purchaser's knowledge, threatened against the Purchaser that questions or challenges the validity of this Agreement or that may prevent, delay, make illegal or otherwise interfere with the ability of the Purchaser to consummate any of the transactions contemplated by this Agreement.

Section 4.5    Brokers Fees. Neither the Purchaser nor any Person acting on its behalf has incurred any Liability to pay any fees or commissions to any broker, finder or agent in connection with any of the transactions contemplated by this Agreement.

Section 4.6    Financial Capacity. The Purchaser has immediately available cash in an amount sufficient to allow the Purchaser to perform all of its obligations under this Agreement and immediately prior to Closing will own the Pre-Petition Financing.

Section 4.7    No Knowledge of Breach or Inaccuracy. The Purchaser has no knowledge of any breach of, or inaccuracy in, or any fact, event, breach, condition or occurrence that may constitute a breach of, or inaccuracy in, any representation or warranty made by the Seller in this Agreement.

Section 4.8    Independent Investigation. The Purchaser has conducted its own independent investigation, review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Business as it has deemed appropriate, which investigation, review and analysis was done by the Purchaser and its representatives. The Purchaser acknowledges that it and its representatives have been provided adequate access to the personnel, properties, premises and records of the Business for such purpose. In entering into this Agreement, the Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations or opinions of the Seller or its representatives (except the representations and warranties set forth in Article 3). The Purchaser hereby acknowledges and agrees that (a) other than the representations and warranties set forth in Article 3, none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders make or have made any representation or warranty, express or implied, at law or in equity, as to any matter whatsoever relating to the Business, the Purchased Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to (i) merchantability or fitness for any particular use or purpose, (ii) the operation of the Business by the Purchaser after the Closing in any manner or (iii) the probable success or profitability of the Business after the Closing, and (b) none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders will have or will be subject to any Liability or indemnification obligation to the Purchaser or any other Person resulting from the distribution to the Purchaser or its Affiliates or representatives of, or the Purchaser's use of, any information relating to the Business or any other matter relating to the transactions contemplated by this Agreement, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to the Purchaser or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions submitted on behalf of the Purchaser or in any other form in expectation of the transactions contemplated by this Agreement.

## ARTICLE 5
## COVENANTS

Section 5.1    Access and Investigation. Until the Closing and upon reasonable advance notice from the Purchaser, the Seller will allow the Purchaser and its representatives reasonable access during normal business hours and without unreasonable interference with the operation of the Business to (a) such materials and information about the Business as the Purchaser may reasonably request and (b) specified members of management of the Business as the parties may reasonably agree.

Section 5.2    Operation of the Business.

(a)    Until the Closing, except (i) as required by Law or as a result of the Bankruptcy Case (it being understood that no provision of this Section 5.2 will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code), (ii) as otherwise set forth in this Agreement or the Seller Disclosure Schedule or (iii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), the Seller will operate, and will conduct the Business in the ordinary course of the Business in all material respects and use its commercially reasonable efforts to keep available the services of the Employees and to preserve the Business' relationships with its customers and others doing business with it.

(b)    Until the Closing, except (i) as required by Law or as a result of the Bankruptcy Case (it being understood that no provision of this Section 5.2 will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would

otherwise violate the Bankruptcy Code), (ii) as otherwise set forth in this Agreement or the Seller Disclosure Schedule or (iii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), the Seller will not:

        (i)      incur any indebtedness for borrowed money that constitutes an Assumed Liability other than in the ordinary course of the Business in amounts in excess of 115% of the aggregate amount budgeted in cash collateral orders approved by Chatham III or the Purchaser and entered by the Bankruptcy Court;

        (ii)     materially and adversely amend any material Contract;

        (iii)    waive or release any right or claim of a material value to the Business other than in the ordinary course of the Business;

        (iv)    sell, lease or license, or permit any Lien on, any material portion of the Purchased Assets other than in the ordinary course of the Business;

        (v)     acquire, by merger or consolidation with, or by purchase of all or a substantial portion of the assets or stock of, or by any other manner, any business or entity, or enter into any joint venture, partnership or other similar arrangement for the conduct of the Business;

        (vi)    materially change the remuneration or terms of employment of any Employee other than (A) in the ordinary course of the Business, (B) as required by Law or as a result of the Bankruptcy Case or (C) for retention, incentive and similar payments relating to the consummation of the transactions contemplated by this Agreement; or

        (vii)   agree in writing to take any of the foregoing actions.

Section 5.3     Consents and Filings; Best Efforts.

       (a)     Subject to the terms and conditions of this Agreement, each of the parties will use their respective best efforts (i) to take promptly, or cause to be taken, all actions, and to do promptly, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement and (ii) as promptly as practicable after the date of this Agreement, to obtain all Governmental Authorizations from, and make all filings with, all Governmental Authorities, and to obtain all other consents, waivers, approvals and other authorizations from, all other third parties, that are necessary or advisable in connection with the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement.

       (b)     The Seller and the Purchaser will promptly notify the other of any communication it or any of its Affiliates receives from any Governmental Authority relating to the transactions contemplated by this Agreement, and will permit the other party to review in advance any proposed communication by such party to any Governmental Authority. Neither party will agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other party in advance and, to the extent permitted by such Governmental Authority, gives the other party the opportunity to attend and participate at such meeting. The Seller and the Purchaser will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other party may reasonably request in connection with the foregoing. The Seller and the Purchaser will provide each other with copies of all correspondence, filings or communications between them or any of their representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement.

Section 5.4     Supplements to Disclosure Schedules.  The Seller may, from time to time prior to the Closing by written notice to the Purchaser, supplement the Seller Disclosure Schedule or add a schedule to the Seller Disclosure Schedule (such added schedule to be deemed a supplement hereunder) in order to disclose any matter which, if occurring prior to the date of this Agreement, would have been required to be set forth or described in the Seller Disclosure Schedule or to correct any inaccuracy or breach in the representations and warranties made by the Seller in this Agreement.  Subject to this Section 5.4, none of such supplements to the Seller Disclosure Schedule will be deemed to cure the representations and warranties to which such matters relate with respect to satisfaction of the conditions set forth in Section 6.1(a) or otherwise affect any other term or condition contained in this Agreement; provided, however, that unless the Purchaser will have delivered a notice of termination with respect to such matter as contemplated by Section 7.1(b) (to the extent the Purchaser is entitled to deliver such notice pursuant to Section 7.1(b)) within ten Business Days of the receipt by the Purchaser of any supplement to the Seller Disclosure Schedule pursuant to this Section 5.4, then the Purchaser will have waived any and all rights to terminate this Agreement pursuant to Section 7.1(b) or otherwise arising out of or relating to the contents of such supplement and the resulting breach or breaches of the representations and warranties and the Purchaser will be deemed to have accepted the contents of such supplement for all purposes of this Agreement; and provided, further, that from and after the Closing, the Seller will have no Liability pursuant to this Agreement for any matters arising out of or relating to any of the matters disclosed on the Seller Disclosure Schedule, as supplemented or amended by the Seller prior to the Closing.

Section 5.5     Confidentiality.

(a)     After the Closing, the Seller will, and will instruct its directors, officers, employees and advisors to, hold in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all non-public documents and information relating to the Business (the "Business Information"), except to the extent that such Business Information (i) must be disclosed in connection with the obligations of the Seller pursuant to this Agreement, (ii) can be shown to have been in the public domain through no fault of the Seller, (iii) becomes a matter of public record as a result of the Bankruptcy Case and filings made with the Bankruptcy Court with respect thereto or (iv) was later lawfully acquired by the Seller from sources other than those related to its prior ownership of the Business.  Notwithstanding the foregoing, in no event will this Section 5.5(b) limit or otherwise restrict the right of the Seller to disclose such Business information (w) to its and its Affiliates' respective directors, officers, employees, agents and advisors to the extent reasonably required to facilitate the negotiation, execution, delivery or performance of this Agreement, (x) to any Governmental Authority or arbitrator to the extent reasonably required in connection with any Proceeding relating to the enforcement of this Agreement, (y) in connection with the Bankruptcy Case and filings made with the Bankruptcy Court with respect thereto, and (z) as permitted in accordance with Section 5.6.

Section 5.6     Public Announcements.  Prior to the Closing, neither the Purchaser nor the Seller will issue any press release or make any other public announcement relating to this Agreement or the transactions contemplated hereby without the prior written approval of the other party (which approval will not be unreasonably withheld, conditioned or delayed), unless required by applicable Law or in connection with filings to be made with the Bankruptcy Court in connection with the Bankruptcy Case.  Prior to issuing any such press release or making any such other public announcement as required by applicable Law, the disclosing party will give the other party a copy of the proposed press release or other announcement and reasonable opportunity to comment on the same.

Section 5.7     Further Actions.  Subject to the other express provisions of this Agreement, upon the request of either party to this Agreement, the other party will execute and deliver such other

documents, instruments and agreements as the requesting party may reasonably require for the purpose of carrying out the intent of this Agreement and the transactions contemplated by this Agreement.

Section 5.8    Bulk Transfer Laws. The Purchaser hereby waives compliance by the Seller with any applicable bulk sale or bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement.

Section 5.9    Bankruptcy Court Filings.

(a)    The Seller will file with the Bankruptcy Court a motion (the "Sale and Procedures Motion") seeking entry of an order substantially in the form attached hereto as Exhibit D and reasonably acceptable in form and substance to Purchaser and the Seller (the "Bidding Procedures Order") approving (i) bidding procedures to govern the solicitation of bids and the conduct of an auction for the Purchased Assets under the supervision of the Bankruptcy Court (the "Bidding Procedures"); and (ii) procedures for the assumption and assignment of Executory Contracts as contemplated in this Agreement (the "Contract Procedures").

(b)    The Seller will use its commercially reasonable efforts to have the Bankruptcy Court (i) schedule a hearing on the Sale and Procedures Motion as promptly as practicable following the date of this Agreement, (ii) enter the Bidding Procedures Order as promptly as practicable following the date of this Agreement, (iii) provide that bids are due no later than April 22, 2014, (iv) provide that the Auction during which the Seller will solicit Qualified Bids (as defined in the Bidding Procedures) from other prospective purchasers in accordance with the procedures set forth in the Bidding Procedures Order, will be held no later than April 25, 2014, (v) obtain entry of the Sale Order as promptly as practicable following the date on which the Auction is closed and (vi) consummate the Closing as promptly as practicable after the approval of the Sale Order. The Purchaser and the Seller will use their respective commercially reasonable efforts to cause the Bidding Procedures Order and the Sale Order to become Final Orders as soon as practicable after their entry.

(c)    The Purchaser will cooperate with and promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Bidding Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by the Purchaser under this Agreement, adequate assurance of performance by the Purchaser from and after the Closing under the Included Contracts, and demonstrating that the Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. The Seller will not, without the prior written consent of the Purchaser, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Assets hereunder.

(d)    If an appeal is taken, or a stay pending appeal is requested from either the Bidding Procedures Order or the Sale Order, the Seller will promptly notify the Purchaser of such appeal or stay request and the Purchaser and the Seller will take all steps as may be reasonable or appropriate to defend against such appeal or stay request. Notwithstanding the foregoing, nothing in this Agreement precludes the parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and the Purchaser, in its sole discretion, waives in writing the condition set forth in Section 6.1(e) that the Sale Order be a Final Order.

Section 5.10    Exclusivity; Solicitation.

(a)    The Purchaser and the Seller acknowledge that under the Bankruptcy Code the sale of Purchased Assets is subject to approval of the Bankruptcy Court. The Purchaser and the Seller acknowledge that to obtain such approval the Seller must demonstrate that it has taken reasonable steps to

obtain the highest or best value possible for the Purchased Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Purchased Assets to prospective bidders, entertaining higher or better offers from prospective bidders and, if necessary, conducting an Auction.

(b)     The Seller acknowledges it has solicited other potential bids for the sale of the Business through the date of this Agreement. Pursuant to such efforts, and as consideration for substantial expenditures of time, effort and expense undertaken and continuing by the Purchaser in connection with the completion of its due diligence review of the Business and the preparation, negotiation, and execution of this Agreement, the Seller acknowledges and agrees that (i) the Purchaser will be the stalking horse bidder at the Auction, (ii) no Person other than the Purchaser will be the stalking horse bidder at the Auction and the Seller will not participate in any negotiations for the purpose of naming any Person other than the Purchaser as the stalking horse bidder in the Auction, and (iii) the Seller will actively oppose any effort by any other Person to be the stalking horse bidder; provided, however, that consistent with its fiduciary duties to elicit the highest and best offer for the Purchased Assets and to conduct the Auction, notwithstanding any provision in this Agreement to the contrary, the Seller and its representatives and Affiliates may solicit, encourage and negotiate higher or better offers for the Purchased Assets under the terms of the Bidding Procedures Order, and provided further that the Seller and its representatives and Affiliates may (A) in response to an Acquisition Proposal for some or all of the Purchased Assets that was not solicited after the date hereof, participate in negotiations or discussions with, request clarifications from, or furnish information to, any Person which makes such Acquisition Proposal, and (B) continue discussions and negotiations and continue to provide information to any Person, group or other entity with which Seller has been conducting such discussions or negotiations.

Section 5.11     Other Bids. The Purchaser acknowledges that both before and after the filing of the Sale and Procedures Motion, the Seller and its representatives and Affiliates may solicit bids from other prospective purchasers for the sale of the Purchased Assets, on terms and conditions substantially the same in all respects to this Agreement (or improved terms) and in accordance with the procedures set forth in the proposed Bidding Procedures prior to the entry of the Bidding Procedures Order on the docket in the Bankruptcy Case, or pursuant to the Bidding Procedures Order after entry thereof on the docket in the Bankruptcy Case.

Section 5.12     Assumption & Rejection of Executory Contracts.

(a)     Schedule 5.12 (the "Contract & Cure Schedule") sets forth a list of Executory Contracts that the Seller may assume and assign to the Purchaser in accordance with Section 5.12(b) below (each, an "Assumable Executory Contract") or reject under Section 365 of the Bankruptcy Code. From the date of this Agreement until the Executory Contract Designation Deadline, the Purchaser in its sole and absolute discretion may amend the Contract & Cure Schedule to (i) add or remove any Executory Contract or (ii) modify the treatment of any Executory Contract. The term "Executory Contract Designation Deadline" means the later of (x) the Closing Date or (y) the third Business Day following the date upon which any objection to assumption of the Executory Contract or the proposed cure amount is resolved.

(b)     All Executory Contracts that are assumed will be deemed and assigned to the Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the Closing Date or (ii) (A) the date following expiration of the deadline for objecting to assumption and assignment of the Executory Contract or to a proposed cure amount, if no such objection is submitted or (B) the third Business Day following the date of resolution of any such objection. On the Assumption Effective Date, such Executory Contract will be deemed to be an Included Contract under this Agreement. If it is determined that the Seller may not assume and assign to the Purchaser any Executory Contract under the Contract

Procedures or the Sale Order, then such Executory Contract will be deemed to be an Excluded Contract under this Agreement. From the date of this Agreement until the Executory Contract Designation Deadline, the Purchaser in its sole and absolute discretion may amend Schedule 2.1(b) or Schedule 2.3(d) to add or remove any Executory Contract or modify the Assumption Effective Date for any Executory Contract listed therein, if such date has not passed.

(c)     All Executory Contracts that are listed on the Contract & Cure Schedule, but are not assumed under Section 5.12(b), will be rejected on the date (the "Rejection Effective Date") that is the later of (i) the Closing Date or (ii) (A) the date following expiration of the deadline for objecting to assumption and assignment of the Executory Contract, if no such objection is submitted or (B) the date of resolution of any such objection provided the contract is not assumed.  On the Rejection Effective Date, such Executory Contract will be deemed to be an Excluded Contract under this Agreement.

(d)     At and after Closing and until the Executory Contract Designation Deadline, the Purchaser will be obligated to pay or cause to be paid all amounts due in respect of the Seller's performance under each Executory Contract listed on the Contract & Cure Schedule  until the Rejection Effective Date or the removal of such Executory Contract from the Contract & Cure Schedule.

(e)     The Seller and the Purchaser will comply with the procedures set forth in the Contract Procedures and the Bidding Procedures Order with respect to the assumption and assignment or rejection of any Executory Contract pursuant to, and in accordance with, this Section 5.12.

(f)     No designation of any Executory Contract for assumption and assignment or rejection in accordance with this Section 5.12 will give rise to any right to any adjustment to the Purchase Price.

## ARTICLE 6
## CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE

Section 6.1     Conditions to the Obligation of the Purchaser.  The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Purchaser, in whole or in part, in its sole and absolute discretion):

(a)     Accuracy of Representations and Warranties.  The representations and warranties of the Seller in Article 3 must be true and correct in all respects as of the Closing (except to the extent any such representation or warranty speaks as of the date of this Agreement or any other specific date, in which case such representation or warranty must have been true and correct in all respects as of such date), except where the failure of such representations and warranties to be so true and correct (without regard for any "material," "Material Adverse Effect" or similar qualification) would not, individually or in the aggregate, constitute a Material Adverse Effect;

(b)     Performance of Covenants.  All of the covenants and obligations that the Seller is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)     No Action.  There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement or cause the transactions contemplated by this Agreement to be rescinded following consummation;

(d)     Bidding Procedures Order.  The Bidding Procedures Order must be a Final Order;

(e)     Sale Order.  The Sale Order, which shall be in form and substance agreeable to Purchaser in its sole and absolute discretion, must be a Final Order;

(f)     Rule 9019 Order.  The Bankruptcy Court shall have entered a Final Order, which shall be in form and substance agreeable to Purchaser in its sole and absolute discretion, approving the *Joint Motion of the Official Committee of Unsecured Creditors and the Debtors for Order Approving Compromise of Controversies in accordance with the Term Sheet* that was filed with the Bankruptcy Court on March 25, 2014 (Docket No. 223);

(g)     No Material Adverse Effect.  There shall not have occurred any event or occurrence (regardless of whether such event or occurrence constitutes a breach of any representation, warranty, or covenant of Seller under this Agreement) which has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and

(h)     Transaction Documents.  The Seller must have delivered or caused to be delivered each document that Section 2.8(a) requires it to deliver.

Section 6.2     Conditions to the Obligation of the Seller.  The obligation of the Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Seller, in whole or in part):

(a)     Accuracy of Representations and Warranties.  The representations and warranties of the Purchaser in Article 4 must be true and correct in all material respects as of the Closing (except to the extent any such representation or warranty speaks as of the date of this Agreement or any other specific date, in which case such representation or warranty must have been true and correct in all material respects as of such date);

(b)     Performance of Covenants.  All of the covenants and obligations that the Purchaser is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)     No Action.  There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement or cause the transactions contemplated by this Agreement to be rescinded following consummation;

(d)     Bidding Procedures Order.  The Bidding Procedures Order must have been entered and must not have been stayed as of the Closing Date;

(e)     Sale Order.  The Sale Order must be a Final Order; and

(f)     Transaction Documents.  The Purchaser must have delivered or caused to be delivered to the Seller each document that Section 2.8(b) requires it to deliver.

**ARTICLE 7**
**TERMINATION**

Section 7.1     Termination Events.  This Agreement may, by written notice given before or at the Closing, be terminated:

(a)     by mutual consent of the Purchaser and the Seller;

(b)    by the Purchaser (so long as the Purchaser is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if (i) there has been a breach of any of the Seller's representations or warranties contained in this Agreement, which would result in the failure of a condition set forth in Section 6.1(a) or (ii) there has been a breach of any of the Seller's covenants contained in this Agreement, which would result in the failure of a condition set forth in Section 6.1(b), and which breach, in case of either clause (i) or (ii) of this Section 7.1(b) has not been cured within 10 days after written notice of the breach has been delivered to the Seller from the Purchaser;

(c)    by the Seller (so long as the Seller is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if there has been a breach of any of the Purchaser's representations, warranties or covenants contained in this Agreement, which would result in the failure of a condition set forth in Section 6.2(a) or Section 6.2(b), and which breach has not been cured within 10 days after written notice of the breach has been delivered to the Purchaser from the Seller;

(d)    by either the Purchaser or the Seller, if there is in effect a Final Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; provided, however, that the right to terminate this Agreement under this Section 7.1(d) will not be available to any party whose failure to fulfill any covenant under this Agreement has been the cause of or resulted in the action or event described in this Section 7.1(d) occurring;

(e)    by either the Purchaser or the Seller, if the Seller consummates an Acquisition Proposal with any Person other than the Purchaser;

(f)    by either the Purchaser or the Seller, if (i) the Sale Order has not been entered by the Bankruptcy Court on or prior to 7 days after the Sale Hearing;

(g)    by the Purchaser, if the Closing has not occurred (other than through the failure of the Purchaser to comply fully with its obligations under this Agreement) on or before 30 days following entry of the Sale Order; or

(h)    by the Seller, if the Closing has not occurred (other than through the failure of the Seller to comply fully with its obligations under this Agreement) on or before 30 days following entry of the Sale Order.

