John E. Mitchell, SBT # 00797095
Rosa A. Shirley, SBT # 24056313
**BAKER & McKENZIE LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 2300
Dallas, Texas 75201
Tel: (214) 978-3000
Fax: (214) 978-3099
Email: john.mitchell@bakermckenzie.com
rosa.shirley@bakermckenzie.com

**ATTORNEYS FOR THE DEBTORS**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| IN RE:<br><br>BUFFET PARTNERS, L.P., et al.<br><br>DEBTORS.[1] | CASE NO. 14-30699-11<br><br>CHAPTER 11<br><br>(Jointly Administered)<br><br>Expedited hearing requested for April 29, 2014 at 2:00 P.M. |

**DEBTORS' MOTION TO AUTHORIZE PAYMENT IN THE ORDINARY COURSE OF BUSINESS OF CERTAIN EMPLOYEE BONUSES EARNED PREPETITION**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The above-referenced debtors and debtors in possession (the "Debtors") file this Emergency Motion to Authorize Payment in the Ordinary Course of Business of Certain Employee Bonuses Earned Prepetition (the "Motion"), and in support would respectfully show the Court as follows:

---

[1] The Debtors in these chapter 11 cases are Buffet Partners, L.P. and Buffet G.P., Inc.

## JURISDICTION AND PROCEDURAL BACKGROUND

1. On February 4, 2014, (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code"). The Debtors continue to manage and operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. A creditors' committee (the "UCC") has been appointed in these chapter 11 cases by the United States Trustee. No trustee or examiner has been appointed in these Chapter 11 cases.

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## BACKGROUND

### Company History and Overview

4. Headquartered in Plano, Texas, Buffet Partners, L.P., d/b/a Furr's Fresh Buffet ("Furr's," the "Company" or the "Debtor(s)"), is a well-recognized, value oriented restaurant chain with 29 restaurants in Arizona, Arkansas, New Mexico, Oklahoma and Texas, generating in excess of $100 million in revenue. With a rich, 65+ year operating history and strong brand awareness, Furr's operates straight-line and scatter-bar buffet units that feature a wide variety of "all-you-can-eat," "home-cooked," high quality foods served with personalized service at an affordable price ($9.00 average guest check).

5. Furr's provides a compelling price-to-value relationship which results in high average sales per restaurant, relatively low labor costs and attractive unit economic returns. The Company enjoys a unique competitive advantage through its Dynamic Foods division

("Dynamic Foods" or "Dynamic"), a fully integrated food processing, manufacturing, warehousing and distribution operation centrally located in Lubbock, Texas, that services Furr's restaurants and a host of external customers.

6. Furr's is one of the longest-tenured and most recognized restaurant brands in the Southwest. The restaurant was founded in 1946 by Roy Furr, and expanded to approximately 60 locations as a family-owned business for over 35 years. In 1980, it was acquired by Kmart Corporation. Kmart ultimately sold Furr's in a leveraged buy-out which subsequently went public in 1986. Following a take private transaction, the Company entered a period of decline due to its debt burden, culminating in a restructuring and reorganization under chapter 11 in 2003 in Dallas, Texas (*In re Cafeteria Operators, L.P.*, Case No. 03-30179-HDH-11, BANKR. N.D. Tex).

7. Recognizing the strength of the brand, attractive restaurant locations and vertically integrated food processing capabilities, Buffet Partners, L.P. was formed to purchase Furr's in September of 2003. Under Buffet Partners' ownership, management systematically shifted the business to the Furr's Fresh Buffet (scatter-bar) concept while closing underperforming straight-line units. Furr's hired CEO Barry Barron in May, 2013, a seasoned restaurant industry veteran, to oversee the next phase of the Company's growth. Additionally, Furr's has a highly experienced and committed management team with over 160 years of combined restaurant experience and an average of 14 years with Furr's.

**Operations and Financial Performance**

8. Today, the Company operates 29 restaurants, of which 12 are scatter-bar concepts and 17 are straight-line concepts, in five states throughout the Southwest. All restaurants are Company owned, and all are assets of Buffet Partners, L.P., including Dynamic Foods.