Section 7.2    Effect of Termination.    If this Agreement is terminated pursuant to Section 7.1, this Agreement and all rights and obligations of the parties under this Agreement automatically end without Liability against any party or its Affiliates, except that (i) Section 5.5(a) (*Confidentiality*), Section 5.6 (*Public Announcements*), Section 7.3 (*Certain Effects of Termination*), Article 11 (*General Provisions*) (except for Section 11.12 (*Specific Performance*)) and this Section 7.2 will remain in full force and survive any termination of this Agreement and (ii) if this Agreement is terminated by a party because of the knowing and intentional breach of this Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's knowing and intentional failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

Section 7.3    Certain Effects of Termination.    If the Purchaser or the Seller terminates this Agreement pursuant to Section 7.1, the Purchaser will comply with the Confidentiality Agreement.

## ARTICLE 8
## NO SURVIVAL

Section 8.1      No Survival of Representations and Warranties and Certain Covenants.  The representations, warranties and covenants (other than covenants that, by their terms, survive the Closing or termination of this Agreement) in this Agreement terminate at the Closing, or upon termination of this Agreement pursuant to Section 7.1 and, following the Closing or the termination of this Agreement, as the case may be, no party will make any claim whatsoever for any breach of any such representation, warranty or covenant hereunder, subject to Sections 7.2 and 7.3.

## ARTICLE 9
## TAX MATTERS

Section 9.1      Transfer Taxes.  The Purchaser will pay in a timely manner all applicable sales, use, ad valorem, property, transfer, conveyance, documentary, recording, notarial, value added, excise, registration, stamp, gross receipts and similar Taxes and fees ("Transfer Taxes"), arising out of or in connection with or attributable to the transactions effected pursuant to this Agreement, including expenses and fees relating to registering Purchased Intellectual Property in the name of the Purchaser or its designee, regardless of whether such Transfer Taxes, expenses and fees are imposed by Law on the Purchaser, the Purchased Assets or the Seller.  Any Tax Returns that must be filed in connection with any Transfer Taxes will be prepared by the party that customarily has primary responsibility for filing such Tax Returns pursuant to the applicable Law under and according to which the respective Tax Returns are due to be filed; provided, however, that the preparing party will deliver such Tax Returns for the other party's review and approval (not to be unreasonably withheld, conditioned or delayed) at least ten Business Days prior to the applicable due date.  The parties will cooperate with each other in the provision of any information or preparation of any documentation that may be necessary or useful for obtaining any available mitigation, reduction or exemption from any such Transfer Taxes.

## ARTICLE 10
## EMPLOYEE MATTERS

Section 10.1      Employees.

(a)      On or before the Closing, the Purchaser will (i) extend a written offer of employment to the individuals holding senior management positions as identified on Schedule 10.1 and (ii) offer at will employment to all other categories of employees identified in Schedule 10.1 who are employed by the Seller on the Closing Date (collectively, the "Employees") (which schedule will be updated by the Seller prior to the Closing Date by deleting those individuals no longer employed in connection with the Business and adding any individuals who have become so employed since the schedule was first prepared or the last revision thereto, as the case may be).  Effective as of the Closing Date, the Purchaser will hire each Employee who timely accepts an offer of employment extended by the Purchaser (such Employees, the "Transferred Employees").  An offer of employment extended by the Purchaser to an Employee in accordance with the foregoing provisions of this Section 10.1 will be for a position with job duties substantially similar to the job duties of the position that the Employee held immediately prior to the Closing Date and on at least the same terms and conditions as those in effect immediately prior to the Closing Date including any terms and conditions required by any applicable employment agreement; provided, however, that such offer of employment shall not include any option or equity benefits that were in existence prior to the Closing Date.  The Purchaser will extend an offer of employment to Employees who are on an approved leave of absence for workers compensation, disability, military, family illness or parental leave as of the Closing Date to at least the same extent, if any, as such Employees would be entitled to reemployment under either applicable Law or the Seller's policies and

procedures in existence immediately prior to the Closing Date, and any such Person who accepts such an offer will be treated as a Transferred Employee.

(b)     To the extent that service is relevant for purposes of eligibility, vesting or benefit accrual under any employee benefit plan, program or arrangement established or maintained by the Purchaser for the benefit of Transferred Employees, such plan, program or arrangement will credit such employees or former employees for service on or prior to the Closing with the Seller and its Affiliates.

Section 10.2     Defined Contribution Plan.

(a)     Effective as of the Closing Date, the Transferred Employees will no longer participate in the Seller's savings plan (the "Savings Plan"), and the Seller will have taken all such action prior to the Closing Date as may be required to achieve this result. As of the Closing Date, the Seller will cause each Transferred Employee to be 100% vested in his or her account balance. As soon as practicable after the Closing Date, the Seller will cause the transfer of an amount representing the entire account balances of the Transferred Employees who participated in the Savings Plan immediately prior to the Closing Date determined as of the plan valuation date coinciding with or next preceding the date of the account balance transfer, together with the actual return thereon from such valuation date to the date of account balance transfer, to the trustee, designated by the Purchaser, of the qualified trust established or maintained by the Purchaser in accordance with the following sentence.

(b)     After the Closing Date, the Purchaser will establish or provide the Transferred Employees with a new savings plan intended to be qualified under Sections 401(a) and 401(k) of the Code, which shall provide (i) for immediate eligibility for participation for each Transferred Employee who participated in the Savings Plan immediately prior to the Closing Date, (ii) each such Transferred Employee with an initial account balance equal to the amount transferred to the Purchaser's savings plan in respect of such Transferred Employee's interest in the Savings Plan and (iii) vesting and eligibility provisions that are no less favorable than those of the Savings Plan as in effect immediately prior to the Closing Date, applied by aggregating service with the Seller and its Affiliates prior to the Closing Date with service with the Purchaser and its Affiliates on and after the Closing Date. The Seller and the Purchaser agree to cooperate fully with respect to the actions necessary to effect the transactions contemplated in this Section 10.3, including the provision of records and information as each may reasonably request from the other.

(c)     Following the date of the asset transfer described in this Section 10.2, the Purchaser will assume all Liabilities of the Seller and its Affiliates under the Savings Plan with respect to accrued benefits of the Transferred Employees, and the Seller and its Affiliates will have no further Liability to the Purchaser or any Transferred Employees with respect thereto following the date of transfer.

Section 10.3     Welfare Arrangements.     To the extent that any medical, dental, hospitalization, life or other similar health, welfare or insurance benefits are provided to Transferred Employees through one or more Seller Employee Benefit Plans (the "Welfare Plans"), the Purchaser agrees to designate or establish, effective as of the Closing, one or more benefit plans, programs or arrangements for the purpose of providing such benefits to Transferred Employees. The Purchaser will cause such benefit plans, programs or arrangements to (i) waive any preexisting condition limitations for conditions covered under the applicable Welfare Plans available to the Transferred Employees immediately prior to the Closing and any applicable waiting periods, and (ii) credit Transferred Employees with any deductible and out-of-pocket expenses incurred by such employees and their dependents under the Welfare Plans during the portion of 2014 preceding the Closing Date for purposes of satisfying any applicable deductible or out-of-pocket requirements under any similar plan, program or arrangement in which such employees may be eligible to participate after the Closing Date. With respect to aggregate lifetime maximum benefits available under the Purchaser's welfare benefit plans, a Transferred Employee's prior claim experience

under any of the Welfare Plans will not be taken into account. Effective as of the Closing Date, the Transferred Employees (and their dependents) will no longer participate in the Welfare Plans and the Seller will have taken all such action prior to the Closing Date as may be required to achieve this result.

Section 10.4    WARN Act.  The Purchaser and the Seller agree to cooperate in good faith to determine whether any notification may be required under the WARN Act as a result of the transactions contemplated by the Agreement and, if such notices are required, to provide such notice in a manner that is reasonably satisfactory to each of the Purchaser and the Seller.

## ARTICLE 11
## GENERAL PROVISIONS

Section 11.1    Notices.  All notices and other communications under this Agreement must be in writing and are deemed duly delivered when (a) delivered if delivered personally or by nationally recognized overnight courier service (costs prepaid), (b) sent by facsimile with confirmation of transmission by the transmitting equipment (or, the first Business Day following such transmission if the date of transmission is not a Business Day) or (c) received or rejected by the addressee, if sent by United States of America certified or registered mail, return receipt requested; in each case to the following addresses or facsimile numbers and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number or individual as a party may designate by notice to the other party):

If to the Seller:

Buffet Partners, L.P.
2701 E. Plano Parkway, Suite 200
Plano, Texas  75074
United States of America
Facsimile:      214-291-2473
Attention:      Barry M. Barron, Sr.


with a copy (which will not constitute notice) to:

Baker & McKenzie LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
United States of America
Facsimile:      214-978-3099
Attention:      John Mitchell

If to the Purchaser:

Chatham Capital
Brian G. Reynolds
400 Galleria Parkway, Suite 1950
Atlanta, GA  30339
Facsimile:  (770) 618-2101
Attention: Brian G. Reynolds

with a copy (which will not constitute notice) to:

Erich N. Durlacher
Burr & Forman LLP
Suite 1100, 171 Seventeenth Street, N.W.
Atlanta, Georgia 30363
(404) 685-4313 [dial]
(404) 214-7387 [telecopier]

Section 11.2    Amendment. Except as contemplated by Section 5.4, this Agreement may not be amended, supplemented or otherwise modified except in a written document signed by each party to be bound by the amendment and that identifies itself as an amendment to this Agreement.

Section 11.3    Waiver and Remedies. The parties may (a) extend the time for performance of any of the obligations or other acts of the other party to this Agreement, (b) waive any inaccuracies in the representations and warranties of the other party to this Agreement contained in this Agreement or (c) waive compliance with any of the covenants or conditions for the benefit of such party contained in this Agreement. Except as contemplated by Section 5.4: (i) any such extension or waiver by a party to this Agreement will be valid only if set forth in a written document signed on behalf of the party against whom the extension or waiver is to be effective; (ii) no extension or waiver will apply to any time for performance, inaccuracy in any representation or warranty, or noncompliance with any covenant or condition, as the case may be, other than that which is specified in the written extension or waiver; and (iii) no failure or delay by a party in exercising any right or remedy under this Agreement or any of the documents delivered pursuant to this Agreement, and no course of dealing between the parties, operates as a waiver of such right or remedy, and no single or partial exercise of any such right or remedy precludes any other or further exercise of such right or remedy or the exercise of any other right or remedy. Except as provided in Section 5.4, any enumeration of a party's rights and remedies in this Agreement is not intended to be exclusive, and a party's rights and remedies are intended to be cumulative to the extent permitted by law and include any rights and remedies authorized in law or in equity.

Section 11.4    Entire Agreement. This Agreement (including the Schedules and Exhibits hereto and the documents and instruments referred to in this Agreement that are to be delivered at the Closing) constitutes the entire agreement between the parties and supersedes any prior understandings, agreements or representations by or between the parties, or either of them, written or oral, with respect to the subject matter of this Agreement. Notwithstanding the foregoing, the Confidentiality Agreement will remain in effect in accordance with its terms as modified pursuant to Section 5.5.

Section 11.5    Assignment, Successors and No Third Party Rights. This Agreement binds and benefits the parties and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in any respect of the Seller under Chapter 11 or Chapter 7 of the Bankruptcy Code and any entity appointed as a successor to the Seller pursuant to a confirmed Chapter 11 plan). No party may delegate any performance of its obligations under this Agreement, except that the Purchaser may at any time delegate the performance of its obligations (other than the obligation to pay the Purchase Price) to any Affiliate of the Purchaser so long as the Purchaser remains fully responsible for the performance of the delegated obligation. Purchaser may designate one or more affiliate entities, including any special purpose entities that may be organized by Purchaser, to take title to the Purchased Assets or a portion thereof and operate the business going forward, and Purchaser and/or such designees may pledge this Agreement as collateral to obtain debt financing. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement except such rights as may inure to a successor or permitted assignee under this Section 11.5.

Section 11.6 Severability. If any provision of this Agreement is held invalid, illegal or unenforceable, the remaining provisions of this Agreement remain in full force and effect, if the essential terms and conditions of this Agreement for each party remain valid, binding and enforceable.

Section 11.7 Exhibits and Schedules. The Exhibits and Schedules to this Agreement are incorporated herein by reference and made a part of this Agreement. The Seller Disclosure Schedule and the Purchaser Disclosure Schedule are arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of Article 3 and Article 4, respectively. The disclosure in any section or paragraph of the Seller Disclosure Schedule or the Purchaser Disclosure Schedule, and those in any amendment or supplement thereto, will be deemed to relate to each other provision of Article 3 or Article 4, respectively.

Section 11.8 Interpretation. In the negotiation of this Agreement, each party has received advice from its own attorney. The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no provision of this Agreement will be interpreted for or against either party because that party or its attorney drafted the provision.

Section 11.9 Expenses. Except as set forth in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, each party will pay its own direct and indirect expenses incurred by it in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated by this Agreement, including all fees and expenses of its advisors and representatives.

Section 11.10 Governing Law. Except to the extent the mandatory provisions of the Bankruptcy Code apply, the internal laws of the State of Texas (without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any other jurisdiction) govern all matters arising out of or relating to this Agreement and its Exhibits and Schedules and the transactions contemplated by this Agreement, including its validity, interpretation, construction, performance and enforcement and any disputes or controversies arising therefrom or related thereto.

Section 11.11 Limitation on Liability. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN NO EVENT WILL ANY PARTY OR ANY OF ITS AFFILIATES BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS, LOSS OF REVENUE OR LOST SALES) IN CONNECTION WITH ANY CLAIMS, LOSSES, DAMAGES OR INJURIES ARISING OUT OF THE CONDUCT OF SUCH PARTY PURSUANT TO THIS AGREEMENT REGARDLESS OF WHETHER THE NONPERFORMING PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR NOT.

Section 11.12 Specific Performance. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by the Purchaser in accordance with their specific terms or were otherwise breached by the Purchaser. The parties accordingly agree that, prior to the termination of this Agreement pursuant to Section 7.1, in addition to any other remedy to which the Seller is entitled at law or in equity, the Seller is entitled to injunctive relief to prevent breaches of this Agreement by the Purchaser and otherwise to enforce specifically the provisions of this Agreement against the Purchaser; provided that, Seller shall only be entitled to injunctive relief if Seller is not otherwise in breach of this Agreement or if Purchaser is not otherwise entitled to terminate this Agreement. The Purchaser acknowledges and agrees that it is not entitled to injunctive relief to prevent any breaches of this Agreement by the Seller or to enforce specifically the provisions of this Agreement or otherwise obtain any equitable relief or remedy against the Seller; provided, however, that the Purchaser will be entitled to injunctive relief solely to prevent any breach by the Seller of Section 5.5 (*Confidentiality*) or Section 5.6 (*Public Announcements*). Each party expressly waives any requirement

that the other party obtain any bond or provide any indemnity in connection with any action seeking injunctive relief or specific enforcement of the provisions of this Agreement.

Section 11.13  Jurisdiction and Service of Process.  Any action or proceeding arising out of or relating to this Agreement or the transactions contemplated by this Agreement must be brought in the Bankruptcy Court; provided, however, that if the Bankruptcy Case is closed, any action or proceeding arising out of or relating to this Agreement or the transactions contemplated by this Agreement must be brought in the courts of the State of Texas, County of Dallas, or, if it has or can acquire jurisdiction, in the United States District Court for the Northern District of Texas.  Each of the parties knowingly, voluntarily and irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding and waives any objection it may now or hereafter have to venue or to convenience of forum.  Each party to this Agreement may make service on the other party by sending or delivering a copy of the process to the party to be served at the address and in the manner provided for the giving of notices in Section 11.1. Nothing in this Section 11.13, however, affects the right of a party to serve legal process in any other manner permitted by law.

Section 11.14  Waiver of Jury Trial.  **EACH OF THE PARTIES KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE ACTIONS OF EITHER PARTY TO THIS AGREEMENT IN NEGOTIATION, EXECUTION AND DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT.**

Section 11.15  No Joint Venture.  Nothing in this Agreement creates a joint venture or partnership between the parties.  This Agreement does not authorize either party (a) to bind or commit, or to act as an agent, employee or legal representative of, the other party, except as may be specifically set forth in other provisions of this Agreement, or (b) to have the power to control the activities and operations of the other party.  The parties are independent contractors with respect to each other under this Agreement.  Each party agrees not to hold itself out as having any authority or relationship contrary to this Section 11.15.

Section 11.16  Counterparts.  The parties may execute this Agreement in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement.  This Agreement is effective upon delivery of one executed counterpart from each party to the other party.  The signatures of all parties need not appear on the same counterpart.  The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending party's signature(s) is as effective as signing and delivering the counterpart in person.

Section 11.17  Waiver and Release of Avoidance Actions against the Purchaser.  As of the Closing, the Seller, acting on behalf of itself and its successors and assigns, hereby waives, releases and forever discharges any and all avoidance actions under Chapter 5 of the Bankruptcy Code, against the Purchaser and its Affiliates arising out of occurrences before the Closing Date; provided, however, that the Seller does not hereby waive any claims, demands, rights or causes of action arising under this Agreement.

Section 11.18  Preservation of Records; Post-Closing Access and Cooperation.

(a)  For a period equal to the lesser of (i) one (1) year after the Closing Date and (ii) the closing of the Bankruptcy Case by the Bankruptcy Court (the "Post-Closing Access and Cooperation Period"), Purchaser shall preserve and retain, all corporate, accounting, legal, auditing, human resources and other books and records in its possession (including any documents relating to any governmental or

non-governmental claims, actions, suits, proceedings or investigations) relating to the operation of Business and the Purchased Assets prior to the Closing Date.

(b) During the Post-Closing Access and Cooperation Period, Purchaser shall afford promptly to Seller and its representatives (or its designee or successors, which may include the trustee of a liquidating trust) reasonable access during normal business hours to the offices, facilities, books, records, officers and employees of the Business as reasonably requested by Seller for the purpose of winding-up its affairs and finalizing the administration of the Bankruptcy Case. In addition, during the Post-Closing Access and Cooperation Period, Purchaser shall provide Seller (or, its designee or successors), at no cost to Seller, with reasonable access to various personnel to whom Seller may need continued access after Closing during regular business hours of Purchaser and at Purchaser's business locations to assist Seller in furtherance of the purposes set forth herein; provided, that such access does not unreasonably interfere with Purchaser's business operations. During the Post-Closing Access and Cooperation Period, Purchaser shall cooperate with, and shall permit and use its reasonable efforts to cause, its personnel to cooperate with Seller (or, its designee or successors) after the Closing, in furnishing information, testimony and other assistance with respect to the Business or Purchased Assets for periods prior to the Closing Date in connection with any action or proceeding in furtherance of the purposes set forth herein.

[Signature page follows.]

The parties have executed and delivered this Agreement as of the date indicated in the first sentence of this Agreement.

**BUFFET PARTNERS, L.P.**


By:  Buffet G.P., Inc.
Its:  General Partner


By:  /s/ Barry M. Barron, Sr. _____
Barry M. Barron, Sr.
CEO

**CHATHAM CREDIT MANAGEMENT III, LLC**

**By: Chatham Capital Holdings, Inc., its Manager**


By:_____
Name:
Title:

The parties have executed and delivered this Agreement as of the date indicated in the first sentence of this Agreement.

**BUFFET PARTNERS, L.P.**

By: _____

    By: Buffet G.P., Inc.
    Its: General Partner

    By:_____
    Barry M. Barron, Sr.
    CEO

**CHATHAM CREDIT MANAGEMENT III, LLC**

**By: Chatham Capital Holdings, Inc., its Manager**

By: _____
Name: Brian Reynolds
Title: Managing Partner

**EXHIBIT A**

**FORM OF SALE ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § § § | CASE NO. 14-30699-11 |
| BUFFET PARTNERS, L.P., et al. | § § | CHAPTER 11 |
| DEBTORS.[1] | § § § § | Jointly Administered |

**ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL ASSETS AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

This matter having come before the Court upon the motion (the "Motion") of Buffet G.P., Inc. and Buffet Partners, L.P. (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), pursuant to sections 363 and 365 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order (I) approving the procedures (the "Sale Procedures") for (a) the sale of substantially all of the Debtor's assets (the

---

[1] The Debtors in these chapter 11 cases are Buffet Partners, L.P. and Buffet G.P., Inc.