Restaurants are supported by Dynamic Foods, a captive, vertically integrated food processing and distribution operation. Approximately 2080 persons are employed at the restaurants, 200 are employed by Dynamic Foods, and approximately 20 persons are employed at the corporate headquarters in Plano, Texas.

9. Furr's continues to strategically convert its restaurant portfolio to the Furr's Fresh Buffet (scatter-bar) concept that generates over $4 million in average annual unit volume, and higher profit per store. Additionally, Dynamic's sales have nearly doubled since 2009, and with capacity utilization only near 50%, Dynamic and the Company have substantial upside growth opportunities, to service both an increased number of Furr's units as well as external customers.

10. For the year ending December 2013, Furr's total net sales for restaurant operations exceeded $100 million. Dynamic's total net sales for the same period exceeded $59 million, with over $14 million from external customers. Furr's serviced almost 11 million guests in 2013, with an unadjusted EBITDA for 2013 of $2.7 million. In 2012 the Company's EBITDA approximated $5.8 million and guest count approximated 12.8 million. Reduction in sales, EBITDA and guest count are attributed in part to the closure of several stores.

## Assets, Liabilities, & Capital Structure

11. Furr's assets consist primarily of the 29 operating restaurants, each leased from multiple different landlords, and the real estate, personal property, vehicles, and other assets at the Lubbock, Texas, Dynamic Foods facility, and the Plano corporate headquarters. Furr's liabilities consist primarily of $39 million in senior, secured debts of Chatham Capital Partners ("Chatham"), and its affiliated funds, as well as approximately $4 million in trade payables to miscellaneous vendors, suppliers and other parties, and undetermined liabilities to landlords of closed store locations. All of Furr's assets, to include its cash, are pledged to Chatham on a

senior, secured basis. Upon belief, the value of the Company's assets, whether valued in liquidation or as a going concern, are materially below the aggregate amount of the Chatham debt.

### Reasons for Filing Chapter 11

12. Furr's has weathered the macro-economic storm that began in 2008, but the credit constraints resulting from the financial crisis impacted the Company's ability to finance growth and improvements in process, and subjected the Debtors to higher interest and leasing rates. Further, commodity and transportation prices increased, and the recessionary climate limited the Company's ability to raise prices to cover increasing costs, and impacted guest counts. Certain locations began to suffer and the Company became increasingly undercapitalized. One of the most successful cash flow locations was lost in an eminent domain proceeding, and a major competitor began direct attacks on the Company. Specific locations subject to these factors began to lose money. The Company did not act to close stores quickly while assessing losses and duration of the recession, wanting to preserve jobs, investment and store locations. The economic climate and onerous lease terms however could not sustain continued operation of stores producing losses, and these stores were closed.

13. Furr's has begun implementation of a footprint rationalization strategy to streamline its restaurant portfolio and focus on its strongest locations, while maintaining strong revenue of $113 million for the year ending 2013. In implementing this strategy, net store closures of 16 units in the last three years resulted in a decrease in revenues of approximately $19.6 million. The decline was offset partially by new, high revenue Furr's Fresh Buffet units and strong external sales at Dynamic. While gross margin remained flat at around 60%, EBITDA decreased approximately $3.0 million from $5.8 million to $2.7 million in 2013 due

primarily to the effect of the store closures, a drop in guest count of almost 2 million, increased G&A expense, deferred maintenance, and continuing economic uncertainty.

14. Overall liquidity was impacted by capital spending on new stores in support of expansion of the scatter-line buffet concept and needed maintenance that had been deferred on older stores. In December the Texas market suffered an ice storm and unusually cold weather, causing a significant loss in guest count and hundreds of thousands of dollars in lost profit. This was detrimental to already tenuous liquidity, and with no available line of credit, the Debtors were unable to continue to weather the financial storm, eventually leading to the chapter 11 filing.