738618-v3\DALDMS

"Sale") pursuant to that certain Asset Purchase Agreement, dated as of March__, 2014, between the Debtor and _____, a copy of which is attached hereto as Exhibit A (the "Purchase Agreement")[2] (the assets to be sold being more fully described in the Motion, and collectively defined in the Purchase Agreement, are hereinafter referred to as the "Acquired Assets"), free and clear of all liens, claims and encumbrances, other than Permitted Exceptions, (b) the assumption and assignment of certain executory contracts and unexpired leases, and (c) the establishment of cure amounts, ((a) through (c) above collectively referred to herein as the "Transactions"), (II) setting a hearing date for the approval of the Sale (the "Sale Hearing") and (III) approving the form of notice of the Sale Hearing; and the Court having reviewed and considered the Motion and the Purchase Agreement, the objections thereto, if any, the arguments of counsel made, and the evidence adduced at the Sale Hearing, at which time all interested parties were offered an opportunity to be heard with respect to the Sale; and it appearing that the Sale is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest; and upon the record of the Sale Hearing and this Chapter 11 Case, and after due deliberation thereon, and good cause appearing therefore;

## THE COURT HEREBY FINDS, DETERMINES AND CONCLUDES THAT:[3]

A.    **Sale Procedures Order**. The Court entered an order on April __, 2014 (Docket No. ___), granting the relief requested in the Motion and setting the Sale Hearing to approve the Sale.

B.    **Jurisdiction and Venue**. The Court has jurisdiction to authorize the Sale pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b). Venue of this Chapter 11 Case in this district is

---

[2]    Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the Purchase Agreement.

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Bankruptcy Rule 7052.

proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

C. **Statutory Predicates**. The statutory predicates for the relief granted herein are sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

D. **Notice**. Notice of the Sale, including notice of the Sale Hearing (the "Sale Notice"), was transmitted to all parties who have previously expressed an interest in the Acquired Assets or who may have been interested in purchasing the Acquired Assets. In addition, the Debtor published the Sale Notice in Nations Restaurant News.

E. **Opportunity to Object**. A reasonable opportunity to object and to be heard with respect to the Motion and the relief requested therein has been given, in light of the circumstances, to all interested persons and entities.

F. **Corporate Authority**. The Debtor has the legal power and authority to convey all of its right, title and interest in and to the Acquired Assets. The Debtor has (i) full power and authority to execute the Purchase Agreement and all other documents contemplated thereby, and (ii) the necessary power and authority to consummate the Sale. No consents or approvals, other than those expressly provided for in the Purchase Agreement or in the schedules thereto, are required for the Debtor to close the Sale.

G. **Business Justification**. Sound business reasons exist for the Sale. Entry into the Purchase Agreement and consummation of the Transactions constitute the Debtor's exercise of sound business judgment and such acts are in the best interests of the Debtor, its estate, and all parties in interest. The Court finds that the Debtor has articulated good and sufficient business reasons justifying the Sale. Such business reasons include, but are not limited to, the following:

(i) the Purchase Agreement constitutes the highest and best offer for the Acquired Assets; (ii) the Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Acquired Assets on a going concern basis and avoid decline and devaluation of the Acquired Assets; and (iii) any plan would have likely yielded, at best, the same economic result (i.e., the sale of a substantial portion of the Debtor's assets creating a residual fund against which the Prepetition Secured Lenders would have secured claims).

H. **Arm's Length Sale**. The Purchase Agreement and the Transactions were negotiated, and have been and are undertaken, by the Debtor and Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. As a result of the foregoing, the Debtor and Purchaser are entitled to the protections of section 363(m) of the Bankruptcy Code. Moreover, neither the Debtor nor Purchaser engaged in any conduct that would cause or permit the Purchase Agreement, the consummation of the Transactions or the assumption and assignment of the Assumed Executory Contracts and Assumed Unexpired Leases to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

I. **Good Faith Purchaser**. The Purchaser is a good faith purchaser under Bankruptcy Code section 363(m) and, as such, is entitled to all of the protections afforded thereby.

J. **Credit Bid**. The Prepetition Secured Lenders hold secured claims in, on and against the Debtor, its estate and property of the estate, arising in connection with the Prepetition Financing Agreement, including a claim for principal and accrued interest, in an amount of not less than $40 million (the "Prepetition Secured Claims"). Prior to the Closing, the Prepetition Secured Lenders shall assign to Purchaser a portion of the Prepetition Secured Claims. The

Purchaser shall use a portion of the Prepetition Secured Claims, aggregating at least $21,900,000 million, to credit bid, and such credit bid is valid and proper pursuant to the sale procedures set forth in the Motion and Bankruptcy Code sections 363(b) and 363(k) (the "Credit Bid").

K.    **Consideration**.  The Purchase Price is the highest or otherwise best offer received by the Debtor, and the Purchase Price constitutes reasonably equivalent value for the Acquired Assets under the Bankruptcy Code and other applicable law.  A sale of the Acquired Assets other than one free and clear of all liens, claims and encumbrances (other than Permitted Exceptions) would materially and adversely impact the Debtor's bankruptcy estate, would yield substantially less value for the Debtor's estate, with less certainty than the available alternatives and thus the alternative would be of substantially less benefit to the  Debtor's estate.  Purchaser would not have entered into the Purchase Agreement and would not consummate the Transactions, thus adversely affecting the Debtor, its estate, and its creditors, if the sale of the Acquired Assets, including the assignment of the Assumed Executory Contracts and Assumed Unexpired Leases, to Purchaser was not free and clear of all liens, claims and encumbrances (other than Permitted Exceptions), or if Purchaser would, or in the future could, be liable for any such liens, claims or encumbrances.  Therefore, the Sale free and clear of all liens, claims and encumbrances, other than Permitted Exceptions, as contemplated by the Purchase Agreement, is in the best interests of the Debtor, its estate and creditors, and all other parties in interest.  In reaching this determination, the Court has taken into account both the consideration to be realized directly by the Debtor and the indirect benefits of such Sale for the Debtor's employees, the Debtor's vendors and suppliers, and the public served, directly and indirectly, by the functions performed by the Debtor's employees and the Debtor's business.

L.    **Free and Clear**.  The Debtor may sell the Acquired Assets free and clear of all
liens, claims and encumbrances (other than and Permitted Exceptions) because, with respect to
each creditor asserting a lien, claim or encumbrance, one or more of the standards set forth in
Bankruptcy Code § 363(f)(1)-(5) has been satisfied.  Those holders, if any, of liens, claims or
encumbrances who did not object or withdrew objections to the Sale are deemed to have
consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of
liens, claims or encumbrances who did object fall within one or more of the other subsections of
section 363(f) Bankruptcy Code.

M.    **Assumption of Executory Contracts and Unexpired Leases**.  The Debtor has
demonstrated that it is an exercise of its sound business judgment to assume and assign and sell
the Assumed Executory Contracts and Assumed Unexpired Leases to Purchaser in connection
with the consummation of the Sale, and the assumption, assignment, and sale of the Assumed
Executory Contracts and Assumed Unexpired Leases is in the best interests of the Debtor, its
estate, its creditors, and all parties in interest.  The Executory Contracts and Unexpired Leases
being assigned and sold to Purchaser are an integral part of the Acquired Assets being purchased
by Purchaser, and accordingly, the assumption, assignment, and sale of the Assumed Executory
Contracts and Assumed Unexpired Leases are reasonable and enhance the value of the Debtor's
estate.

N.    **Cure/Adequate Assurance**.  The Debtor has filed with the Court and served on
all non-debtor parties to all known Executory Contracts and known Unexpired Leases that the
Debtor may assume and assign to the Purchaser a notice setting forth, among other things, all
such known Executory Contracts and known Unexpired Leases and the Debtor's estimate of cure
costs with respect to each such Executory Contract and Unexpired Lease according to the

Debtor's books and records (the "Cure Notice"). Purchaser has provided or will provide adequate assurance of cure of any default existing with respect to any of the Assumed Executory Contracts and Assumed Unexpired Leases, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code. Purchaser has provided or will provide adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date of the assignment and assumption of any of the Assumed Executory Contracts and Assumed Unexpired Leases within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. Purchaser has provided or will provide adequate assurance of its future performance of and under any of the Assumed Executory Contracts and Assumed Unexpired Leases, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.

O.    **No Intentional Fraudulent Transfer**. The Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

P.    **Purchaser Not a Successor**. Pursuant to the Purchase Agreement, Purchaser is not purchasing all of the Debtor's assets in that Purchaser is not purchasing any of the Excluded Assets, and Purchaser is not holding itself out to the public as a continuation of the Debtor. The Sale and related Transactions are not and do not amount to a consolidation, merger or *de facto* merger of Purchaser and the Debtor and/or the Debtor's estate, there is not substantial continuity between Purchaser and the Debtor, there is no continuity of enterprise between the Debtor and Purchaser, Purchaser is not a mere continuation of the Debtor or the Debtor's estate, and Purchaser does not constitute a successor to the Debtor or the Debtor's estate to the extent allowed under state law.

Q.     **Legal, Valid Transfer**.  The transfer of the Acquired Assets to Purchaser will be a legal, valid, and effective transfer of the Acquired Assets, and will vest Purchaser with all right, title, and interest of the Debtor to the Acquired Assets free and clear of all liens, claims and encumbrances, other than Permitted Exceptions, including, but not limited to all claims arising under doctrines of successor liability, to the extent allowed under state law.

R.     **Not a Sub Rosa Plan**.  The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of Debtor's creditors nor impermissibly dictates a liquidating plan of reorganization for the Debtor.

S.     **Prompt Consummation**.  Time is of the essence in consummating the Sale. Accordingly, to maximize the value of the Debtor's assets, it is essential that the sale of the Acquired Assets occur as soon as practicable.  Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004 and 6006.  Approval of the Purchase Agreement and assumption, assignment, and sale of the Assumed Executory Contracts and Assumed Unexpired Leases, and consummation of the Sale of the Acquired Assets at this time are in the best interests of the Debtor, its creditors, its estate, and all parties in interest.

Based upon all of the foregoing, and after due deliberation, **THE COURT ORDERS, ADJUDGES, AND DECREES THAT:**

## I.     SALE OF THE ACQUIRED ASSETS

1.     Any objections to the entry of this Order or the relief granted herein that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, hereby are denied and overruled on the merits with prejudice.

2.      The Purchase Agreement (including without limitation the Credit Bid) and the Sale of the Acquired Assets to Purchaser, are hereby approved and authorized in all respects.

3.      The consideration provided by Purchaser for the Acquired Assets under the Purchase Agreement is fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed on or awarded against any party in interest in these bankruptcy cases under section 363(n) or any other provision, of the Bankruptcy Code.

4.      The Sale and the Transactions are undertaken by Purchaser in good faith. Purchaser is a purchaser in good faith of the Acquired Assets as that term is used in section 363(m) of the Bankruptcy Code, and Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption, assignment, and sale of any of the Assumed Executory Contracts and Assumed Unexpired Leases), unless such authorization is duly stayed pending such appeal.

5.      Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, upon the Closing Date, under the Purchase Agreement, the Acquired Assets shall be transferred to Purchaser free and clear of (a) all liens, claims and encumbrances, other than Permitted Exceptions, (b) any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership of the Acquired Assets and (c) any claim, whether arising prior to or subsequent to the commencement of this Chapter 11 Case, arising under doctrines of successor liability, to the extent allowed under state law.

6. Except as expressly provided in the Purchase Agreement, Purchaser is not assuming nor shall it or any affiliate of Purchaser be in any way liable or responsible, as a successor, to the extent allowed under state law, or otherwise, for any liabilities, debts, or obligations of the Debtor in any way whatsoever relating to or arising from the Debtor's ownership or use of the Acquired Assets prior to the consummation of the transactions contemplated by the Purchase Agreement, or any liabilities calculable by reference to the Debtor or its operations or the Acquired Assets, or relating to continuing or other conditions existing on or prior to the Closing Date, which liabilities, debts, and obligations are hereby extinguished insofar as they may give rise to liability, successor liability, to the extent allowed under state law, or otherwise, against Purchaser or any affiliate of Purchaser.

7. The Debtor is authorized and directed to take any and all actions necessary or appropriate to: (a) consummate the Sale (including, without limitation, to convey to Purchaser any and all of the Acquired Assets intended to be conveyed pursuant to the Purchase Agreement) and the Closing of the Transactions in accordance with the Purchase Agreement and this Order; and (b) perform, consummate, implement and close fully the Purchase Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement. The Debtor and Purchaser shall have no obligation to proceed with the Closing of the Purchase Agreement until all conditions precedent to their obligations to do so as set forth in the Purchase Agreement have been satisfied or waived. The obligations of Purchaser under the Purchase Agreement to consummate the transactions contemplated therein at the Closing are subject to the satisfaction of the conditions precedent set forth in Article V of the Purchase Agreement on the Closing Date.

8.     Purchaser is hereby authorized in connection with the consummation of the Sale to allocate the Acquired Assets and the Assumed Executory Contracts and Assumed Unexpired Leases among its affiliates, designees, assignees, and/or successors in a manner as it in its sole discretion deems appropriate and to assign, sublease, sublicense, transfer or otherwise dispose of any of the Acquired Assets or the rights under any of the Assumed Executory Contracts or Assumed Unexpired Leases to its affiliates, designees, assignees, and/or successors with all of the rights and protections accorded under this Order and the Purchase Agreement, and the Debtor shall cooperate with and take all actions reasonably requested by Purchaser to effectuate any of the foregoing.

## II.     ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

9.     The Debtor is hereby authorized, pursuant to the Purchase Agreement and in accordance with sections 105(a), 363, 365(b)(1) and (f)(2) of the Bankruptcy Code, to: (a) assume the Assumed Executory Contracts and Assumed Unexpired Leases; (b) sell, assign and transfer to Purchaser each of the Assumed Executory Contracts and Assumed Unexpired Leases in each case free and clear of all liens, claims and encumbrances (other than Permitted Exceptions, to the extent applicable); and (c) execute and deliver to Purchaser such assignment documents as may be necessary to sell, assign and transfer the Assumed Executory Contracts and Assumed Unexpired Leases.

10.     The Assumed Executory Contracts and Assumed Unexpired Leases, upon assignment and sale to Purchaser, shall be deemed valid and binding, in full force and effect in accordance with their terms. Upon assignment and sale to Purchaser pursuant to the Purchase Agreement, and in accordance with sections 363 and 365 of the Bankruptcy Code, Purchaser

shall be fully and irrevocably vested in all right, title and interest of the Debtor in, to or under each Assumed Executory Contract and Assumed Unexpired Lease.

11. All defaults or other obligations of the Debtor under the Assumed Executory Contracts and Assumed Unexpired Leases arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by the payment or other satisfaction of the amounts (the "Cure Amounts") set forth in the Cure Notice or as otherwise agreed to by the parties thereto. Unless a non-debtor party to an Executory Contract or Unexpired Lease that may become an Assumed Executory Contract or an Assumed Unexpired Lease filed an Assumption Objection with respect to the Cure Amount by the Cure Objection Deadline, (i) such Cure Amount shall be controlling at the amount set forth in the applicable Cure Notice and the non-debtor party to such Assumed Executory Contract or Assumed Unexpired Lease is hereby forever bound by such Cure Amount; (ii) payment of such Cure Amount shall constitute a cure of all defaults under such Executory Contract or Unexpired Lease; (iii) payment of such Cure Amount shall constitute consent to the assignment of such Executory Contract or Unexpired Lease to Purchaser; and (iv) such Cure Amount is not subject to further dispute or audit, including based on performance prior to the assumption, assignment and sale thereof, irrespective of whether such Assumed Executory Contract or Assumed Unexpired Lease contains an audit or similar clause.

12. Any Assumption Objections not resolved at the Sale Hearing shall be resolved at such other hearing scheduled on the Assumption Objection that is reasonably acceptable to Purchaser. With respect to any Executory Contract or Unexpired Lease to which an Assumption Objection is filed, the Executory Contract or Unexpired Lease shall not become

738618-v3\DALDMS

12

an Assumed Executory Contract or Assumed Unexpired Lease until (i) the date on which the Assumption Objection is consensually resolved by the parties or an order of the Court, and (ii) the Executory Contract or Unexpired Lease does not appear on Schedule __ attached to the Purchase Agreement by the Executory Contract Designation Deadline, as applicable. On the date upon which any Executory Contract or Unexpired Lease becomes an Assumed Executory Contract or an Assumed Unexpired Lease, Purchaser shall assume and undertake to pay, perform and discharge when due or required to be performed all of the Debtor's obligations under such Assumed Executory Contract or Assumed Unexpired Lease.

13.     Purchaser shall pay or otherwise satisfy the Cure Amounts as soon as reasonably practicable following the date upon which any Executory Contract or Unexpired Lease becomes an Assumed Executory Contract or an Assumed Unexpired Lease as a condition to the assumption and assignment of such Executory Contract or Unexpired Lease.

14.     Upon the assumption and assignment of an Assumed Executory Contract or Assumed Unexpired Lease, each non-Debtor party to such Assumed Executory Contract or Assumed Unexpired Lease is hereby forever barred, estopped, and permanently enjoined from asserting against Purchaser or the Acquired Assets any default, additional amounts or other claims existing as of the date of such assumption and assignment related to such Assumed Executory Contract or Assumed Unexpired Lease, whether declared or undeclared or known or unknown, and such non-Debtor parties to an Assumed Executory Contract or Assumed Unexpired Lease are also forever barred, estopped, and permanently enjoined from asserting against Purchaser any counterclaim, defense or setoff, or any other claim, lien or interest, asserted or assertable against the Debtor related to such Assumed Executory Contract or Assumed Unexpired Lease.

15.     There shall be no rent accelerations, assignment fees, increases or any other fees charged or chargeable to Purchaser as a result of the assumption, assignment and sale of the Assumed Executory Contracts and Assumed Unexpired Leases. Any provisions in any Assumed Executory Contract or Assumed Unexpired Lease that prohibit or condition the assignment of such contract or lease, allow the party to such contract or lease to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such contract or lease, constitute unenforceable anti-assignment provisions, and are void and of no force and effect. The validity of the assumption, assignment and sale of the Assumed Executory Contracts and Assumed Unexpired Leases to Purchaser shall not be affected by any existing dispute between the Debtor and any non-Debtor party to such contracts or leases. Any party that may have had the right to consent to the assignment of its Executory Contract or Unexpired Lease is determined to have consented for the purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code.

16.     The designation of an agreement as an Assumed Executory Contract or Assumed Unexpired Lease shall not be a determination that such agreement is an executory contract within the meaning of section 365 of the Bankruptcy Code.

## III.     LIMITATIONS ON LIABILITY AND RELEASE OF ENCUMBRANCES

17.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale and the Transactions. Except as set forth in the Purchase Agreement, no brokers were involved in consummating the Sale or the Transactions, and no brokers' commissions are due to any person or entity in connection with the Sale or the Transactions.

18.    Upon the Closing, (a) pursuant to the terms of the Purchase Agreement, the Debtor is hereby authorized to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of the Acquired Assets to Purchaser free and clear of any and all liens, claims and encumbrances, other than Permitted Exceptions, and (b) except as otherwise expressly provided in the Purchase Agreement, all liens, claims and encumbrances, other than Permitted Exceptions, shall be and hereby are released, terminated and discharged as to Purchaser and the Acquired Assets.

19.    Upon the Closing, and except as otherwise expressly provided in the Purchase Agreement, Purchaser shall not be liable for any claims against, and liabilities and obligations of, the Debtor or any of the Debtor's predecessors or affiliates. Without limiting the generality of the foregoing, (a) other than as specifically set forth in the Purchase Agreement, Purchaser shall have no liability or obligation (x) to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any pension plans) or any other payment to employees of the Debtor, or (y) in respect of any employee pension plan, employee health plan, employee retention program, employee incentive program or any other similar agreement, plan or program to which the Debtor is a party (including, without limitation, liabilities or obligations arising from or related to the rejection or other termination of any such plan, program agreement or benefit), and (b) Purchaser shall in no way be deemed a party to or assignee of any such employee benefit, agreement, plan or program, and all parties to any such employee benefit, agreement, plan or program are enjoined from asserting against Purchaser any claims arising from or relating to such employee benefit, agreement, plan or program.