15. Under the leadership of Barry Barron, new operating initiatives and cost saving programs are positively impacting sales and operating profits at the restaurants. The Company is developing and implementing strategies to buy more efficiently, and improve credit and terms with its vendor base. Dynamic Foods external sales continue to be strong and the business is actively pursuing several opportunities with new customers.

16. On December 31, 2013, the Company decided to retain Bridgepoint Consulting, LLC ("Bridgepoint") as financial advisor, to assist the Company with cash management, restructuring analysis and other similar financial advisory services. While Bridgepoint's expertise in these areas greatly improved the Company's cash management, the ongoing liabilities of the Company were deemed unsustainable with the current diminished cash flow and lack of vendor credit. Accordingly, on February 4, 2014, the Company commenced these proceedings to afford it an opportunity to restructure its affairs.

17. Furr's believes that the core, operating business is sustainable and will be successful over the long term, so long as it has the ability to restructure its balance sheet and de-lever the Company.

### Employee Bonuses

18. The Debtors have, for the past several years, offered certain of its employees various incentive- and performance-based bonuses (collectively, the "Arrangements"). The Arrangements generally provide for each eligible employee to receive bonus payments in exchange for, *inter alia,* an individual store meeting certain EBITDA targets. Performance under the Arrangements was historically measured according to the calendar year, with bonuses being paid in or around April of the following year.

19. On the Petition Date, the Debtors also filed their *Emergency Motion to Authorize Payment of Prepetition Wages, Salaries, Commissions, Reimbursable Employee Expenses and Benefits in the Ordinary Course of Business* [Dkt. No. 5] (the "Wage Motion"). The Wage Motion sought payment of among other things, "Employee Claims" which included prepetition bonuses. Specifically, paragraph 22 of the Wage Motion states:

> Pursuant to Bankruptcy Code §§ 105, 363, 507, 1107 and 1108, as supplemented by Federal Rule of Bankruptcy Procedure 6003(b) ("Bankruptcy Rule 6003(b)"), the Debtors request authority from the Court to, among other things: (a) honor their prepetition obligations to employees for compensation, commissions, bonuses, expense reimbursements, and benefits that were accrued but unpaid as of the Petition Date and which arose in the ordinary course of the Debtors' business (collectively, the "Employee Claims") under all plans, programs and policies instituted by the Debtors; (b) confirm that the Debtors shall be permitted to pay any and all local, state and federal withholding and payroll taxes relating to prepetition periods; and (c) continue all employee compensation and benefit plans, programs and policies instituted by the Debtors (the "Employee Programs") in the ordinary course of business during the pendency of these Cases.

20. On February 6, 2014, this Court entered the *Order Authorizing Payment of Prepetition Wages, Salaries, Commissions, Reimbursable Employee Expenses and Benefits in the Ordinary Course of Business* [Dkt. No. 37] (the "Wage Order"). The Wage Order adopted the definition of "Employee Claims" under the Wage Motion and authorized the Debtors to pay such claims. Wage Order ¶2.

## RELIEF REQUESTED

21. By this Motion, the Debtors specifically seek authority to pay those employees of Dynamic Foods whose names are set forth in **Exhibit A** and in the amounts set forth therein (the "Dynamic Foods Bonuses"), because they have each satisfied the eligibility criteria under the Arrangements. None of the other stores owned by the Debtors was able to meet the minimum EBITDA required to trigger bonuses under the Arrangements. Although the Debtors have been authorized by this Court to make post-petition payments of bonuses accrued pre-petition as Employee Claims under the Wage Order, out of an abundance of caution, the Debtors seek specific authority to pay the Dynamic Foods Bonuses.

## BASIS FOR RELIEF

**The Dynamic Foods Bonuses are Permissible Payments in the Ordinary Course.**

22. As a consequence of the filing of these chapter 11 cases, the Debtors are prohibited from paying claims that arose prior to the Petition Date absent specific court authorization. This prohibition applies to, among other things, amounts owed to, or on behalf of, the Debtors' employees relating to salaries, wages, commissions, bonuses, benefits and reimbursable business expenses incurred immediately before the bankruptcy filings.