20.     Any and all notices, if any, required to be given to Debtor's employees pursuant to the Worker Adjustment and Retraining Adjustment Act (the "WARN Act"), or any similar federal or state law, shall be the sole responsibility and obligation of the Debtor, and Purchaser shall have no responsibility or liability therefore.

21.     Purchaser shall not be deemed a successor of or to the Debtor or the Debtor's estate with respect to any liens, claims and encumbrances (other than Permitted Exceptions) against the Debtor or the Acquired Assets, to the extent allowed under state law, and Purchaser shall not be liable in any way for any such liens, claims and encumbrances (other than Permitted Exceptions) including, without limitation, the Excluded Assets. Upon Closing the Sale, all creditors, employees and equityholders of the Debtor are permanently and forever barred, restrained and enjoined from (a) asserting any claims or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against Purchaser or the Acquired Assets on account of any of the liens, claims and encumbrances, other than Permitted Exceptions, or (b) asserting any claims or enforcing remedies under any theory of successor liability, to the extent allowed under state law, *de facto* merger, substantial continuity or similar theory.

22.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to Purchaser, on the Closing Date pursuant to the terms of the Purchase Agreement.

23.     This Order is and shall be (a) effective as a determination that, upon Closing, all liens, claims and encumbrances (other than Permitted Exceptions) existing as to the Acquired Assets conveyed to Purchaser have been and hereby are adjudged and declared to be

unconditionally released, discharged and terminated, and (b) binding upon and govern the acts of all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets conveyed to Purchaser. All such entities described above in this paragraph are authorized and specifically directed to strike all recorded liens, claims and encumbrances (other than Permitted Exceptions) against the Acquired Assets from their records, official and otherwise.

24. If any person or entity that has filed statements or other documents or agreements evidencing liens, claims and encumbrances (other than Permitted Exceptions) on or in the Acquired Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens, and any other documents necessary for the purpose of documenting the release of all such liens, claims or encumbrances, the Debtor or Purchaser are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets.

25. Each and every federal, state and governmental agency or department, and any other person or entity, is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

26.     Any and all Acquired Assets in the possession or control of any person or entity, including, without limitation, any former vendor, supplier or employee of the Debtor shall be transferred to Purchaser free and clear of liens, claims and encumbrances, other than and Permitted Exceptions.

27.     On the Closing Date, each active employee who becomes an employee of the Purchaser (each an "Affected Employee") and who has an account balance under the 401(k) Plan maintained by the Debtor prior to the Closing Date (the "401(k) Plan") shall be 100% vested in such account effective at the Closing Date, notwithstanding any vesting schedule otherwise provided under the 401(k) Plan. Within 90 days following the Closing Date, Purchaser shall establish a defined contribution plan and trust intended to qualify under Section 401(a) and Section 501(a) of the Internal Revenue Code (the "New Furr's Plan"). Promptly following the establishment of the New Furr's Plan, Debtor shall direct the trustee of the 401(k) Plan to transfer directly from the trust established under the 401(k) Plan to the trust established under the New Furr's Plan an amount of assets equal to the aggregate account balances under the 401(k) Plan of all Affected Employees, valued as of the day immediately preceding the date of transfer. Upon such transfer, the New Furr's Plan shall assume all liabilities for accrued benefits under the 401(k) Plan in respect of Affected Employees and the 401(k) Plan shall be relieved of all such liabilities. Assets shall be transferred in cash with the exception that outstanding loans of Affected Employees from the 401(k) Plan shall be transferred in-kind. Pending such transfer, Debtor shall maintain the 401(k) Plan accounts of the Affected Employees on the same basis as other former employees of Debtor. The New Furr's Plan will (i) provide that the Affected Employees are 100% vested in the amounts transferred from the 401(k) Plan (and any subsequent investment earnings on such amounts), (ii) accommodate the in-kind transfer of the

outstanding loans and honor such loans in accordance with their terms, and (iii) provide for such other benefits, rights and features as required in order to satisfy Internal Revenue Code Section 411(d)(6). The parties shall cooperate in the filing of the documents required by the transfer of assets and liabilities described in this paragraph 27.

## IV. VALIDITY OF PREPETITION LIENS

28. The obligations of and claims against the Debtor or its estate under or arising from the Prepetition Financing Agreement (the "Prepetition Obligations") shall constitute the legal valid and binding obligations of the Debtor and its estate. No portion of the Prepetition Obligations shall be subject to avoidance, recharacterization, subordination or recovery pursuant the Bankruptcy Code or applicable non-bankruptcy law.

29. The Debtor and its bankruptcy estate shall forever release any claims, counterclaims, causes of action, defenses, set-offs and challenges to the validity, enforceability, priority or amount of the claims, liens and security interests granted for the benefit of the Prepetition Secured Lenders whether arising under the Bankruptcy Code or otherwise, against the Prepetition Secured Lenders, and their respective affiliates, agents, officers, directors, employees, attorneys, and advisors with respect to the Prepetition Obligations.

## V. USE OF PROCEEDS AND SATISFACTION OF PREPETITION SECURED CLAIMS

30. Upon the Closing, the Prepetition Obligations shall be deemed to be satisfied in an amount equal to the amount of such Prepetition Obligations used in connection with the Credit Bid. Upon Closing, the liens on the Acquired Assets granted under the Prepetition Financing Agreement to secure the Prepetition Obligations shall be deemed released and the Prepetition Secured Lenders (as defined in the Motion) shall take all reasonable actions to confirm removal of any such liens. Any portion of the Prepetition Obligations that is not used

as part of the Credit Bid and any liens on assets (other than the Acquired Assets) granted under the Prepetition Financing Agreement and related security agreements to secure the Prepetition Obligations shall not be affected by this Order or the Closing.

## VI. ADDITIONAL PROVISIONS

31. This Order and the Purchase Agreement shall be binding in all respects upon all creditors and interestholders of the Debtor, all non-Debtor parties to the Assumed Executory Contracts and Assumed Unexpired Leases, all successors and assigns of the Debtor and its affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtor's bankruptcy case or upon a conversion to chapter 7 under the Bankruptcy Code, and the Purchase Agreement and related documents shall not be subject to rejection or avoidance under any circumstances.

32. The Purchase Agreement may be modified, amended, or supplemented by the parties thereto, in a writing signed by the parties thereto, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

33. Nothing contained in any order entered in the above-captioned bankruptcy case subsequent to entry of this Order, nor in any chapter 11 plan confirmed in this Chapter 11 Case, shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Order.

34. This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h), 6006(d) and any other provision of the Bankruptcy Code or Bankruptcy Rules shall not apply, is expressly lifted and this Order is immediately effective and enforceable.

738618-v3\DALDMS                                     20

35.    The provisions of this Order are nonseverable and mutually dependent.

36.    The failure specifically to include or make reference to any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement is authorized and approved in its entirety.

37.    To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtor to the extent necessary, without further order of the Court (a) to allow Purchaser to give the Debtor any notice provided for in the Purchase Agreement, and (b) to allow Purchaser to take any and all actions permitted by the Purchase Agreement.

38.    To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit relating to the operation of the Acquired Assets sold, transferred or conveyed to Purchaser on account of the filing or pendency of this Chapter 11 Case or the consummation of the Sale.

39.    The transfer of the Acquired Assets pursuant to the Sale is a transfer pursuant to section 1146(a) of the Bankruptcy Code, and accordingly, the "issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax." 11 U.S.C. § 1146(a).

40.    This Court retains jurisdiction, even after the closing of this Chapter 11 Case, to: (a) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and the terms of the Purchase Agreement, all amendments thereto and any waivers and consents thereunder; (b) protect Purchaser, or any of

the Acquired Assets, from and against any of the liens, claims or encumbrances; (c) compel delivery of all Acquired Assets to Purchaser; and (d) resolve any disputes arising under or related to the Purchase Agreement, the Sale or the Transactions, or Purchaser's peaceful use and enjoyment of the Acquired Assets.

# # # END OF ORDER # # #

## EXHIBIT B

## FORM OF BILL OF SALE

This Bill of Sale (the "Bill of Sale") is delivered pursuant to the Closing under the Asset Purchase Agreement (the "Purchase Agreement") dated as of February __, 2014, by and among Buffet Partners, L.P., a Delaware limited partnership, as the "Seller," and _____, as the "Purchaser." Capitalized terms used in this Bill of Sale without definition have the respective meanings given to them in the Purchase Agreement.

Pursuant to the Purchase Agreement, the Purchaser has agreed to acquire the Purchased Assets. The Purchaser and the Seller now seek to consummate the assignment, conveyance and transfer of such Purchased Assets.

NOW, THEREFORE, intending to be legally bound and in consideration of the mutual provisions set forth in this Bill of Sale and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Section 1        Sale and Transfer of Purchased Assets.  The Seller hereby sells, assigns, conveys, transfers and delivers to the Purchaser all of the Purchased Assets.

Section 2        Power of Attorney.  The Seller hereby constitutes and appoints the Purchaser as the Seller's true and lawful agent and attorney-in-fact, with full power of substitution and resubstitution, in whole or in part, in the name and stead of Seller but on behalf and for the benefit of the Purchaser and its successors and assigns, to demand, receive and collect any and all of the Purchased Assets and to give receipts and releases for and in respect of the same, and from time to time to institute and prosecute in the Seller's name, or otherwise for the benefit of the Purchaser and its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Purchaser or its successors or assigns may deem proper for the collection or recovery of any of the Purchased Assets or for the collection and enforcement of any claim or right of any kind hereby sold, assigned, conveyed and transferred, or intended so to be, and to take any other actions and make, sign, execute, acknowledge and deliver any documents and instruments as may from time to time be necessary or appropriate to assign to the Purchaser and its successors and assigns the Purchased Assets and all rights granted to the Purchaser under the Purchase Agreement.  The Seller declares that the foregoing powers are coupled with an interest and are and will be irrevocable by the Seller or by its dissolution or in any manner or for any reason whatsoever.  Nothing in this Section 2 will be deemed a waiver of any remedies otherwise available.

Section 3        General.  This Bill of Sale (a) is irrevocable and effective upon the Seller's signature to and delivery of a manually signed copy of this Bill of Sale or facsimile or email transmission of the signature to this Bill of Sale in connection with the Closing, if and only if the Closing is completed, (b) benefits and binds the parties to the Purchase Agreement and their respective successors and assigns, (c) does not modify or affect, and is subject to, the provisions of the Purchase Agreement and (d) may be signed in counterparts as provided in Section 11.16 of the Purchase Agreement.  In the event of any conflict or inconsistency between the provisions of the Purchase Agreement and the provisions of this Bill of Sale, the provisions of the Purchase Agreement will control.

*[Signature page follows.]*

The undersigned has signed this Bill of Sale on February __, 2014.

**[PURCHASER]**

By:_____
        **[Name]**
        **[Title]**

**BUFFET PARTNERS, L.P.**

By: Buffet G.P., Inc.
Its: General Partner

By:_____
        **[Name]**
        **[Title]**

**EXHIBIT C**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption Agreement (the "Agreement") is delivered pursuant to the Closing under the Asset Purchase Agreement (the "Purchase Agreement") dated as of February __, 2014, by and among Buffet Partners, L.P., a Delaware limited partnership, as the "Seller," and _____, as the "Purchaser." Capitalized terms used in this Agreement without definition have the respective meanings given to them in the Purchase Agreement.

Pursuant to the Purchase Agreement, the Seller has agreed to assign and the Purchaser has agreed to assume the Assumed Liabilities. The Purchaser and the Seller now seek to consummate the assignment and assumption of such Assumed Liabilities.

NOW, THEREFORE, intending to be legally bound and in consideration of the mutual provisions set forth in this Agreement and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Section 1     Assignment and Assumption of Assumed Liabilities.  The Seller hereby assigns, sells, transfers and sets over (collectively, the "Assignment") to the Purchaser the Assumed Liabilities. The Purchaser hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants of, and to pay and discharge when due, all of the Assumed Liabilities.  Notwithstanding the foregoing, the Purchaser does not assume, or agree to pay, perform or discharge, any Liabilities of the Seller (including, without limitation, the Excluded Liabilities) other than the Assumed Liabilities, and the parties hereto agree that all such Liabilities, other than the Assumed Liabilities, will remain the sole responsibility of the Seller.

Section 2     General.  This Agreement (a) is irrevocable and effective upon the Purchaser's signature to and delivery of a manually signed copy of this Agreement or facsimile or email transmission of the signature to this Agreement in connection with the Closing, if and only if the Closing is completed, (b) benefits and binds the parties to the Purchase Agreement and their respective successors and assigns, (c) does not modify or affect, and is subject to, the provisions of the Purchase Agreement and (d) may be signed in counterparts as provided in Article 11.16 of the Purchase Agreement.  In the event of any conflict or inconsistency between the provisions of the Purchase Agreement and the provisions of this Agreement, the provisions of the Purchase Agreement will control.

*[Signature page follows.]*

The undersigned have signed this Agreement on February ___, 2014.

**[PURCHASER]**

By:_____
        **[Name]**
        **[Title]**

**BUFFET PARTNERS, L.P.**

By: Buffet G.P., Inc.
Its: General Partner

By:_____
        **[Name]**
        **[Title]**

**EXHIBIT D**

**FORM OF BIDDING PROCEDURES ORDER**



U.S. BANKRUPTCY COURT

NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 21, 2014**

Honli DeWayne Hale

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | CASE NO. 14-30699-11 |
| BUFFET PARTNERS, L.P., et al. | § § | CHAPTER 11 |
| DEBTORS.[1] | § § § | Jointly Administered |

### ORDER (I) APPROVING THE PROCEDURES FOR (A) THE SALE OF SUBSTANTIALLY ALL ASSETS (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES (C) THE ESTABLISHMENT OF CURE AMOUNTS, (II) APPROVING FORM OF NOTICE AND (III) SETTING A HEARING DATE FOR THE APPROVAL OF THE SALE

This matter having come before the Court on the Debtors' Motion (the "Motion")[2] for an

order (the "Order") (I) approving the procedures for (a) the sale (the "Sale") of substantially all

of the Debtors' assets (the "Assets") pursuant to section 363 of the Bankruptcy Code, (b) the

assumption and assignment of certain executory contracts and unexpired leases pursuant to

section 365 of the Bankruptcy Code, (c) the establishment of cure amounts, (II) approving the

---

[1] The Debtors in these chapter 11 cases are Buffet Partners, L.P. and Buffet G.P., Inc.

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Motion and/or the Bidding Procedures (as defined herein).

737979-v12\DALDMS

form of notice of the sale of substantially all of the Debtors' assets including the Sale Hearing, and (III) setting a hearing date for the Sale Hearing; and the Court having considered the Motion, and all of the exhibits attached to the Motion, the objections to the Motion, the statements and arguments of counsel, and the testimony or offer of proof as to testimony on the record at the hearing to approve the procedural relief requested in the Motion held March 19, 2014 (the "Sale Procedures Hearing"), at which time all interested parties were offered an opportunity and were heard with respect to the Motion; and it appearing that the relief requested in the Motion as modified herein is in the best interests of the Debtors, their bankruptcy estates, their creditors and other parties-in-interest; and after due deliberation and good cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[3]

A.   **Jurisdiction and Venue**. This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. §157(b)(2)(A). Venue of this Chapter 11 Case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.   **Statutory Predicates**. The statutory predicates for the relief sought in the Motion are Bankruptcy Code §§ 105(a), 363 and 365 and Bankruptcy Rules 2002, 6004 and 6006.

C.   **Notice**. As evidenced by the certificates of service filed with this Court and based upon the representations of counsel at the Sale Procedures Hearing: (i) due, proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with Bankruptcy Code §§ 102(1), 105(a), and 363 and Bankruptcy Rules 2002, 6004, and 6006; (ii) such notice was and is good, sufficient and appropriate under the circumstances; and (iii) no other or further

---

[3]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Bankruptcy Rule 7052.

notice of the Motion, or the Sale Procedures Hearing, is or shall be required. The Debtors are authorized, pursuant to Bankruptcy Rule 2002(*l*), to give supplemental publication notice of the Auction and Sale Hearing by publication in the Nations Restaurant News, or any other newspaper in their discretion and on a date no greater than 7 business days after entry of this Order.

D.    **Opportunity to Object**. A reasonable opportunity to object and to be heard with respect to the Motion and the relief currently requested therein was given, in light of the circumstances, to all interested persons and entities.

E.    **Business Justification and Best Interests**. The Debtors have demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the establishment and implementation of sale procedures, and the relief requested in the Motion with respect to the establishment of sale procedures, as modified herein, is in the best interests of Debtors, their estates, their creditors and other parties in interest.

F.    **Sale Procedures**. The sale procedures approved by this Order (the "Sale Procedures"), which include the bidding procedures attached hereto as **Exhibit A** (the "Bidding Procedures"), are reasonable and appropriate, and represent the best method for maximizing the return for the Purchased Assets. The Sale Procedures were negotiated in good faith between the Debtors, the Prepetition Secured Lenders, and various other parties, and reflect the rulings of this Court at the Sale Procedures Hearing.

G.    **Stalking Horse Bid**. The Debtors have demonstrated a compelling and sound business justification for authorization to enter into the Purchase Agreement to establish the minimum bidding purchase price for the Purchased Assets. The Prepetition Secured Lenders' Stalking Horse Bid will serve as a minimum or floor bid on which all other bidders can rely, and

will provide a benefit to the Debtors' estates by increasing the likelihood that the price at which the Purchased Assets are sold will reflect their true worth.

H.    **No Other Current Bids**.  No other party to date has entered into an asset purchase agreement for the Purchased Assets on terms acceptable to the Debtors.  The Purchase Agreement provides the Debtors with the opportunity to sell their business on a "going concern" basis for the benefit of all parties.  The execution of the Purchase Agreement is a necessary prerequisite to determining whether any party other than the Stalking Horse is willing to enter into a definitive agreement for the Purchased Assets on terms acceptable to the Debtors and their creditor constituencies.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Motion is GRANTED to the extent set forth herein.

2.    Any objections to the Motion with respect to the establishment of the Sale Procedures, the entry of this Order, or the relief granted herein, that have not been sustained, withdrawn, waived, settled, or otherwise resolved pursuant to the terms of this Order, are hereby denied and overruled on the merits with prejudice.

3.    The Sale Procedures are approved, including without limitation the procedures regarding (i) the auction and bidding process, (ii) the assumption and assignment of certain Executory Contracts, and (iii) the establishment of cure amounts.

4.    The Notice of Sale of Substantially All of The Debtors' Assets attached hereto as **Exhibit B** (the "Notice of Sale") is approved.

5.    To constitute a "Qualified Bid," a bid must be received by the Bid Deadline (as defined in the Bidding Procedures) and otherwise comply with all of the applicable provisions of

the Bidding Procedures, including without limitation the requirement that all bids contain, at a minimum, the following information:

> (i)    The exact legal name of the bidder, the entity that would take assignment of any non-residential real property leases, and any entities that may provide guaranties or other security in connection with the assignment of the any non-residential real property leases (collectively, the "Proposed Assignees");
>
> (ii)   A description of the Proposed Assignees' experience in operating restaurants generally and specifically buffet-style restaurants;
>
> (iii)  The number of restaurants the Proposed Assignees operate and all trade names that the Proposed Assignees use; and
>
> (iv)   A statement setting forth the Proposed Assignees' intended use of the premises leased pursuant to any assigned non-residential real property leases.

(collectively, the "Baseline Adequate Assurance Information").

6.      The Prepetition Secured Lenders' Stalking Horse Bid is a Qualified Bid, provided, however, that to the extent the Stalking Horse Bid does not already contain such information, the Stalking Horse shall supplement the Stalking Horse Bid no later than March 28, 2014, by providing to the Debtors the Baseline Adequate Assurance Information, and the Debtors shall in turn provide such Baseline Adequate Assurance Information on March 28, 2014 to counterparties to Executory Contracts who have requested it.    In addition, the Prepetition Secured Lenders shall have the right, but not the obligation, pursuant to § 363(k) of the Bankruptcy Code to credit bid up to the full amount of their secured claim.

7.      The failure specifically to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision.

8.      The Debtors shall file a "Notice of Successful Bidder" identifying the Successful Bidder and the terms of the Successful Bid within 24 hours following the completion of the Auction.