23. Bankruptcy Courts in the Fifth Circuit have granted authority for a debtor's payment of claims similar to the Dynamic Foods Bonuses and continuation of similar incentive

programs. *See, e.g.*, *In re Daisytek, Incorporated,* Case No. 03-34762, Docket No. 48 (Bankr. N.D. Tex. May 12, 2003); *In re Mosaic Group (US) Inc.*, Case No. 02-81440, Docket No. 24 (Bankr. N.D. Tex. Dec. 19, 2002); *In re Food Fast Holdings, Ltd.*, Case No. 02-10542, Docket No. 22 (Bankr. E.D. Tex. Jan. 24, 2002); *In re Gulf Air Inc.*, 112 B.R. 152, 153-54 (Bankr. W.D. La. 1989).

24. Pursuant to Bankruptcy Code §§ 105, 363, 507, 1107 and 1108, the Debtors request authority from the Court to pay the Dynamic Foods Bonuses, and further request confirmation by the Court that the Debtors shall be permitted to pay any and all local, state and federal withholding and payroll taxes related thereto.

25. Bankruptcy Code section 507(a)(4) provides priority status for prepetition claims for wages, salaries, commissions, severance pay, vacation pay, and sick leave pay in an amount not to exceed $12,475.00 per employee. For a plan of reorganization to be confirmed, Bankruptcy Code section 1129 requires payment of priority claims under section 507(a)(4). Because the Dynamic Foods Bonuses would be entitled to priority status under section 507(a)(4) and because such claims must be paid to confirm a plan of reorganization, the Debtors' payment of such claims as requested herein should neither prejudice general unsecured creditors nor materially affect the Debtors' estate. The Debtors do not seek to pay any employee more than $12,475.00, including any prior payments under the Wage Order, for the pre-petition period.[2]

26. The Debtors believe that the proposed Dynamic Foods Bonuses fall within the section 363(c)(1) "ordinary course of business" standard. The Arrangements represent the Debtors' preexisting, well-established business practice with respect to employee compensation, have been a common component of the company's compensation plans during at least the past

---

[2] The only employee who may have become eligible for a bonus above the statutory cap was Mike Blasdell. The Debtors intend to apply the $12,475.00 statutory cap to Mr. Blasdell's bonus.

three (3) years, and do not differ from the company's prepetition practices. The Debtors have also determined in their business judgment that payment of the Dynamic Foods Bonuses will meet the reasonable expectations of the Debtors' employees who had relied on the company's historical practice of providing performance bonuses. The Debtors further believe that paying the Dynamic Foods Bonuses will improve the morale of employees, and motivate them to continue to perform at the high levels the Debtors have come to expect.[3]

### The Dynamic Foods Bonuses are also Permissible as Payments Outside the Ordinary Course.

27. In the alternative, in the unlikely event the Court does not find the Dynamic Foods Bonuses to be payments made in the ordinary course of business, they are nonetheless permissible payments outside the ordinary course of business under Bankruptcy Code section 363(b). After notice and a hearing, debtors may use property of the estate other than in the ordinary course of business. 11 U.S.C. § 363(b). Where employee compensation is involved, however, Bankruptcy Code section 503(c) provides certain limitations to such payments. Specifically, sections 503(c)(1) and (c)(2) prohibit retention and severance payments, respectively, to "insiders" as administrative claims in chapter 11 cases absent specific findings. *See* 11 U.S.C. §§ 503(a)(1) and (c)(2). Section 503(c)(3) applies to both insider and non-insider employees and prohibits transfers "outside the ordinary course" that are not justified by the "facts and circumstance" of the case. 11 U.S.C. § 503(c)(3); *see also In re Dana Corp.*, 351 B.R. 96, 100 (Bankr. S.D.N.Y. 2006). However, section 503(c) was not intended to foreclose a chapter 11 debtor from reasonably compensating its employees, including insider employees, for

---

[3] For Mr. Blasdell, the Debtors believe payment of the Dynamic Foods Bonus subject to the statutory cap will help maintain their goodwill, not just with Mr. Blasdell but also with other members of the small community in which Dynamic Foods operates.

contributions made to the debtors' reorganization. *See Dana*, 358 B.R. at 575 (citing *In re Nobex Corp.*, No 05-20050(MFW), 26 WL 4063024, at *3-4 (Bankr. D. Del. Jan. 19, 2006)).