9.      If for any reason the Successful Bidder fails to consummate an approved Sale within such time as is determined reasonable by the Debtors' Auction Team, in its sole discretion after consultation with the Official Committee of Unsecured Creditors (the "Committee"), the Backup Bidder will be deemed to have submitted the highest or best bid and the Debtors and the Backup Bidder are authorized to effect any approved Sale to the Backup Bidder as soon as is commercially reasonable. If the Stalking Horse is neither the Successful Bidder nor the Backup Bidder, but remains a Qualified Bidder, and the Backup Bidder fails to consummate an approved Sale within such time as is determined reasonable by the Debtors' Auction Team, in its sole discretion after consultation with the Committee, the Debtors and the Stalking Horse are authorized to effect any approved Sale to the Stalking Horse.

10.     Following Court approval of a proposed Sale to the Successful Bidder or the Backup Bidder, (i) if a failure to consummate an approved Sale is the result of a breach by the Successful Bidder and/or the Backup Bidder, the Successful Bidder and/or the Backup Bidder, as the case may be, shall be deemed to have forfeited its deposit, and the Debtors may retain such deposit(s) and seek all available damages from any defaulting Bidder, and (ii) if a failure to consummate an approved Sale is the result of a breach by the Debtors, the Successful Bidder and/or Backup Bidder, as the case may be, shall have no recourse against the Debtors other than for recovery of its deposit.

11.     The Debtors shall file with the Court a fully executed Purchase Agreement with the Stalking Horse, with all Schedules thereto, no later than March 28, 2014.

12. The Debtors shall file with the Court a "Cure Notice" listing the applicable cure amounts for all Executory Contracts that are proposed to be assumed and assigned to the Stalking Horse, and serve such filed Cure Notice on each of the counterparties to those Executory Contracts and their counsel of record no later than March 28, 2014, via United States, First Class Mail.

13. Except as otherwise set forth herein, all objections to the Sale (including cure objections and objections to assumption and assignment of Executory Contracts to the Stalking Horse), shall be filed and served on counsel for the Debtors, Baker & McKenzie LLP, 2001 Ross Avenue, Suite 2300, Dallas, Texas 775201 (Attn: John E. Mitchell, john.mitchell@bakermckenzie.com), counsel for the Prepetition Secured Lenders, Burr & Forman, 171 17th Street, NW, Suite 1100, Atlanta, Georgia 30363 (Attn: Erich Durlacher, edurlacher@burr.com) and counsel for the UCC, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067 (Attn: Jeffrey N. Pomerantz, jpomerantz@pszjlw.com) and Brookwood Associates, 3575 Piedmont Road, 15 Piedmont Center, Suite 820, Atlanta, Georgia 30305 (Attn: Amy V. Forrestal, af@brookwoodassociates.com) (collectively, the "Notice Parties") by no later than 5:00 p.m. (Prevailing Central Time) on April 16, 2014.

14. If the Stalking Horse is not the Successful Bidder at the Auction, objections and/or supplemental objections to Sale and the assumption and assignment of Executory Contracts to the Successful Bidder must be filed and served on the Notice Parties by no later than 5:00 p.m. (Prevailing Central Time) on May 1, 2014.

15. Counterparties to Executory Contracts who execute reasonable confidentiality agreements with the Debtors (collectively, the "Requesting Parties"), will receive complete

7

copies of all bids received by the Debtors. The Debtors will send the bids to the Requesting Parties promptly upon the Debtors' receipt of each bid, but in no event later than 5:00 p.m. (Prevailing Central Time) on April 23, 2014. Other than with respect to the Stalking Horse (who may be contacted at any time), counterparties to Executory Contracts shall not directly contact any Potential Bidder absent consent of the Debtors. Once the Auction has concluded, counterparties to Executory Contracts may contact the Successful Bidder to discuss its bid and the assumption and assignment of their respective Executory Contracts.

16.    If no Qualified Bids are received or the Stalking Horse is chosen as the Successful Bidder at the Auction, the Sale Hearing to approve the Sale of the Purchased Assets to the Stalking Horse shall be heard on April 29, 2014 at 2:00 p.m. (Prevailing Central Time).

17.    If the Stalking Horse is not the Successful Bidder at the Auction, the Sale Hearing to approve the Sale of the Purchased Assets to the Successful Bidder shall be heard on May 5, 2014 at 1:30 p.m. (Prevailing Central Time).

18.    The Debtors shall file and submit to the Court at least two (2) business days prior to the applicable Sale Hearing a proposed order approving the Sale to the Successful Bidder. Unless otherwise agreed to by parties in interest, or by order of the Court, objections to cure amounts, adequate assurance of future performance, or other requirements for assumption and assignment of Executory Contracts, shall be heard at the applicable Sale Hearing.

19.    With respect to discovery related to any proposed Sale to a Successful Bidder other than the Stalking Horse, the normal, applicable notice periods or other time limitations that would otherwise limit such discovery are hereby shortened to that which is reasonable under the circumstances. The Court expects all parties in interest to work collaboratively to reach a

reasonable, agreed discovery schedule taking into account the expedited nature of the Sale Hearing. The Court will hear discovery disputes, on an expedited basis, if necessary.

20.    Any objections not timely filed and served in the manner set forth in this Order may, in the Court's discretion, not be considered and may be overruled.

21.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

# # # END OF ORDER # # #

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed in connection with an auction (the "Auction") for the sale (the "Sale") of certain assets and equity interests (the "Purchased Assets") of Buffet Partners, L.P. (the "Debtor"). At a hearing following the Auction, the Debtor will seek entry of an order (the "Sale Order") from the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") authorizing and approving the Sale to the Qualified Bidder (as defined below) that the Debtor determines to have made the highest or otherwise best bid.

## I.    Assets to be Sold

As described in the Purchase Agreement, all of the Debtor's right, title and interest in all of the Debtor's properties and assets of every kind and description whether real, personal, mixed, tangible or intangible and wherever located, except for Excluded Assets, including the following:[1]

(a)    all inventory as of the Closing Date, including all finished goods, work in process and raw materials;

(b)    all of the rights of the Seller under all Contracts to which the Seller is a party, by which the Seller or any of the Purchased Assets is bound or affected or pursuant to which Seller is a beneficiary, including any rights the Seller may have under nondisclosure, confidentiality, non-solicitation, non-competition and similar agreements and those Contracts set forth in Schedule 2.1(b) to the extent such Contracts are assumed pursuant to Section 5.12 (collectively, the "Included Contracts"); provided, however, that if any Contract is recharacterized by a Final Order as a secured financing, then the real property or personal property that is subject to such Contract shall be a Purchased Asset;

(c)    all machinery, equipment, furniture, fixtures, rolling stock and other items of tangible personal property;

(d)    (i) the real property set forth on Schedule 2.1(d)(i) (collectively, the "Owned Real Property") and (ii) all rights in respect of the real property set forth on Schedule 2.1(d)(ii) (collectively, the "Leased Real Property"), to the extent such rights may be transferred under applicable Law;

(e)    all Intellectual Property, including the Intellectual Property set forth on Schedule 2.1(e) (collectively, the "Purchased Intellectual Property");

(f)    all goodwill of the Seller;

(g)    to the extent transferable under applicable Law, all Governmental Authorizations held by the Seller;

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such term in the Stalking Horse Asset Purchase Agreement.

737997-v7\DALDMS

**EXHIBIT A**

1

(h)    to the extent transferable under applicable Law, all books, records, files and papers, including all advertising materials, client and customer lists, supplier and vendor lists, purchase orders, sales and purchase invoices, production reports, personnel and employment records, and financial and accounting records other than the corporate books and records of the Seller;

(i)    all the assets of the Seller Employee Benefit Plans transferred pursuant to Article 10;

(j)    all of the Seller's claims, rights, credits, causes of action, defenses and rights of set-off against third parties relating to or arising from any of the Business, the Purchased Assets, or Assumed Liabilities, including unliquidated rights under manufacturers' and vendors' warranties;

(k)    all cash, cash equivalents, bank deposits, investment accounts, lockboxes, certificates of deposit, marketable securities, bank accounts, corporate credit cards and other similar cash items;

(l)    all notes, accounts receivable and other receivables;

(m)    all insurance policies, binders and claims and rights thereunder and proceeds thereof;

(n)    all deposits and pre-payments made by the Seller;

(o)    all rights to refunds, credits or similar benefits relating to Taxes and other governmental charges of whatever nature for any period, or portion of any period, ending on or prior to the Closing Date;

(p)    all surveys, plans, specifications, engineering studies, marketing studies and similar items with respect to the Business;

(q)    any and all claims or causes of action, whether filed or not, against the Purchaser or its Affiliates and against the Debtor's present and former directors, officers, or employees, including without limitation, any causes of action arising as a result of the commencement of the Bankruptcy Case, whether pursuant to the Bankruptcy Code or otherwise, and including all proceeds therefrom, to the extent related to activities or time periods prior to the Closing Date; and

(r)    any and all claims of the Seller under chapter 5 of the Bankruptcy Code, provided, however, that the Purchaser agrees and covenants not to sue, prosecute, or otherwise assert, any such Seller claims other than as a defense or offset to an affirmative claim or cause of action brought against the Purchaser based on any conduct, claim, action, or inaction arising prior to the Closing Date.

## II.    Submissions and Due Diligence

Any person or entity that is interested in becoming a potential purchaser or holder of a direct or indirect interest in the Purchased Assets, including, without limitation, each direct

or indirect equity holder of such prospective purchaser or holder and each trustee and beneficiary of any trust included therein (each a "Potential Bidder")[2] shall notify the Debtor and shall submit the following information:

### A. Confidentiality Agreement

If not previously executed and delivered in connection with the Sale, each Potential Bidder shall provide an executed confidentiality agreement substantially in the form annexed hereto as Exhibit __ with such changes as are reasonably acceptable to the Debtor (the "Confidentiality Agreement").

### B. Due Diligence

A Potential Bidder or Potential Bidder Group, as the case may be, who has executed a Confidentiality Agreement shall be given access to a data room for such purpose.

To the extent practicable, the Debtor shall provide each Potential Bidder or Potential Bidder Group, as the case may be, who has executed a Confidential Agreement with access to (i) the same confidential evaluation materials and information provided by the Debtor to each other Potential Bidder and the Proposed Buyers (as defined below) and (ii) such other financial information and other data related to the Debtor as the Potential Bidder may reasonably request, which requests may include reasonable access to the Debtor's senior management and advisors and shall be deemed to include, in any event, the Debtor's good faith estimate of the potential cure costs and rejection damages associated with each material contract and lease subject to assumption in conjunction with the Sale.

### III. Submission of Bids

Each offer, solicitation or proposal (a "Bid") from a Potential Bidder or Potential Bidders Group, as the case may be, must be in writing and must be received by (a) the Debtor's counsel, Baker & McKenzie LLP, 2001 Ross Avenue, Suite 2300, Dallas, Texas 75201 (Attn: John E. Mitchell, john.mitchell@bakermckenzie.com); (b) the counsel to the Prepetition Secured Lenders, Burr & Forman, 171 17th Street, NW, Suite 1100, Atlanta, Georgia 30363 (Attn: Erich Durlacher, edurlacher@burr.com), counsel for the Official Committee of Unsecured Creditors (the "Committee"), Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067 (Attn: Jeffrey N. Pomerantz, jpomerantz@pszjlaw.com) and Brookwood Associates, 3575 Piedmont Road, 15 Piedmont Center, Suite 820, Atlanta, Georgia 30305 (Attn: Amy V. Forrestal, af@brookwoodassociates.com) (collectively, the "Interest Notice Parties"), on or before 5:00 p.m. (prevailing Central time) on April 22, 2014 (the "Bid Deadline"). As detailed in subparagraphs A through C below, a Potential Bidder or Potential Bidders Group, as the case may be, that submits a Bid on or before the Bid Deadline that includes an executed mark-up of the Purchase Agreement (as defined below), and a Deposit (as defined below), shall be deemed an "Acceptable Potential Bidder."

---

[2] If two or more Potential Bidders are part of a single group, such group of Potential Bidders shall be referred to herein as a "Potential Bidders Group."

A Potential Bidder or a Potential Bidders Group, as the case may be, that submits a Bid after the Bid Deadline shall not constitute an Acceptable Potential Bidder. Each Bid must be accompanied by:

### A.    Mark-Up of Purchase Agreement

To facilitate the Auction and to assist the Debtor's CEO and Brookwood Associates (collectively, the "Debtor Auction Team") and other interested parties in assessing the terms of each Bid, each Potential Bidder or Potential Bidders Group, as the case may be, must work from the Asset Purchase Agreement (the "Purchase Agreement") between the Debtor and Chatham Credit Management III, LLC or its designee (the "Proposed Buyer" or the "Stalking Horse") to prepare its bid and shall submit as part of its Bid, a fully executed asset purchase agreement, marked to show all proposed changes to such Purchase Agreement. Each Bid shall include a summary term sheet including a summary of the material terms proposed to be included in the Bid.

To the extent practicable, the Debtor will make members of senior management and advisors available to discuss the terms of a Bid and seek to provide to each Acceptable Potential Bidder the disclosure schedules to the Acceptable Potential Bidder's Bid in connection with the preparation of such Bid.

### B.    Deposit

Potential Bidders will be required to submit to the Debtor, in immediately available funds, letter of credit or other form of security reasonably acceptable to Debtor, a good faith deposit in an amount equal to US $1,000,000.00 (the "Deposit") at the time the Potential Bidder submits a Bid. The Deposit shall be returned to the respective Potential Bidder if such bidder is determined not to be a Qualified Bidder, or following the Auction if the Acceptable Potential Bidder is a Qualified Bidder but not the Backup Bidder (as defined below) or the Successful Bidder (as defined below). The Deposit shall be returned to the Backup Bidder on the earlier of: (i) the closing of the Sale to the Successful Bidder (as defined below) and (ii) 45 days after the close of the Auction.

### IV.    Determining Qualified Bids and Qualified Bidders

### A.    Terms and Conditions of a Qualified Bid

In addition to the requirements for an Acceptable Potential Bidder, in order for a Bid from an Acceptable Potential Bidder to be deemed a "Qualified Bid" and for the Acceptable Potential Bidder to be deemed a "Qualified Bidder", the Bid must: (i) satisfy each of the conditions listed below in paragraphs 1 through 7 and (ii) be submitted on or before the Bid Deadline. A Bid submitted after the Bid Deadline shall not constitute a Qualified Bid. The bid provided by the Stalking Horse (the "Stalking Horse Bid") shall become considered a Qualified Bid. In addition, the Prepetition Secured Lenders shall have the right, but not the obligation, pursuant to Section 363(k) of the Bankruptcy Code to credit bid up to the full amount of their secured claim.

The Debtor Auction Team may determine in its reasonable discretion, after consultation with the Committee, and whether an Acceptable Potential Bidder's Bid is a Qualified Bid.

Promptly after determining that any Acceptable Potential Bidder does not appear to be a Qualified Bidder, the Debtor Auction Team shall notify such Bidder of this determination and, not acting in bad faith, shall seek to resolve any impediment to the Acceptable Potential Bidder's becoming a Qualified Bidder if possible.

1.    Financial Capability

To the extent not previously provided, a Bid shall contain evidence (in the form of binding commitment letters, guarantees or otherwise) that the Acceptable Potential Bidder is able to fulfill all obligations in connection with the contemplated transactions.

2.    Corporate Authority

A Bid shall contain written evidence of each Acceptable Potential Bidder's boards of directors' (or comparable governing bodies) approval of the contemplated transaction.

3.    Nature of Bids for Purchased Assets and Minimum Overbid

The Bid must describe the amount of cash consideration to be paid and must be for all of the Purchased Assets.

The Bid must also be at least US $22,900,000 ($250,000.00 greater than the total value of the Stalking Horse Bid as evidenced by the Purchase Agreement) and include assumption of all liabilities and financial obligations assumed in the Purchase Agreement. The foregoing overbid amount includes the sum of $750,000, which is comprised of the Unencumbered Settlement Cash and the Committee Expense Cash (as such capitalized terms are defined in the Purchase Agreement). The overbid will be reduced by the amount of any payments made by the Debtors prior to the Closing Date with respect to the Committee Expense Cash.

In addition to the foregoing consideration, any overbid must assume the following liabilities:

(s)    all (i) allowed administrative expenses incurred from the Petition Date through the Closing and remain unpaid as of the Closing (except professional fees and expenses), including Liabilities arising under section 503(b)(9) of the Bankruptcy Code, the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a et seq. ("PACA"), and trade accounts payable of the Seller to third parties set forth on Schedule 2.3(a) or incurred by the Seller in the ordinary course of business after the Petition Date and remain unpaid prior to the Closing, and (ii) the then outstanding unpaid fees and expenses of the Debtor's retained restructuring professionals that are incurred prior to Closing and allowed by the Bankruptcy Court, in an amount not to exceed $600,000 in the aggregate, reduced by amounts actually paid to such restructuring professionals prior to Closing; provided, however, that the Purchaser reserves the right to object, in good faith, to the allowance of such claims;

(t)     all Liabilities for Taxes imposed on the Purchaser pursuant to Section 9.1;

(u)     all Liabilities of the Seller arising after the Closing under the Included Contracts and the Governmental Authorizations included in the Purchased Assets;

(v)     to the extent set forth next to any Included Contract on Schedule 2.3(d), any Cure Amount with respect to such Included Contract;

(w)     all Liabilities relating to the employment of Transferred Employees arising after the Closing;

(x)     all Liabilities assumed by the Purchaser pursuant to Article 10;

(y)     all Liabilities associated with the Owned Real Property and the Leased Real Property arising after the Closing;

(z)     all Liabilities associated with the Purchased Assets relating to or arising out of environmental matters, including those arising under any Environmental Law, and arising after the Closing;

(aa)     all Liabilities specifically identified on Schedule 2.3(i);

(bb)     all allowed priority claims arising under Section 507(a)(4),(5), and (8) of the Bankruptcy Code remaining unpaid as of the Closing; provided, however, that the Purchaser reserves the right to object, in good faith, to the allowance of such claims; and

(cc)     all other Liabilities arising out of, relating to or incurred in connection with the Business or the Purchased Assets arising after the Closing including (i) the operation of the Business after the Closing, (ii) the use by the Purchaser or its permitted licensees of Purchased Intellectual Property and (iii) any other condition arising after the Closing with respect to the Purchased Assets.

        4.      Asset Purchase Agreement and Ancillary Agreements

As stated above in Section III.A, a Bid must include a fully executed form of asset purchase agreement marked against the Purchase Agreement and must also include any agreements ancillary to the Sale, each executed by an Acceptable Potential Bidder.

        5.      Approval

Contain a representation that the bid is not conditional on any unperformed due diligence, debtor equity financing or any corporate approval.

        6.      Other Bid Requirements

A Bid must: (i) provide that the bidder's offer is irrevocable until the earlier of (x) consummation of the Sale of the Purchased Assets, (y) the close of the Auction unless the Potential Bidder is selected as the Successful Bidder or the Backup Bidder and (z) 45 days after the close of the Auction if the Potential Bidder is selected as the Backup Bidder; (ii) contain the

form of Sale Order (marked against the proposed order) the bidder would request the Debtor to seek court approval of at the Sale Hearing; and (iii) include evidence of the bidder's ability to provide adequate assurance of future performance of such contracts, permits and licenses it would require the Debtor to assume and assign.

        7.      Adequate Assurance of Future Performance

Any Bid submitted by a Potential Bidder or Potential Bidders Group must include a good faith showing of adequate assurance of future performance with respect to Executory Contracts proposed to be assumed and assigned to the Potential Bidder or Potential Bidders Group. With respect to unexpired leases of non residential real property, such information must include, but is not limited to, the following:

To constitute a "Qualified Bid," a bid must be received by the Bid Deadline (as defined in the Bidding Procedures) and otherwise comply with all of the applicable provisions of the Bidding Procedures, including without limitation the requirement that all bids contain, at a minimum, the following information:

        (i)      The exact legal name of the bidder, the entity that would take assignment of any non-residential real property leases, and any entities that may provide guaranties or other security in connection with the assignment of the any non-residential real property leases (collectively, the "Proposed Assignees");

        (ii)     A description of the Proposed Assignees' experience in operating restaurants generally and specifically buffet-style restaurants;

        (iii)    The number of restaurants the Proposed Assignees operate and all trade names that the Proposed Assignees use; and

        (iv)     A statement setting forth the Proposed Assignees' intended use of the premises leased pursuant to any assigned non-residential real property leases.

**B.      Qualified Bidders**

Only the Acceptable Potential Bidders who have satisfied the foregoing requirements, shall be Qualified Bidders. If no Qualified Bid in addition to the Stalking Horse Bid is timely received, the Debtor will not conduct an Auction and instead may present such bid to the Bankruptcy Court for approval at the Sale Hearing.