<u>*Sections 503(c)(1) and (c)(2) are Not Applicable to the Dynamic Foods Bonuses.*</u>

28. Pursuant to the statute's plain language, Bankruptcy Code section 503(c)(1) concerns retention plans, while section 503(c)(2) applies to severance plans. Because the primary purpose for paying the Dynamic Foods Bonuses is to implement the Debtors' historic compensation commitments for successful performance under the Arrangements and not to retain those employees or offer severance-type compensation to terminated employees, such payments cannot be considered part of a severance or retention plan. *See, e.g.*, *In re Global Home Products, LLC*, 369 B.R. 778, 783 (Bankr. D.Del. 2007) (holding that inasmuch as proposed compensation plans were "plans intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."). Moreover, even if payment of the Dynamic Foods Bonuses could have some retentive effect, they will still not be subject to the parameters of sections 503(c)(1) and (c)(2) because the primary purpose of the plan is what is determinative. *In re Nellson Nutraceutical*, 369 B.R. 787, 802 (Bankr. D.Del. 2007) ("although the bonus program has some retentive effect, it is for the primary purpose of motivating employees and, thus, the limitations of section 503(c)(1) are not applicable."). Here, the chief purposes of paying the Dynamic Foods Bonuses are to honor the Debtors' prepetition commitments and maintain employee morale. As a result, sections 503(c)(1) and (c)(2) are inapplicable. Notably, even if sections 503(c)(1) and (2) were to apply (which the Debtors refute), the 503(c)(1) and 503(c)(2) analyses apply only to insiders. None of the employees sought to be paid would be considered insiders under section 101(31) of the Bankruptcy Code.

<u>*The Dynamic Foods Bonuses Comply with Section 503(c)(3).*</u>

29. The Debtors have analyzed the proposed payments under the Arrangements and believe the Debtors' performance under the Arrangements is an exercise of the Debtors' sound business judgment. Section 503(c) applies to any transfer or obligation outside the ordinary course of business. 11 U.S.C. § 503(c)(3).

30. In the Fifth Circuit, a two-part inquiry is used to determine whether employee compensation plans outside the ordinary course of the debtor's business meet the "facts and circumstances" standard of section 503(c)(3). *See In re Pilgrim's Pride Corp.*, 401 B.R. 229, 235-36 (Bankr. N.D. Tex. 2009). First, the transaction must meet the "business judgment" standard articulated in section 363(b). Under section 363(b), for the debtor to satisfy "its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using . . . property outside the ordinary course of business." *In re Continental Airlines*, 780 F.2d 1223, 1226 (5th Cir. 1986) (citations omitted). Second, a court must determine that the proposed transfer or obligation is "justified in the case before it." *Pilgrim's Pride*, 401 B.R. at 236. This means that the court must make its own determination that the transaction will "serve the interests of creditors and the debtor's estate." *Id.*

31. Here, paying amounts owing under the Arrangements will help motivate employees to perform at the high level that the Debtors have come to expect and maintain the goodwill the Debtors have established in the past years.[4] Timely payment of the Dynamic Foods Bonuses will help ensure that the Debtors continue to have a pool of employees familiar with the Debtors' operations throughout these Cases. The Debtors submit that the $66,114.53 aggregate cost of the Dynamic Foods Bonuses is reasonable in light of the size of the Debtors' business and the potential harm to the estates if the Debtors were to be without its employees during this

---

[4] Mr. Blasdell recently retired. As noted earlier, however, the amount of his bonus payment will be reduced to satisfy the limitations under Section 507(a), and the Debtors believe such payment will help maintain their goodwill, not just with Mr. Blasdell but also with other members of the small community in which Dynamic Foods operates.

critical time in these cases when the Debtors are seeking to sell their business. Thus, payment of the Dynamic Foods Bonuses will be an exercise of the Debtors' business judgment and will also serve the interests of the creditors and the debtors' estate. The payments are therefore justified in these cases and comply with section 503(c)(3).