**C.      Notification by the Debtor of the Best Qualified Bid**

On or prior to 5:00 p.m. (prevailing Eastern time) on the April 23, 2014, the Debtor Auction Team shall provide each Qualified Bidder that has submitted a Qualified Bid and each counterparty to an Executory Contract who has executed a reasonable Confidentiality Agreement: (i) written notice of the Auction and (ii) notice of the Qualified Bid with

which the Debtor intends to commence the Auction (the "Best Qualified Bid") and (iii) copies of all Qualified Bids.

**V.    The Auction**

If more than one Qualified Bid is timely received, the Auction will be conducted at the offices of Baker & McKenzie LLP, 2001 Ross Avenue, Suite 2300, Dallas, Texas 75201 commencing on April 25, 2014, at 10:00 a.m. (Prevailing Central Time) to determine the highest or otherwise best bid with respect to the Purchased Assets.

**A.    Participation in the Auction**

Only Qualified Bidders who have submitted a Qualified Bid shall be eligible to participate in the Auction.

**B.    The Auction Process**

All Bids made at the Auction after the commencement thereof (each, an "Overbid") shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtor Auction Team shall maintain a transcript of all Overbids made and announced at the Auction, including the Successful Bid (as defined below). The Debtor Auction Team, in its reasonable discretion, may extend the Auction deadline and/or adjourn, continue or suspend the Auction and/or the hearing to approve the Sale of the Purchased Assets for any reason, including to seek further clarification from the Bankruptcy Court regarding any issues, without further order of the Bankruptcy Court, by filing a notice with the Bankruptcy Court and serving such notice on all Qualified Bidders.

The Debtor Auction Team shall announce at the Auction the material terms of each Overbid, and in consultation with the Committee, the total consideration offered in each such Overbid to provide a floor for further bidding. The current highest or best offer for the Purchased Assets, as determined by the Debtor Auction Team in consultation with the Committee shall represent the new Best Qualified Bid. A Qualified Bidder need not make an Overbid in any particular Auction round to maintain their ability to make a later Overbid.

Any Overbid shall be made in overbid increments of at least US $250,000.00 greater than the Best Qualified Bid.

Except as modified below, an Overbid must comply with the conditions for a Qualified Bid as set forth above.

To the extent not previously provided (which shall be determined by the Debtor in consultation with the Committee, a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor in consultation with the Committee) demonstrating such Qualified Bidder's ability to close the proposed transaction.

Except as expressly provided herein, the procedures set forth herein cannot be amended or modified without the approval of the Bankruptcy Court. The Bankruptcy Court shall retain exclusive jurisdiction to construe these Bidding Procedures and determine any disputes arising under them.

## VI. Identification of the Successful Bidder and Acceptance of Successful Bid

### A. Identification of the Successful Bidder

At the close of the Auction, the Debtor Auction Team, in consultation with the Committee, shall determine and announce which Qualified Bidder had the highest or best bid (the "Successful Bid," and such bidder being the "Successful Bidder"). The Debtor Auction Team reserves the right to determine, in its reasonable business judgment and in consultation with the Committee, which bid is the highest or otherwise best (recognizing that, in determining same, a critical consideration shall be which bid provides the greatest net proceeds available for distribution to creditors by the estates.

After the Debtor Auction Team, in consultation with the Committee, so determines the Successful Bid, the Auction will be closed. The Debtor Auction Team, in consultation with the Committee, will then determine and announce which bid has been determined to be the second highest or otherwise best bid (the "Backup Bid" and such bidder being the "Backup Bidder"). In determining which bid is the Backup Bid, the Debtor, in consultation with the Committee, will use its reasonable business judgment.

Notwithstanding anything herein to the contrary, the Debtor, in its reasonable discretion and in consultation with the Committee, reserves the right to reject at any time prior to entry of a court order approving an offer, without liability, any offer (other than the offer submitted by the Proposed Buyers) that the Debtor deems to be: (x) inadequate or insufficient, (y) contrary to the best interests of the Debtor and its estate, or (z) with the advice of counsel, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures set forth therein or herein.

The presentation of a particular Bid to the Bankruptcy Court for approval shall not constitute the Debtor's acceptance of the Bid. The Debtor will be deemed to have accepted the Bid only when the Bid has been approved by the Bankruptcy Court at the Sale Hearing.

### B. Acceptance of Bid From Successful Bidder

The Debtor presently intends to sell the Purchased Assets to the Successful Bidder, pursuant to the terms of the Successful Bid. The Debtor shall be bound by the Successful Bid only when such Bid has been approved by the Bankruptcy Court at the Sale Hearing.

Except as otherwise provided in the Successful Bid agreed to by the Debtor, all of the Debtor's right, title and interest in and to the Purchased Assets shall be sold free and clear of all liens, claims, encumbrances, and interests thereon and there against (except Permitted Encumbrances) (collectively, the "Transferred Liens"), with such Transferred Liens attaching

to the proceeds of the Purchased Assets with the same validity and priority as the Transferred Liens had on the Purchased Assets immediately prior to the Sale.

## VII.    The Sale Hearing

The Sale Hearing shall be held in the Bankruptcy Court on April 29, 2014 if the Stalking Horse Bidder is the Successful Bidder; provided that, if a Qualified Bidder other than the Stalking Horse Bidder is the Successful Bidder, then the Sale Hearing shall be held in the Bankruptcy Court on May 5, 2014.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than an announcement in open court at the Sale Hearing.  Any objections to the approval of the sale of the Purchased Assets shall be argued at the Sale Hearing.

## VIII.    Closing with the Backup Bidder(s)

Without any further order of the Bankruptcy Court after Confirmation, if for any reason the Successful Bidder fails to consummate the Sale within such time as is determined reasonable by the Debtor's Auction Team, in its sole discretion after consultation with the Committee, the Backup Bidder will be deemed to have submitted the highest or best bid and the Debtor and the Backup Bidder are authorized to effect the Sale to the Backup Bidder as soon as is commercially reasonable. If the Stalking Horse is neither the Successful Bidder nor the Backup Bidder, but is a Qualified Bidder, and the Backup Bidder fails to consummate the Sale within such time as is determined reasonable by the Debtor's Auction Team, in its sole discretion after consultation with the Committee, the Debtor and the Stalking Horse are authorized to effect the Sale to the Stalking Horse.

Following the Sale, (i) if such failure to consummate the Sale is the result of a breach by the Successful Bidder or the Backup Bidder, the Successful Bidder or the Backup Bidder, as the case may be, shall be deemed to have forfeited its Deposit and the Debtor additionally reserves the right to seek all available damages from any defaulting Bidder, and (ii) if such failure to consummate the Sale is the result of a breach by the Debtor, the Successful Bidder or Backup Bidder, as the case may be, shall have no recourse against the Debtor other than for recovery of its deposit.

Dated: _____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 14-30699-11 |
| | § | |
| BUFFET PARTNERS, L.P., et al. | § | CHAPTER 11 |
| | § | |
| DEBTORS.[1] | § | Jointly Administered |
| | § | |

### NOTICE OF SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS

Please take notice that:

    1.    On February 4, 2014, (the "Petition Date"), the Debtors filed a voluntary petitions in this Court for relief under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code"). The Debtors continue to manage and operate their business as a debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the chapter 11 case. A creditors' committee (the "UCC") has been appointed in this chapter 11 case (the "Chapter 11 Case") by the United States Trustee.

    2.    **The Sale**. The Prepetition Secured Lenders are owed in excess of $39 million, including accrued and unpaid principal, interest, fees, costs and expenses. Pursuant to the Debtors' Motion for an Order (I) Approving the procedures for (a) the Sale of Substantially all Assets (b) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (c) the Establishment of Cure Amounts, (II) Approving Form of Notice and (III) Setting a Hearing Date for the Approval of the Sale (the "Sale Procedures Motion"), the Debtor is in the process of auctioning substantially all of its assets (the "Assets") to the Successful Bidder in the auction (the "Proposed Sale"). An entity formed by the Prepetition Secured Lenders is the stalking horse bidder ("Stalking Horse Bidder") pursuant to an asset purchase agreement (the "Purchase Agreement") for an amount less than the aggregate amount owed to the Prepetition Secured Lenders.

    3.    **The Auction Process**. Pursuant to the Bankruptcy Court's Order (I) Approving the Procedures for (A) the Sale of Substantially All Assets (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (C) the Establishment of Cure Amounts, (II) Approving Form of Notice and (III) Setting a Hearing Date for the Approval of the Sale (the "Sale Procedures Order"), entered on April 21, 2014, an auction (the "Auction") for the sale of the Assets will be held on April 25, 2014, 10:00 a.m. (prevailing Central Time) (the "Auction Date") at the offices of Debtor's counsel, Baker & McKenzie LLP, 2001 Ross Avenue, Suite 2300, Dallas, Texas 75201. Further, pursuant to the Sale Procedures Motion, the deadline by which competing bids (each a

---

[1]    The Debtors in these chapter 11 cases are Buffet Partners, L.P. and Buffet G.P., Inc.

774402-v2\DALDMS
20540647 v2

**EXHIBIT B**

"Competing Bid") to the Proposed Sale will be considered for the Auction is April 22, 2014, 5:00 p.m. (Prevailing Central Time) (the "Bid Deadline"), provided that such Competing Bids are submitted in writing and served, so as to be received by the Bid Deadline, on: (a) the Debtor's counsel, Baker & McKenzie LLP, 2001 Ross Avenue, Suite 2300, Dallas, Texas 775201 (Attn: John E. Mitchell, john.mitchell@bakermckenzie.com); (b) the counsel to the Prepetition Secured Lenders, Burr & Forman, 171 17th Street, NW, Suite 1100, Atlanta, Georgia 30363 (Attn: Erich Durlacher, edurlacher@burr.com); (c) counsel to the Official Committee of Unsecured Creditors (the "UCC"), Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067 (Attn: Jeffrey N. Pomerantz, jpomerantz@pszjlaw.com); and (d) Brookwood Associates, 3575 Piedmont Road, 15 Piedmont Center, Suite 820, Atlanta, Georgia 30305 (Attn: Amy V. Forrestal, af@brookwoodassociates.com) (collectively, the "Interest Notice Parties").

4.    **The Bid Procedures**. The Debtor Auction Team which consists of the Debtor's investment banker and chief executive officer, in consultation with the UCC, will consider Competing Bids from interested parties pursuant to the Auction process, provided that any such bid is in compliance with the Court approved Bid Procedures which are attached to the Sale Procedures Order and in general provide that such bid must: (i) be received in writing by the Interest Notice Parties on or before the Bid Deadline, (ii) includes an executed copy of an alternative purchase agreement that reflects any substantive changes to the Purchase Agreement, (iii) indicates the approximate amount of cash consideration the party is willing to pay for the Assets which amount must be no less than $22,900,000; (iv) includes written evidence of available cash or a commitment for financing and such other evidence of ability to consummate the transaction as the Debtor's Auction Team (in consultation with the UCC) may request; (v) includes all of the Assets proposed to be purchased by the Stalking Horse Bidder; (vi) assumes at least the same liabilities as the Stalking Horse Bidder proposes to assume; (vii) includes a copy of a board resolution or similar document demonstrating the authority of the bidding party to make a binding and irrevocable bid on the terms proposed; (viii) is not conditional on the outcome of any unperformed due diligence, the receipt of equity or debt financing, or the approval of any Board of Directors, shareholder, or other corporate approval; (ix) includes any pertinent factual information regarding the proposed bidder's operations that would assist the Debtor's Auction Team's analysis of issues (if any) arising with respect to any regulatory or statutory issues; (x) includes evidence regarding ability to adequately perform the terms of any executory contract sought to be assumed or assigned; and (xi) is reasonably likely to close no later than the date that the Proposed Sale with the Stalking Horse Bidder would close.  In addition, the bid must include a deposit in the amount of $1,000,000, as described in the Bid Procedures.

5.    **The Sale Hearing**. A hearing (the "**Sale Hearing**") at which the Bankruptcy Court will consider approving the Proposed Sale to the Stalking Horse Bidder, if the Stalking Horse Bidder is the Successful Bidder, will be held on April 29, 2014 at 2:00 p.m. (**Prevailing Central time**) at the **United States Bankruptcy Court for the Northern District of Texas, Dallas Division, Courtroom 3, 14th Floor, 1100 Commerce Street, Dallas, Texas 75242-1496** (the "Bankruptcy Court"), before the

Honorable Harlin D. Hale, United States Bankruptcy Judge.  All objections to the Proposed Sale must be filed on or before April 16, 2014 at 4:00 p.m. (Prevailing Central time) with the Bankruptcy Court, and served so as to be received by the Interest Notice Parties referenced in paragraph 3 above by such deadline.  If a Potential Bidder is the Successful Bidder, the Sale Hearing will be conducted on May 5, 2014 at 1:30 p.m., at the Bankruptcy Court, with objections due by 4:00 p.m. (Prevailing Central Time) on May 1, 2014.

Dated: March 21, 2014                 Respectfully submitted,

**BAKER & McKENZIE LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 2300
Dallas, Texas 75201
Tel: (214) 978-3000
Fax: (214) 978-3099
Emails: john.mitchell@bakermckenzie.com
           rosa.shirley@bakermckenzie.com

By:  */s/ John E. Mitchell*
        John E. Mitchell, SBT # 00797095
        Rosa A. Shirley, SBT #24056313

**ATTORNEYS FOR THE DEBTORS**

**SCHEDULES**

**to**

**ASSET PURCHASE AGREEMENT**

**among**

**CHATHAM CREDIT MANAGEMENT III, LLC**

**and**

**BUFFET PARTNERS, L.P.**

**dated as of March __, 2014**

774725-v5\DALDMS

These Schedules (these "Schedules" and each, a "Schedule") are being delivered in accordance with, and are incorporated and made part of that certain Asset Purchase Agreement, dated as of the date hereof (the "Agreement"), by and among Chatham Credit Management III, LLC, a Georgia limited liability company ("Purchaser") and Buffet Partners, L.P., a Texas limited partnership ("Seller"). Capitalized terms used in these Schedules but not otherwise defined herein will have the respective meanings given to them in the Agreement.

Matters reflected in these Schedules are not necessarily limited to matters required by the Agreement to be reflected in these Schedules, which additional matters are included for information purposes only. Information disclosed in any Schedule shall be deemed to be disclosed on any other Schedule to the extent that it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other Schedule or Schedules, without the necessity of a cross-reference.

Nothing in these Schedules will be deemed or will constitute an admission of any liability or obligation of any party to any third party, nor an admission to any third party against the interests of any or all of the parties.

All descriptions of any documents appearing herein are summary in nature and are qualified by reference to the complete documents. The information contained herein is subject to the confidentiality provisions contained in the Agreement.

i

## LIST OF SCHEDULES

| SCHEDULE | DESCRIPTION |
|----------|-------------|
| 1.1 | Pre-Petition Financing |
| 2.1(b) | Included Contracts |
| 2.1(d)(i) | Owned Real Property |
| 2.1(d)(ii) | Leased Real Property |
| 2.1(e) | Purchased Intellectual Property |
| 2.2(b) | Excluded Contracts |
| 2.3(a) | Trade Accounts Payable |
| 2.3(d) | Cure Amounts |
| 2.3(i) | Assumed Liabilities |
| 3 | Seller Disclosure Schedule |
| 4 | Purchaser Disclosure Schedule |
| 5.12 | Contract & Cure Schedule |
| 10.1 | Employees |

ii

## Schedule 1.1 – Pre-Petition Financing

1.     Promissory Note (Advances), dated April 3, 2009, in the original principal amount of $5,479,740.31, executed by Borrower, payable to the order of Chatham Credit Management III, LLC, as Administrative Agent;

2.     Amended and Restated Promissory Note (Term Loan A), dated April 3, 2009, in the original principal amount of $12,499,999.95, executed by Borrower, payable to the order of Chatham Credit Management III, LLC, as Administrative Agent;

3.     Second Amended and Restated Promissory Note (Term Loan B), dated April 3, 2009, in the original principal amount of $8,495,610.58, executed by Borrower, payable to the order of Chatham Capital Management II, LLC, a Georgia limited liability company, not individually, but as agent for Chatham Investment Fund QPII, LLC and Chatham Investment Fund II, LLC, as assigned to Chatham Credit Management III, LLC, not individually but as agent for Chatham Investment Fund III, LLC and Chatham Investment Fund QPIII, LLC, pursuant to that certain Assignment and Acceptance Agreement dated August 12, 2013;

4.     Promissory Note (Term Loan X), dated April 3, 2009, in the original principal amount of $2,950,000.00, executed by Borrower, payable to the order of Chatham Credit Management III, LLC, as Administrative Agent;

5.     Promissory Note (Term Loan X Add On), dated November 4, 2011, in the original principal amount of $3,000,000.00, executed by Borrower, payable to the order of Chatham Credit Management III, LLC, not individually, but as agent for Chatham Investment Fund QPIII, LLC and Chatham Investment Fund III, LLC; and

6.     Promissory Note (Priority Advance), dated August 29, 2013, in the original principal amount of $1,000,000.00, executed by Borrower, payable to the order of Chatham Credit Management III, LLC, not individually, but as agent for Chatham Investment Fund QPIII, LLC and Chatham Investment Fund III, LLC.

774725-v5\DALDMS

## Schedule 2.1(b) – Included Contracts

**Included Contracts**

| Vendor Name | Description of Contract |
| --- | --- |
| 1 Source International | Conference Calling vendor |
| Admiral Linen | Linen and mat service |
| Air Gas | $CO_2$ for the stores soft drink machines |
| Air Liquide | Dynamic Foods - liquid Nitrogen |
| AKR Recruiting | Direct Placement |
| Allen Canning Co | Purchase contract; Canned Vegetables |
| Alliance Processors | Cooking Oil Recycling - 315 |
| Aloha - Radiant Systems | POS - On line reporting |
| Ameripride Services | Linen and Mat service |
| AP Food Sales | Food Broker |
| Aramark | 318 - Linen and mat service |
| ASO Agreement/TPA, United Healthcare | UHC Admin Agreement |
| AT&T | Telecom services for retained locations |
| Atmos Energy | Gas Contract for W. TX units & DF plant |
| Audio Video Media | Music Choice for Stores - 313, 315, 318, 319 |
| Bellah & Associates | Food Broker |
| BioControl Systems | Provide Swabs for MVP ICON |
| Brinks US. | Armored service for 311 |
| CCS Quickship | Disaster Recovery Services - Hardware |
| Chris Hamilton | R& D - Research etc. |
| Cigna | Dental Insurance for employees |
| Cintas | Uniform Service |
| City of Albuquerque  - 115 | Waste service - 115 |
| City of Odessa - 104 | Utility Service - 104 |
| City of OK | Gas |
| Clear Channel | Wireless Internet backup for 318 |
| Clear Channel | Outdoor Bulletin Advertising - 500 |
| Click Here | Hosting Agreement |
| CNE Gas | Gas |
| Compass Professional Health Services | Employees assistance with medical plan |
| ConAgra | Estimated Contract Residual 11,335 cases; Ketchup and Rotel |
| ConneX Systems Inc. | Maintenance Agreement |
| Consolidated  Edison Solutions, Inc. | Electric for approx. 10 units plus corporate office |
| Creative Restaurant Services | Exit interviews for Managers, Consulting for Ops. Manual |
| Crunch Time | License Agreement |
| Crunch Time Information Systems | Agreement - System to manage Food Cost, Labor etc. |
| Dexter Service Agreement | Risk Administration |
| Dickinson Frozen Foods | Purchasing agreement |