## CERTIFICATE OF CONFERENCE

32.     On April 4, 2014, counsel to the Debtors informed counsel to the UCC, counsel to Chatham Credit Management III, LLC ("Chatham"), and the Office of the United States Trustee for the Northern District of Texas (the "UST") that the Debtors intend to pay the Dynamic Foods Bonuses as authorized under the Wage Order. Neither Chatham nor the UCC objected to such payment. The UST, however, suggested on April 14, 2014 that prior to making the payments, the Debtors file a motion requesting authorization specifically with respect to the Dynamic Foods Bonuses, which may contain negative notice language and be set for expedited hearing. This Motion is therefore being filed at the suggestion of the UST.

## PRAYER

WHEREFORE, the Debtors respectfully request that this Court grant this Motion and enter an order (a) authorizing the Debtors to pay the Dynamic Foods Bonuses; (b) confirming that the Debtors may pay any and all local, state and federal withholding and payroll taxes related to the Dynamic Foods Bonuses; and (c) granting the Debtors such other and further relief as the Court deems proper.

Dated: April 23, 2014  　　　　　　　　Respectfully submitted,
　　　　 Dallas, Texas

**BAKER & McKENZIE LLP**

By: /s/ *John E. Mitchell*
　　　John Mitchell
　　　State Bar No. 24056313
　　　Rosa A. Shirley
　　　State Bar No. 24056313
　　　2300 Trammell Crow Center
　　　2001 Ross Avenue
　　　Dallas, Texas 75201
　　　Telephone: (214) 978-3000
　　　Facsimile: (214) 978-3099
　　　Email: john.mitchell@bakermckenzie.com
　　　Email: rosa.shirley@bakermckenzie.com

## CERTIFICATE OF SERVICE

　　　This is to certify that on April 23, 2014, a copy of the foregoing document was served on the parties registered to receive electronic notification via the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas, and on those parties listed via the methods indicated on the Debtors' Master Service List.

　　　　　　　　　　　　　　　　　　　　*/s/ John E. Mitchell*
　　　　　　　　　　　　　　　　　　　　John E. Mitchell

## **EXHIBIT A**

| Name | Position | 2013 |
|---|---|---|
| Mike Blasdell | President / General Manager | [REDACTED] |
| Todd Hill | Controller | [REDACTED] |
| Beth Tay | Menu Prod Dev Manager | [REDACTED] |
| Connie Luck | Director of Purchasing | [REDACTED] |
| Richard Hill | Director of Processing | [REDACTED] |
| John Bottoni | Cooked Foods Manager | [REDACTED] |
| Julian Guadalcazar | Bakery Manager | [REDACTED] |
| Thomas Trujillo | Transportation Manager | [REDACTED] |
| Rosa Baeza | HR/Safety Manager | [REDACTED] |
| Terri Emerson | Assistant Controller | [REDACTED] |
| Larry Keneda | Sr. Buyer | [REDACTED] |
| Craig Limmer | Assistant Manager - Cooked Foods | [REDACTED] |
| Matthew Bruno | Assistant Cook Foods Manager - Dyn | [REDACTED] |
| Brandon Hale | Meats Assistant Manager | [REDACTED] |
| Jana Odell | Dir - Technical Services | [REDACTED] |
| Gabriel Olivarez | Assistant Maintenance Manager | [REDACTED] |
| Gina Sanchez | Assistant Manager - Cooked Foods | [REDACTED] |
| Fred Elias | Assistant Freezer Manager | [REDACTED] |
| David J. Barrett | Assistant Transportation Manager | [REDACTED] |
| **TOTAL** | | **$66,114.53** |