774725-v5\DALDMS

| Vendor Name | Description of Contract |
| --- | --- |
| DIRECTV Business Service Center | TV Service for certain stores |
| Discover Link | Learning Management System |
| Dr Pepper/Seven Up, Inc. | Purchasing agreement |
| Eco Lab Dish Machine leases | Dish machines - all stores |
| Eco Lab Water Softener Leases | Water Softeners in certain stores |
| Ecolab | Cleaning Chemicals |
| Fidelity Investments | 401K Service Agreement |
| Gallagher Consulting Agreement | 401(K) consulting - paid out of plan not by BPLP |
| Garda | Armored Service |
| GreatAmerica Financial Services | Xerox Copier Systems |
| Headrick Outdoor Media | Sulphur Springs - Billboard |
| Holmes Murphy | Paid out of commissions on health & Wellness plans |
| Hospitality Recruiters Agreement | direct recruiting placement |
| Hyster Capital | Operating lease |
| IBM Credit | iSeries software and hardware maintenance |
| Idahoan Foods | Purchasing agreement; Mashed Potatoes, Hash Browns |
| InfoSync Agreement | Outside Accounting Services |
| International Food Products | Purchasing agreement; Granulated Sugar |
| Iron Mountain | Secure Storage for corporate files |
| J R Simplot Co | Purchasing agreement; French Fries & Sweet Rstd Corn |
| J&R Industrial Cleaning | Cleaning |
| J.M. Smucker Co. | Purchasing agreement; Evap Milk |
| JC's Terminex | Pest Control |
| John Sanfilippo | Food Broker |
| Konica Minolta - DF | Copier lease |
| La Foy Services, Inc. (Originally Grant Leighton Associates of Dallas) | Interior Tropical Plant Lease & Maintenance |
| Lincoln Life | Life/ADD,STD, LTD Provider |
| Lookout Agreement | I-9 licensing |
| Loomis | Armored service |
| Maxus Capital Group | Schedule 2 (Store 319) and Schedule 3 (Dynamic/Lubbock) |
| Mechanical Solutions | HVAC Preventative Maint for Corp Office |
| Messageware Incorporated | Software License Agreement |
| Mexus Group LP | Wireless internet for #500 |
| Morgan Birge & Assoc. | Phone maintenance for Plano and Lubbock |
| Northwest Fire Protection | Fire inspection |
| NuCo2 Agreement | CO2 for the stores soft drink machines |
| Okeene Milling Co | Supply agreement |
| Old Seville Waste Management | Various stores - Trash pickup and other waste services |
| One Source | Tax Lookup Software |
| Oracle | JDE & UPK Software |
| Paccar Financial | Operating lease |

3

| Vendor Name | Description of Contract |
| --- | --- |
| Paragon Foods | Supply agreement |
| Pepsi Beverage Contract | Purchasing agreement; |
| Peterson Farms / Cherrco | Purchasing agreement; IQF Cherries |
| Pictsweet | Purchasing agreement |
| Pitney Bowes | Postage Meter Rental |
| Pitney Bowes | Software (SoftGuard) |
| Premium Assignment Corp | Financing for Annual Insurance Package |
| Pro Act | Broker; Fresh Produce Contract for the Stores (see below) |
| Producers Rice Mill, Inc. | Purchasing agreement; Rice |
| Protection One | Fire alarm and monitoring for DFW stores. |
| Providence Risk | Admin & Claims costs for TNS - TPA |
| Qwest - Century Link | Telecom service |
| R3/Papercraft | Pricing letter |
| Radiant Software License | POS - On line reporting, See Aloha Contract |
| Reed Placement | Direct Management recruiting placement |
| Rich Products | Purchasing agreement; Whip Topping, Biscuits, Pizza Crust |
| Ricoh - Print Solutions Maintenance | DF Printer Maintenance |
| Rocket Software/Aldon | iSeries change Management Software |
| Safesite | Offsite data storage |
| Sand Trap Service | Pump Greasetrap - 319 |
| Sara Lee | Purchasing agreement; Texas Toast |
| Schwan Food Company | Purchasing agreement; Heavy Breaded Okra |
| Securitas Security Systems | Security services |
| Seenergy Foods Limited | Purchasing agreement; Black Beans IQF - Brinker |
| Simplex Grinnell | Service agreement, fire systems inspection |
| Snagajob Agreement | Job Postings online for field hourly |
| Specialty Risk Services | Admins and claims costs - GL policy TPA |
| Summer Prize Fruit Co | Food Broker |
| Swisher | Restroom Cleaning Service - 148 - 318 |
| TALX Employer Service | Unemployment Claims Management |
| Top Brass Building Services | Janitorial cleaning of corporate office |
| Transamerica Life Ins. | Employee paid supplemental insurance plans |
| Tri-venture Marketing | Food Broker |
| UHC - Stop Loss Policy | Stoploss for Medical ASO Plan |
| VALASSIS DIRECT MAIL INC | Online marketing and direct mail |
| Ventura Foods | Purchasing agreement; shortenings and oils |
| Wells Fargo Client Service Agreement | Property and casualty insurance agreement |
| Wells Fargo Merchant Agreement | Merchant Processor Service Agreement |

4

774725-v5\DALDMS

**Pro Act Vendors (Fresh Produce Contract for the Stores)**
Hardies Fruits &
Vegetables
Potato Specialty Co.
Loffredo Fresh
Produce Co
Stern Produce Co.
Segovias Distributing,
Inc.
Tulsa Fruit Company
Go Fresh
Food Services of
America

**Lonestar  Logos &
Signs LLC Inc.**

| Contract Number | Description |
| --- | --- |
| O-39500-SM31 | Billboard - IH 027 @ Exit 049 |
| O-39525-SP9Q | Billboard - IH 040 @ Exit 064 |
| O-40597-951Y | Billboard - IH 030 @ Exit 124 |
| O-40930-8B7H | Billboard - IH 020 @ Exit 134 |
| O-41186-NTSF | Billboard - IH 030 @ Exit 052A |
| O-41522-PXBV | Billboard - IH 635 @ Exit 011A |
| O-41644-8RZD | Billboard - SH 151 @ Exit IH 410 |
| O-38266-7ZC1 | Billboard - LP 0289 @ Exit INDIANA AVE |
| O-44853-9C52 | Billboard - IH 010 @ Exit 032 |
| O-44152-3QSM | Billboard - LP 0250 @ Exit SH 191 |
| O-45528-8K9T | Billboard - IH 020 @ Exit 450 |
| O-45935-1L04 | Billboard - IH 020 @ Exit 465 |

| Unexpired Real Property Leases | | |
| --- | --- | --- |
| Vendor Name | Description of Contract | Location of Lease |
| One Energy Shopping Center  LLC | Lease | #101-Odessa, TX |
| MCM Properties LTD | Lease | #102-Odessa, TX |
| Tomorrow IX Broadmoor, LP | Lease | #103-Hobbs, NM |
| Mesa Center, LLC | Lease | #104-Midland, TX |
| Boston and Mays LLC | Lease | #110-Amarillo, TX |
| WFC Wyoming NM, LLC | Lease | #115-Albuquerque, NM |
| 505 Cordova LLC | Lease | #116 Santa -FE, NM |
| The Holland Island, LLC | Lease | #123-Amarillo, TX |
| Parkway Development LLC | Lease | #128-Clovis, NM |
| Farm Properties, Inc. | Lease | #141-Tulsa, OK |
| ARC CAFEUSA001,LLC | Lease | #148-Garland, TX |

5

| | | |
|---|---|---|
| Segura Investors XII, LLC | Lease | #160-Albuquerque, NM |
| San Juan Plaza Partners | Lease | #175-Farmington, NM |
| Joe E. Monarrez, Jr. and Bricia Margarita Monarrez, Co-trustees of the Monarrez Family Trust Dated 2/4/2010 | Lease | #176-Plainview, TX |
| Anchor Equities, Ltd | Lease | #190-Lubbock, TX |
| Rancier Investment 1 LLC | Lease | #191-Ft. Worth, TX |
| National Retail Properties, LP | Lease | #204-McAllen, TX |
| HUMBOLDT RIO WEST, LLC | Lease | #228-Gallup, NM |
| Hume Arizona Holdings, LLC | Lease | #231-Tucson, AZ |
| Hume Investment Advisors, LLC | Lease | #234-Dallas, TX |
| Arthur N. Rupe Foundation | Lease | #235-Lubbock, TX |
| Michael & Sandra Trammel | Lease | #302-Sulphur Springs,TX |
| National Retail Properties, LP | Lease | #311-Moore, OK |
| Rogers Avenue Properties, LLC | Lease | #312-Ft. Smith, AR |
| National Retail Properties, LP | Lease | #313-Arlington, TX |
| Inland Diversified Dallas Wheatland LLC | Lease | #315-S. Dallas, TX |
| SAN151NNN, LLC | Lease | #318-San Antonio, TX |
| N3 335 Plano TX LLC | Lease | #319-Plano, TX |
| Las Palmas Dunhill LP | Lease | #500-El Paso, TX |
| IndCor Properties | Lease | Plano - Corp. Office |

**Principal Balance of Capital Leases -**

| | |
|---|---|
| Maxus (Schedule 2, Store #319) | $541,516.00 |
| Maxus (Schedule 3, Dynamic - Lubbock) | $134,601.00 |
| Great American Financial | $ 6,291.00 |

*To be updated prior to Closing.

6

## Schedule 2.1(d)(i) – Owned Real Property

1. Food Processing Manufacturing Plant Land, Dynamic Foods, 1001 E. 33rd Street, Lubbock, TX 79404 – Land Value and Property Improvements

2. Building and improvements subject to ground lease; store #500 – El Paso, TX

## Schedule 2.1(d)(ii) – Leased Real Property

| Site # | Address | City | State |
|--------|---------|------|-------|
| 101 | 3120 Andrews Highway | Odessa | TX |
| 102 | 4101 East 42nd Street | Odessa | TX |
| 103 | North Turner & Sanger | Hobbs | NM |
| 104 | 1116 N Midkiff | Midland | TX |
| 110 | 2640 Wolflin Square | Amarillo | TX |
| 115 | 2272 Wyoming , N.E. | Albuquerque | NM |
| 116 | 522 Cordova | Santa Fe | NM |
| 123 | 2201 Southwestern St #145 | Amarillo | TX |
| 128 | 200 West 22nd Street | Clovis | NM |
| 141 | 6560 East 51st Street | Tulsa | OK |
| 148 | 1540 Eastgate Dr. | Garland | TX |
| 160 | 5001 Montgomery Plaza #109 | Albuquerque | NM |
| 175 | 3030 E. Main | Farmington | NM |
| 176 | 3605 Olton Road | Plainview | TX |
| 190 | 2817 Loop 289 South | Lubbock | TX |
| 191 | 3233 Alta Mere Drive | Ft. Worth | TX |
| 204 | 901 W Expressway | McAllen | TX |
| 228 | 505 N US Hwy 491 | Gallup | NM |
| 231 | 1095 W St Mary's | Tucson | AZ |
| 234 | 6465 Samuell Blvd. | Dallas | TX |
| 235 | 6001 Slide Road | Lubbock | TX |
| 302 | 1300 Mockingbird Lane | Sulphur Springs | TX |
| 311 | 1201 S. Interstate Dr. | Moore | OK |
| 312 | 5707 Rogers Avenue | Fort Smith | AR |
| 313 | 300 E Interstate 20 Highway | Arlington | TX |
| 315 | 39779 LBJ Frwy | Dallas | TX |
| 318 | 8410 State Highway 151 | San Antonio | TX |
| 319 | 1900 N Central Expressway | Plano | TX |
| 500 | 11925 Gateway West Blvd. | El Paso | TX |
| Corp | 2701 E. Plano Parkway, Ste 200 | Plano | TX |

## Schedule 2.1(e) – Purchased Intellectual Property

| Trademark Information | State/Country | Goods/Services | Deadline(s) |
|---|---|---|---|
| **FURR'S**<br>Serial No. 19165<br>Filing Date: December 15, 1977<br>Registration No. 19165<br>Registration Date: December 15, 1977 | Arizona | IC 14: Prepared foods and/or ingredients thereof. | *Registered*<br><br>12/14/2017 – Renewal due. |
| **DYNAMIC FOODS**<br>Serial No. 74/285,258<br>Filing Date: June 16, 1992<br>Registration No. 1,987,794<br>Registration Date: July 23, 1996 | USA | IC29: G & S: meat; seafood; prepared foods; namely, beef and pork cutlets and patties; organ meats; fish filets; prepared entrees consisting primarily of meat, fish, poultry or vegetables; and desserts; namely, fruit-based pie fillings and fruit-based dessert toppings<br><br>IC 30: bakery goods; sauces; prepared foods; namely, bread products in the nature of bread loaves, rolls, dumplings, biscuits, pie crusts and bread crumbs; and desserts; namely, pies, cakes, and cobblers; prepared entrees consisting primarily of pasta or rice. | *Registered*<br><br>07/23/2016 – Section 8 & 9 renewal due. |
| **DYNAMIC FOODS (and Design)**<br><br><br><br>Serial No. 77/206,504<br>Filing Date: June 14, 2007<br>Registration No. 3,584,008<br>Registration Date: March 3, 2009 | USA | IC29: Meat; seafood, not live; prepared foods, namely, beef and pork cutlets and patties; organ meats made of liver; fish filets; prepared entries consisting primarily of meat, fish, poultry or vegetables; and desserts, namely, fruit-based pie fillings and fruit-based dessert toppings.<br><br>IC30: Bakery goods; sauces; prepared foods, namely, bread products in the nature of bread loaves, rolls, dumplings, biscuits, pie crusts and bread crumbs; and desserts; namely, pies, cakes and cobblers; prepared entries consisting primarily of pasta or rice. | *Registered*<br><br>03/03/2015 – Section 8 & 15 Declaration due.<br><br>03/03/2019 – Section 8 & 9 renewal due. |

774725-v5\DALDMS

| Trademark Information | State/Country | Goods/Services | Deadline(s) |
|---|---|---|---|
| **FURR'S**<br>Serial No. 74/067,344<br>Filing Date:  June 11, 1990<br>Registration No. 1,870,079<br>Registration Date:  December 27, 1994 | USA | IC 42:  Restaurant services. | *Registered*<br><br>12/27/2014 – Section 8 & 9 renewal due. |
| **FURR'S FAMILY BUFFET**<br>Serial No. 78/848,164<br>Filing Date:  March 28, 2006<br>Registration No. 3,208,318<br>Registration Date:  February 13, 2007 | USA | IC 43:  Restaurant services. | *Registered*<br><br>02/13/2017 – Section 8 & 9 renewal due. |
| **FURR'S FAMILY BUFFET (and Logo)**<br><br>Serial No. 78/848,146<br>Filing Date:  March 28, 2006<br>Registration No. 3,208,315<br>Registration Date:  February 13, 2007 | USA | IC 43:  Restaurant services. | *Registered*<br><br>02/13/2017 – Section 8 & 9 renewal due. |
| **FURR'S FAMILY DINING**<br>Serial No. 74/067,337<br>Filing Date:  June 11, 1990<br>Registration No. 1,878,073<br>Registration Date:  February 7, 1995 | USA | IC 42:  Restaurant services. | *Registered*<br><br>02/07/2015 – Section 8 & 9 renewal due. |
| **FURR'S FRESH BUFFET**<br>Serial No. 78/848,154<br>Filing Date:  March 28, 2006<br>Registration No. 3,208,316<br>Registration Date:  February 13, 2007 | USA | IC 43:  Restaurant services. | *Registered*<br><br>02/13/2017 – Section 8 & 9 renewal due. |
| **FURR'S FRESH BUFFET (and Design)**<br><br>Serial No. 85/311,760<br>Filing Date:  May 4, 2011<br>Registration No. 4,180,545<br>Registration Date:  July 24, 2012 | USA | IC 43:  Restaurant and catering services. | *Registered*<br><br>07/24/2018 – Section 8 & 15 Declaration due.<br><br>07/24/2022 – Section 8 & 9 renewal due. |

10

| Trademark Information | State/Country | Goods/Services | Deadline(s) |
|---|---|---|---|
| **FURR'S FRESH BUFFET (and Logo)**<br><br>Serial No. 78/848,159<br>Filing Date: March 28, 2006<br>Registration No. 3,208,317<br>Registration Date: February 13, 2007 | USA | IC 43: Restaurant services. | *Registered*<br><br>02/13/2017 – Section 8 & 9 renewal due. |
| **FURR'S FRESH SELECTIONS (and Design)**<br><br>Serial No. 85/091,735<br>Filing Date: July 23, 2010 | USA | IC 43: Catering of food and drinks; restaurant services. | *Pending*<br><br>Awaiting acceptance of Statement of Use. |
| **JUST WHAT YOU WANT. MADE FRESH.**<br>Serial No. 85/256,589<br>Filing Date: March 3, 2011<br>Registration No. 4,250,667<br>Registration Date: November 27, 2012 | USA | IC 43: Catering services; restaurant services. | *Registered*<br><br>11/27/2018 – Section 8 & 15 Declaration Due.<br><br>11/27/2022 – Section 8 & 9 renewal due. |

11

## Schedule 2.2(b) – Excluded Contracts

### Rejected Real Property Leases

| Store No. | Lessor | Property Location | Contract Date | Surrender Date | Rejection Date |
|---|---|---|---|---|---|
| 273 | 1750 Redondo, LLC | 1606 South Georgetown, Wichita, Kansas 67218 | December 3, 2004 | January 15, 2014 | February 4, 2014 |
| 247 | Erland L. Stenberg and Mary Ann Stenberg | 4900 Kipling, Wheat Ridge, Colorado 80033 | December 3, 2004 | January 15, 2014 | February 4, 2014 |
| 308 | National Retail Properties, LP | 2340 E Griggs Ave., Las Cruces, NM 88001 | January 30, 2006 | February 3, 2014 | February 4, 2014 |
| 309 | National Retail Properties, LP | 51 South Pantano Road, Tucson, Arizona, 85710 | July 10, 2006 | February 3, 2014 | February 4, 2014 |
| 221 | Rohde-Herzog Family Trust | 937 N. Expressway Brownsville, TX 78521 | December 3, 2004 | February 3, 2014 | February 4, 2014 |
| 271 | Sparky-Sanders, LLC | 2503 South Gregg, Big Spring, Texas 79720 | December 3, 2004 | January 27, 2014 | February 4, 2014 |
| 316 | HOULOUNNN, LLC | 21005 Interstate 45, Spring TX 77373 | November 12, 2010 | January 13, 2014 | February 4, 2014 |
| 317 | SAMP 2 L.L.C. | 7863 S Interstate 35, San Antonio, TX 78224 | December 16, 2010 | January 13, 2014 | February 4, 2014 |

**Rejected Equipment Leases**

| Store No. | Lessor | Property Location | Contract Date | Surrender Date | Rejection Date |
|---|---|---|---|---|---|
| 316 | Olympic Compactor Rentals, Inc. | 21005 Interstate 45, Spring TX 77373 | April 27, 2011 | January 13, 2014 | February 4, 2014 |
| 317 | Maxus Capital Group, LLC | 7863 S Interstate 35, San Antonio, TX 78224 | May 1, 2012 | January 13, 2014 | February 4, 2014 |
| 317 | All States Compactors, Inc. | 7863 S Interstate 35, San Antonio, TX 78224 | May 1, 2012 | January 13, 2014 | February 4, 2014 |
| 318 | Olympic Inc. | 8410 Highway 151, San Antonio, TX 78245 | January 24, 2012 | February 4, 2014 | February 4, 2014 |

*To be updated prior to Closing.

13

## Schedule 2.3(a) – Trade Accounts Payable

| Trade Accts Payable- Estimated Based on 3.4.14 Financial Statements | |
| --- | --- |
| **Vendor Name** | **Amount** |
| Aaa Firepro I | $ 54.98 |
| Adams Extract Co | $ 212.01 |
| Adrian Ezequi | $ 292.27 |
| Advanced Floor | $ 324.75 |
| Advanced Graphix | $ 3,140.21 |
| Affiliated Foods | $ 3,763.53 |
| Airgas Southwest, Inc. | $ 115.11 |
| Alarm Securit | $ 1,623.76 |
| Albert Deloss | $ 1,400.00 |
| Allens Fire S | $ 318.05 |
| Allens Tri St | $ 303.65 |
| Allied Plumbing | $ 1,612.95 |
| Amarillo Custom Box Co | $ 474.60 |
| Amarillo Mop & Broom Co., Inc. | $ 660.52 |
| American Waste | $ 119.59 |
| American Yeast Sales (#2398-01) | $ 3,575.00 |
| Ameripride Se | $ 214.12 |
| Aog | $ 1,685.08 |
| Aramark Unifo | $ 416.98 |
| Arid Mechanic | $ 670.16 |
| Armored Trans | $ 348.18 |
| Armstrong Relocation | $ 357.14 |
| Artemio Busto | $ 337.37 |
| Ash Automated Packaging System | $ 148.00 |
| At&t | $ 6,870.94 |
| Atalanta Corp | $ 8,213.85 |
| Atmos Energy | $ 3,983.87 |
| Bank Of America | $ 13,141.54 |
| Battery Solutions Inc | $ 219.07 |
| Blast Masters | $ 2,172.79 |
| Borden Dairy | $ 75.10 |
| BPI Technology, Inc. | $ 13,329.65 |
| Bravo Sales I | $ 547.89 |
| Brinks Inc | $ 1,265.12 |
| Bruce Foodservice | $ 3,693.55 |
| Business Hygi | $ 815.58 |
| Canatxx Servi | $ 90.00 |
| Candido Arcos | $ 600.00 |
| Casters Of Lubbock | $ 442.86 |
| CF Sauer | $ 4,416.57 |

| Vendor Name | Amount |
|---|---|
| Charles Olson | $ 54.13 |
| Christopher S | $ 414.86 |
| Cintas Corp | $ 500.79 |
| City Electric | $ 1,597.23 |
| City Of Fort | $ 380.71 |
| City Of Las C | $ 339.91 |
| City Of Moore | $ 1,350.52 |
| City Of Odessa | $ 690.67 |
| City Of San A | $ 1,133.00 |
| City Of Sulphur Springs | $ 653.06 |
| City Of Tulsa | $ 745.63 |
| Clear Channel | $ 2,000.00 |
| Colborne Mfg Co | $ 325.00 |
| Commercial Li | $ 1,498.24 |
| Complete Fire | $ 837.14 |
| ConEdison Sol | $ 19,875.97 |
| Countdown Inc | $ 25.20 |
| Cozzini Bros | $ 418.74 |
| Cps Energy | $ 1,727.38 |
| Creamland Dairy | $ 4,610.02 |
| Crowl Mechanical | $ 311.84 |
| Culligan Of West TX | $ 222.85 |
| Culligan Water | $ 364.50 |
| Dan Foley | $ 460.50 |
| David Kenneth | $ 194.85 |
| David Strickland | $ 167.50 |
| Dean Foods Co | $ 3,240.89 |
| Degussa / Cargill | $ 10,076.01 |
| Development & | $ 90.00 |
| Dexter & Co C | $ 11,736.11 |
| Dickinson Frozen Foods | $ 4,234.00 |
| DirecTV | $ 801.58 |
| Don Crawford | $ 80.50 |
| Donald Dodson | $ 36.55 |
| Doris L Smith | $ 180.50 |
| Dot Foods, Inc. | $ 25,132.64 |
| Ecolab Food S | $ 27,819.95 |
| El Paso Elect | $ 1,902.75 |
| Electracom Supply, Inc | $ 73.62 |
| Elite Copy So | $ 8,520.69 |
| Employment Screening Services Inc | $ 123.00 |
| Equacao Serra | $ 495.48 |
| Erasmo Diaz | $ 2,178.55 |
| Farmland Foods Inc. | $ 12,075.40 |

15

774725-v5\DALDMS

| Vendor Name | Amount |
|---|---|
| Federal Express | $ 888.34 |
| Fikes Chemical | $ 177.52 |
| Fikes Service | $ 157.32 |
| Firehawk Safe | $ 313.93 |
| Fishbowl Inc | $ 1,338.99 |
| Fix Right LLC | $ 4,597.43 |
| Florida's Natural | $ 3,523.20 |
| Fluke Electronics Inc 110753 | $ 344.16 |
| Fort Smith Re | $ 410.78 |
| Gandys Dairies | $ 875.43 |
| Garland City | $ 400.00 |
| Garzas Floor | $ 625.00 |
| Grainger Inc | $ 17.29 |
| Grande Communications | $ 34.98 |
| Greasetrap Services | $ 329.50 |
| Groen | $ 1,980.05 |
| GVH Distribution | $ 546.00 |
| Harbor Freight Tools | $ 64.92 |
| Hardies Fruit | $ 37,811.74 |
| Heritage Svc | $ 64.74 |
| Hiland Dairy | $ 237.19 |
| Hoarel Sign Co. | $ 1,339.20 |
| Hobart | $ 1,452.21 |
| Hudcorp Inc | $ 155.15 |
| Hyster Capital | $ 3,852.85 |
| IBM Corporation | $ 633.34 |
| IBT Inc | $ 93.76 |
| Infosync Services | $ 27,511.24 |
| Irma R Floyd | $ 292.00 |
| Ivan W Russell | $ 1,530.10 |
| J Anthonys Refrigeration | $ 2,827.18 |
| J R Simplot | $ 10,800.00 |
| J&R Industrial | $ 1,930.00 |
| J&T Refrigeration | $ 2,186.49 |
| Jack Oliver H | $ 912.00 |
| Jackson Equip | $ 389.24 |
| Jamie Mixon | $ 152.00 |
| Jeff Farris | $ 475.23 |
| Jennie-O Turkey Store | $ 9,348.36 |
| Jill Laird | $ 1,358.59 |
| JM Swank | $ 1,400.00 |
| Joe Carlos Ro | $ 408.00 |
| John Paz | $ 154.00 |
| Johnson Bros. Bakery Supply In | $ 2,249.71 |

16

| Vendor Name | Amount |
|---|---|
| Kaman Industrial Technologies | $ 598.51 |
| Karina Pagan | $ 11.00 |
| Ken Ammerman | $ 1,626.70 |
| Kenneth L Mau | $ 68.50 |
| Kerry Savory | $ 8,934.87 |
| Kevin Hoffman | $ 1,949.79 |
| Kim Sledge | $ 1,337.50 |
| Kirby R Gryde | $ 2,309.50 |
| Kwikknife | $ 43.30 |
| La Foy Service | $ 322.59 |
| Lance, Inc | $ 3,012.00 |
| Lewis Stainless | $ 650.00 |
| Lincoln National | $ 16,633.37 |
| Local & Western of Texas Inc | $ 144,831.88 |
| Lookout Services | $ 352.50 |
| Love & Son Inc | $ 400.31 |
| Lubbock Bolt & Supply | $ 65.34 |
| Lubbock Electric Co | $ 125.27 |
| Lubbock Gasket & Supply | $ 46.80 |
| Marcos Lara | $ 650.00 |
| Markem | $ 243.00 |
| Marsynah Chalupa | $ 845.19 |
| Mayfield Paper Co. | $ 240.00 |
| Mechanical So | $ 199.45 |
| Michael Walto | $ 640.00 |
| Michigan Dessert Corp | $ 4,323.59 |
| Mission Foods | $ 10,059.50 |
| Mozell Powell | $ 400.00 |
| Mr Wilsons Pl | $ 10,303.23 |
| MRCSM Inc | $ 467.64 |
| Mullin Plumbing | $ 2,570.00 |
| National Frozen Foods Corp | $ 19,668.63 |
| National Mark | $ 267.81 |
| National Onion Inc. | $ 4,670.20 |
| National Weld | $ 1,768.44 |
| Neumeier Nurs | $ 116.22 |
| New Mexico Ac | $ 11,000.00 |
| New Mexico Re | $ 1,500.00 |
| Newegg Inc | $ 2,615.98 |
| NewlyWed Foods (20632) | $ 1,713.68 |
| Nicholas Wood | $ 555.43 |
| NMHG FINANCIAL SERVICES | $ 3,314.38 |
| NuTEC Manufacturing (TEC SYSTEMS INC) | $ 5,934.12 |
| Oak Farms San | $ 1,901.54 |

17

| Vendor Name | Amount |
|---|---|
| Officer Kevin | $ 380.00 |
| OG&E | $ 4,405.52 |
| Okeene Mills | $ 18,275.00 |
| Old Seville W | $ 6,905.28 |
| Oswalt Equipment | $ 1,258.93 |
| Paccar Financial Corp | $ 8,880.52 |
| Pepsi Direct | $ 966.75 |
| Pitney Bowes | $ 928.64 |
| Plains Dairy | $ 389.10 |
| Plains Transportation, Inc. | $ 1,417.26 |
| Post Asylum | $ 38,100.00 |
| Potato Specialty | $ 23,964.44 |
| Precise Food Ingredients, Inc. | $ 152.00 |
| Prices Creamery | $ 867.34 |
| Protection One | $ 352.36 |
| Protective Shield | $ 41.73 |
| QVD USA LLC | $ 57,915.00 |
| Qwest | $ 691.51 |
| R & D Marketing | $ 35,729.06 |
| R L Price Inc | $ 5,691.19 |
| R&R Electric Supply | $ 32.24 |
| R3 / Papercraft Southwest | $ 36,198.76 |
| Randall Delga | $ 611.61 |
| Randy Jones | $ 510.33 |
| Raul Aviles | $ 666.61 |
| Ray Refrigeration | $ 70.00 |
| Raymond Knote | $ 250.00 |
| Raymond Patin | $ 1,205.00 |
| Republic Services | $ 539.44 |
| Restoration M | $ 573.76 |
| Rich Products Corp | $ 17,106.00 |
| Richard Tiner | $ 1,018.71 |
| Rickey Williams | $ 4,621.11 |
| Rise Vision U | $ 4,393.70 |
| Robert Heath Trucking Inc | $ 3,860.00 |
| Ron Ware | $ 71.00 |
| Royal Cup Coffee 1084459 | $ 11,150.54 |
| Rubin Sales | $ 60,142.50 |
| San Antonio Water System | $ 2,763.91 |
| San Antonio Police Dept. | $ 100.00 |
| Sara Lee | $ 5,253.12 |
| Schepps Dairy Inc | $ 11,896.37 |
| Schwan's Food Service, Inc. | $ 20,128.50 |
| Segovias Distributing | $ 27,408.64 |

18

| Vendor Name | | Amount |
|---|---|---|
| Shamrock Food | $ | 6,804.21 |
| Shawnee Milling Co | $ | 3,300.00 |
| SL Nichols Inc | $ | 136.00 |
| Snagajob.com | $ | 2,126.95 |
| SOS Staffing | $ | 675.00 |
| Southern Tire Mart, LLC | $ | 1,159.35 |
| Southwaste Disposal | $ | 386.58 |
| Southwest Gloves Inc | $ | 252.00 |
| Special Fab & Machine, Inc. | $ | 129.90 |
| Stern Produce | $ | 2,765.69 |
| Steven L Cook | $ | 1,773.94 |
| Stewart Hall | $ | 2,292.20 |
| Sugar Creek Foods International | $ | 2,455.00 |
| Summit Hill Flavors / F&FI | $ | 3,562.20 |
| Superior Line | $ | 819.93 |
| Supply One Dallas | $ | 17,497.59 |
| Suzanne Swift | $ | 2,381.50 |
| Swisher Hygiene | $ | 171.21 |
| Talx Ucm Services | $ | 897.74 |
| Tammy Deweese | $ | 119.14 |
| Texas Gas Service | $ | 3,289.64 |
| Texas Homeland | $ | 165.08 |
| The Bosworth | $ | 178.61 |
| The Store Des | $ | 1,489.28 |
| Thomson Reuter | $ | 1,428.56 |
| Timothy Brain | $ | 73.50 |
| Tones | $ | 12,821.85 |
| Top Brass Bui | $ | 958.01 |
| Total Quality Logistics, Inc. | $ | 4,172.77 |
| Tulsa Fruit C | $ | 11,143.22 |
| Tumbleweed Re | $ | 347.75 |
| Tundra Specialties | $ | 355.10 |
| Tyco Integrated Security | $ | 21.11 |
| UDawg | $ | 2,501.07 |
| U-Haul Co Of Kansas | $ | 342.10 |
| Unifirst | $ | 3,429.94 |
| United Parcel Service | $ | 2,335.69 |
| Us Foodservice | $ | 21,186.46 |
| USPS-Hasler | $ | 130.56 |
| Valassis Communication | $ | 57,087.81 |
| Valley By Pro | $ | 712.50 |
| Verizon South | $ | 505.42 |
| Vicky Baggett | $ | 348.50 |
| Virginia Porcino | $ | 2,150.00 |

19

| Vendor Name | Amount |
|---|---:|
| Vivid Impress | $ 900.92 |
| Vollrath Co Inc | $ 2,433.48 |
| W W Grainger Inc | $ 506.06 |
| Wanda Newton | $ 1,400.00 |
| Weber Marking Systems, Inc | $ 461.38 |
| Weber Scientific | $ 170.64 |
| West Texas Filters | $ 746.52 |
| William R San | $ 229.00 |
| Windstream | $ 22.81 |
| Wyatt William | $ 276.03 |
| Xcel Energy | $ 3,459.67 |
| | $ 1,272,592.42 |

*To be updated prior to Closing.

774725-v5\DALDMS

**Schedule 2.3(d) – Cure Amounts**

*To be updated prior to Closing.

## Schedule 2.3(i) – Assumed Liabilities

| | | |
|---|---|---|
| Gift Cards - Unredeemed | $ | 249,350.00 |

**Ad Valorem Taxes**

| Creditor | | Amount |
|---|---|---|
| Bernalillo County Treasurer | $ | 4,926.51 |
| Bexar County Tax Assessor | $ | 17,247.54 |
| City of El Paso & El Paso County Tax Assessor | $ | 2,083.89 |
| City of Garland | $ | 1,461.83 |
| City of McAllen | $ | 939.14 |
| City of Sulphur Springs | $ | 271.61 |
| Cleveland County Treasurer | $ | 2,845.53 |
| Collin County Tax Assessor | $ | 6,680.11 |
| Curry County Treasurer | $ | 184.23 |
| Dallas County Tax Office | $ | 25,616.40 |
| Dona Ana County Treasurer | $ | 1,640.16 |
| Ector County Tax Assessor | $ | 4,668.30 |
| Garland ISD | $ | 2,600.22 |
| Hale County Appraisal District | $ | 1,673.79 |
| Harris County Tax Office | $ | 1,123.85 |
| Hidalgo County & ISD | $ | 4,463.57 |
| Hopkins County Tax Office | $ | 477.96 |
| Howard County (City & ISD) | $ | 1,042.57 |
| Jefferson County Treasurer | $ | 1,705.98 |
| KENNETH R BYRD | $ | 676.30 |
| Lea County Treasurer | $ | 376.73 |
| Lubbock County Appraisal District | $ | 72,735.29 |
| McKinley County Treasurer | $ | 503.28 |
| Midland Central Appraisal District | $ | 3,768.58 |
| Midland County Tax Assessor | $ | 290.13 |
| Pima County Tax Collector | $ | 587.89 |
| Potter County, Tax Assessor | $ | 5,625.96 |
| Pueblo County Treasurer | $ | 521.08 |
| Richardson ISD | $ | 1,469.90 |
| San Juan County Treasurer | $ | 500.54 |
| Santa Fe County Treasurer | $ | 379.05 |
| Sedgwick County Courthouse | $ | 1,627.32 |
| Sharon Hollingsworth - Tax Assessor | $ | 4,044.84 |
| Spring ISD Tax Office | $ | 2,003.38 |
| Sulphur Springs ISD | $ | 839.82 |
| Tarrant County | $ | 3,123.43 |
| Tarrant County | $ | 1,362.47 |

22

774725-v5\DALDMS

| | | | |
|---|---|---|---|
| Tarrant County Tax Assessor | | $ | 178.48 |
| Tulsa County Treasurer | | $ | 498.50 |
| | Subtotal - Ad Valorem Taxes | $ | 182,766.16 |
| **Total Assumed Liabilities** | | **$** | **432,116.16** |

\*Notwithstanding the foregoing, the 2013 and any prior year ad valorem taxes that are due and payable with respect to the Purchased Assets shall be paid upon the later of (a) Closing or (b) such later date as agreed upon by the Purchaser and applicable taxing authority, and the Purchased Assets shall be sold subject to the liens for the 2014 ad valorem taxes, liability for which taxes is assumed and shall be paid by the Purchaser in the ordinary course of business.

774725-v5\DALDMS

## Schedule 3 – Seller Disclosure Schedule

None.

774725-v5\DALDMS

**Schedule 4 – Purchaser Disclosure Schedule**

None.

## Schedule 5.12 – Contract & Cure Schedule

| Cure Amounts with respect to Included Contracts | | |
|---|---|---|
| **Vendor Name** | **Description** | **Amou** |
| Konica Minolta Premier Finance | Copier lease | $ 1,075.82 |
| Premium Assignment Corp | Financing for Annual Insurance Package | $ 58,583.05 |
| Crunch Time Information Systems | License Agreement | $ 7,824.00 |
| Wells Fargo Insurance Service USA, Inc. | Merchant Processor Service Agreement | $ 206,182.56 |
| Hyster Capital | Operating lease | $ 3,852.85 |
| Radiant Systems Inc. (Aloha Radiant) | Aloha POS - On line reporting | $ 53,833.16 |
| Dr Pepper/Seven Up, Inc. | Purchasing agreement | $ 53,235.25 |
| Pepsi-Cola | Purchasing agreement | $ - |
| 505 Cordova LLC C/o Westgate Properties | Real Property Lease | $ 18,440.08 |
| AM Realty Capital (ARC CafeUSA001) | Real Property Lease | $ 73,971.44 |
| Anchor Equities Ltd | Real Property Lease | $ 14,500.00 |
| Arthur N Rupe Foundation | Real Property Lease | $ 42,596.23 |
| Boston & Mays LLC Inc | Real Property Lease | $ 5,478.40 |
| Bre Central Ind Non Reit (Indcor Properties) | Real Property Lease | $ 16,888.33 |
| Consolidated Holdings Dba Mesa Center LLC | Real Property Lease | $ 39,670.86 |
| Dennis A Gura Segura Holdings | Real Property Lease | $ 27,696.58 |
| Farm Properties Inc | Real Property Lease | $ 11,592.76 |
| Gailup Rio West LLC - Attn: Anita Artalejo | Real Property Lease | $ 15,786.26 |
| Holland Island LLC | Real Property Lease | $ 51,390.70 |
| Hume Arizona Holdings LLC - Attn: Jonathan Garonce | Real Property Lease | $ 14,322.88 |
| Inland Diversified Real Estate Services - Attn 65092 | Real Property Lease | $ 60,320.03 |
| Joe E Monarrez Jr | Real Property Lease | $ 21,518.34 |
| Las Palmas Dunhill LP c/o Wells Fargo | Real Property Lease | $ 20,807.88 |
| M Trammell | Real Property Lease | $ 22,128.63 |
| Music City Mall Properties | Real Property Lease | $ 57,072.34 |
| N3 335 Plano TX LLC | Real Property Lease | $ 77,277.34 |
| National Retail Properties, Lp - #204 | Real Property Lease | $ 17,754.54 |
| National Retail Properties, Lp - #311 | Real Property Lease | $ 34,153.93 |
| National Retail Properties, Lp - #313 | Real Property Lease | $ 26,836.60 |
| One Energy Shopping Center LLC | Real Property Lease | $ 6,299.94 |
| Parkway Development Co c/o Commercial Property Serv | Real Property Lease | $ 60,439.50 |
| Rancier Investments 1 LLC | Real Property Lease | $ 27,147.16 |
| Rogers Avenue Properties LLC | Real Property Lease | $ 23,833.33 |
| San Juan Associates | Real Property Lease | $ 53,934.66 |
| SAN151NNN LLC | Real Property Lease | $ 31,730.42 |
| Tomorrow IX Broadmoor | Real Property Lease | $ 4,727.51 |
| Wfc Wyoming NM LLC - Attn: Alicia & Jeronimo LP | Real Property Lease | $ 75,408.77 |
| Maxus Capital Group | Schedule 2 (Store 319); Schedule 3 (Dynamic) | $ 36,507.16 |
| Headrick Outdoor Media | Sulphur Springs - Billboard | $ 1,026.30 |
| GreatAmerica Financial Services | Xerox Copier Systems | $ 1,004.17 |
| Estimated Real Estate Tax Cure Amounts *(excluding any amounts paid prior to closing)* | | $ 598,000.00 |
| | **Total** | **$ 1,974,849.76** |

Cure amounts for all other Included Contracts deemed to be $0.

26

774725-v5\DALDMS

**Principal Balance of Capital Leases -**

| | |
|---|---|
| Maxus (Schedule 2, Store #319) | $541,516.00 |
| Maxus (Schedule 3, Dynamic - Lubbock) | $134,601.00 |
| Great American Financial | $ 6,291.00 |

*To be updated prior to Closing.

## Schedule 10.1 – Employees

**(i) Senior management**

| Position | Name |
| --- | --- |
| Chief Executive Officer | Barry M. Barron, Sr. |
| Chief Financial Officer | David Siebert |
| Vice President – Operation | Sam Pyeatt |
| Senior Director – Operations (Dynamic Foods) | Richard Hill |
| Senior Director – Purchasing (Dynamic Foods | Connie Luck |

**(ii) At-will employees**

*Note: Regional Managers (4), Corporate staff and Store level personnel may not require written agreements; subject to further discussion with Purchaser; to be updated prior to Closing.

28